# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

WILLIE B. SMITH III,       )
                            )
      Plaintiff,         )
                            )
v.                         )     No. 2:19-cv-00927-ECM-SMD
                            )
JEFFERSON DUNN,       )
Commissioner, Alabama    )
Department of Corrections,  )
                            )
and                       )
                            )
CYNTHIA STEWART, Warden,  )
Holman Correctional Facility,  )
                            )
      Defendants.       )

---

## DEFENDANTS' MOTION TO DISMISS

---

Steve Marshall
*Alabama Attorney General*

Lauren A. Simpson*
*Alabama Assistant Attorney General*
 *Counsel of Record

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
Tel: (334) 353-1209
Fax: (334) 353-8400
January 31, 2020        lsimpson@alabamaag.gov

## TABLE OF CONTENTS

FACTUAL AND LEGAL BACKGROUND ..........................................................1

    I.      Smith's crime, conviction, and subsequent litigation ........................3

          A.    Trial and direct appeal.................................................................3

          B.    State postconviction proceedings and *Atkins* claim.................6

          C.    Federal habeas proceedings ....................................................10

    II.    The introduction of nitrogen hypoxia as a method of execution ......15

          A.    The act and the election period ...............................................15

          B.    The *Price* litigation and nitrogen hypoxia's "availability" ....16

STANDARD OF REVIEW ...................................................................................27

ARGUMENT .......................................................................................................28

    I.      The Court should dismiss Smith's Eighth Amendment claim because Smith has not met his pleading burden under *Baze*, *Glossip*, and *Bucklew* .......................................................................28

    II.    The Court should dismiss Smith's ADA claim because Smith is not intellectually disabled, and even if he were, the ADA would offer no ground for relief..................................................................31

CONCLUSION ....................................................................................................35

## FACTUAL AND LEGAL BACKGROUND

On March 22, 2018, Alabama Laws Act 2018-353 amended the Code of Alabama[1] to introduce nitrogen hypoxia as a method of execution. While the primary method of execution in Alabama remains lethal injection, inmates sentenced to death prior to the effective date of the act were given a thirty-day period in which to make an election of hypoxia in writing to the warden of their correctional facility; otherwise, election would be deemed waived.[2] This thirty-day period extended from June 1–30, 2018.[3]

Willie B. Smith III, a death-row inmate at Holman Correctional Facility, did not make a timely election. Indeed, when Smith initiated the present action on November 25, 2019, almost seventeen months had elapsed since the election period ended. Smith was represented by at least four attorneys during the election period: Dylan C. Black and Stanley Blackmon of Bradley Arant Boult Cummings LLP (Birmingham), Hugh A. Abrams of Shook, Hardy & Bacon, LLP (Chicago), and Tung T. Nguyen of Sidley Austin LLP (Dallas).[4] Those attorneys—plus four more from Sidley Austin's Chicago office—are currently acting as Smith's counsel in the

---

1. Specifically, sections 15-82-82(a)–(b) and 15-18-82.1(a)–(c), (f), (i)–(j) of the Code of Alabama.
2. ALA. CODE § 15-18-82.1(b)(2) (2018).
3. *Id.*
4. *E.g.*, *Smith v. Comm'r, Ala. Dep't of Corrs.*, 924 F.3d 1330, 1334 (11th Cir. 2019) (listing counsel).

1

Supreme Court.[5] In the present matter, Smith is instead represented by the Federal Defenders for the Middle District of Alabama, many of whose clients made timely elections of nitrogen hypoxia.[6]

Smith raises two claims in his complaint: first, that the Alabama Department of Corrections' ("ADOC") lethal injection protocol violates the Eighth Amendment's prohibition against cruel and unusual punishment, and second, that the ADOC has violated the Americans with Disabilities Act of 1990[7] ("ADA") because there was no election-period accommodation made for Smith, who allegedly is intellectually disabled. As discussed below, this Court should dismiss both claims. Concerning the first, Smith cannot satisfy his burden under *Baze v. Rees*[8] and *Glossip v. Gross*[9] of (1) establishing that lethal injection "'presents a risk that is *sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers,'"[10] and (2) identifying an alternative method of execution that is "'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain'"[11] because, due to his lack of diligence, nitrogen hypoxia is not

---

5. *E.g.*, Application for an Extension of Time Within Which to File a Petition for a Writ of Certiorari to the United States Court of Appeals for the Eleventh Circuit, *Smith v. Dunn*, No. 19A513 (Nov. 7, 2019) (listing counsel).
6. Doc. 1 ¶ 32.
7. 42 U.S.C. § 12101 *et seq.*
8. 553 U.S. 24 (2008).
9. 135 S. Ct. 2726 (2015).
10. *Id.* at 2737 (quoting *Baze*, 553 U.S. at 50; further internal quotation omitted).
11. *Id.* (quoting *Baze*, 553 U.S. at 52).

available to him. As to the second, Smith is not intellectually disabled,[12] and therefore, his ADA claim is meritless. Indeed, the notion that the ADOC must make accommodations under the ADA for intellectually disabled inmates to elect a method of execution makes no sense, as *Atkins v. Virginia*[13] categorically prohibits the execution of intellectually disabled persons. If Smith is intellectually disabled, then he cannot be executed, and he certainly need not elect a method. If he is not intellectually disabled, then he is not entitled to special treatment just because he declined to elect hypoxia for nearly a year and a half. In neither case does the ADA give rise to a claim for relief.

## I.     Smith's crime, conviction, and subsequent litigation

### A.     Trial and direct appeal

Smith was convicted of two counts of capital murder—murder during the course of a robbery[14] and murder during the course of a kidnapping[15]—for the execution-style slaying of Sharma Ruth Johnson.[16]

In brief, Smith and seventeen-year-old Angelica Willis left their apartment on foot, looking for Smith's brother, Lorenzo, around midnight on October 26, 1991.

---

12. *E.g.*, *Smith v. Comm'r, Ala. Dep't of Corrs.*, 17-15043, slip op. at 8–21 (11th Cir. May 22, 2019).
13. 536 U.S. 304 (2002).
14. ALA. CODE § 13A-5-40(a)(2).
15. *Id.* § 13A-5-40(a)(1).
16. *Smith v. State*, 838 So. 2d 413 (Ala. Crim. App. 2002).

As they headed for a Pizza Hut, they saw Johnson sitting in her car by an ATM. At Smith's prodding, Willis approached the passenger side of Johnson's car and asked for directions to Krystal. While Johnson was distracted, Smith pointed a sawed-off shotgun through the driver's-side window and ordered Johnson into her trunk. The two drove her around Huffman for a time, then returned to the ATM, where they found Johnson's debit card, forced her to call out the PIN from the trunk, and withdrew $80. The ATM's security camera caught Smith sitting in Johnson's car, directing Willis as she withdrew the money at 1:25 AM on October 27.[17]

Smith and Willis then purchased gasoline and found Lorenzo at a shopping center in Huffman. Lorenzo climbed into the car, and on learning that Johnson was in the trunk, made sexual taunts. They drove to Zion Memorial Cemetery, and Smith explained that he would have to kill Johnson. He opened the trunk, and as Johnson promised she would say nothing, he shot her in the head. The three abandoned Johnson's vehicle and body in Roebuck, and the next day, Smith told Willis that he had returned to the car and burned it to remove his fingerprints. Willis testified to Smith's actions at his trial.[18]

Another witness, Germane Norman, testified that she heard Smith describing how he had "killed a white woman at the cemetery, had ridden around in her car and

---

17. *Id.* at 421–22.
18. *Id.* at 422.

later burned the car," and how he was going to leave town.[19]

A third key witness was Latonya Roshell, an informant for the Hoover Police Department. She met Smith when he and another man moved into her home, and Smith told her that he had "got a white woman and shot her——blowed her brains out——and got some money from her." After comparing Smith's statement to news reports, Roshell informed her contact and agreed to be wired. In a recorded conversation between her and Smith, he made several inculpatory statements; a redacted version of the recording and a transcript were given to the jury.[20]

After refusing a plea bargain for life without parole, Smith was tried for capital murder in Jefferson County. A jury found him guilty on both counts on May 7, 1992. Following the penalty-phase presentation of mitigation evidence, the jury recommended death by a 10–2 vote on May 8, and the trial court imposed that sentence after a sentencing hearing on July 17, 1992.[21]

On direct appeal, the Court of Criminal Appeals initially ordered a remand regarding a potential *J.E.B. v. Alabama*[22] violation.[23] The trial court found no

---

19. *Id.*
20. *Id.* at 422–23 (internal quotation marks omitted).
21. The sentencing order can be found at C. 148–67 in the trial transcript, available in Volume 1 of the habeas record filed in *Smith v. Thomas*, 2:13-cv-00557-RDP (N.D. Ala.).
22. 511 U.S. 127 (1994).
23. *Smith v. State*, 698 So. 2d 1166 (Ala. Crim. App. 1997).

problem with the jury striking,[24] and on return to remand in 2002, the Court of Criminal Appeals affirmed Smith's conviction and death sentence.[25] The Alabama Supreme Court denied certiorari,[26] as did the United States Supreme Court later that year.[27]

### B.    State postconviction proceedings and *Atkins* claim

Smith filed a Rule 32 petition for postconviction relief in 2003, an amended petition in 2005, and a second amended petition in 2007.[28] Therein, among other claims, he contended that he was ineligible to be executed because he is intellectually disabled, citing *Atkins v. Virginia*.[29]

The circuit court held a hearing on Smith's claims on November 12, 2008.[30] Smith retained Dr. Karen Salekin, who administered several tests:

- **Stanford-Binet Intelligence Scales, 5th Edition (SB-5):** Dr. Salekin found that Smith had a full-scale IQ of 64, with a 95% confidence interval of 61–69. She explained that if the Flynn Effect were applied, Smith's score could be lowered by more than two points. However, she admitted that there is no national consensus as to whether the Flynn Effect should be applied to IQ tests.[31] In fact, the test manual does not refer to the Flynn

---

24. *Smith*, 838 So. 2d at 425–26.
25. *Id.* at 477.
26. *Ex parte Smith*, No. 1011228 (Ala. June 28, 2002).
27. *Smith v. Alabama*, 537 U.S. 1090 (2002) (mem.).
28. *Smith v. State*, 112 So. 3d 1108, 1113–14 (Ala. Crim. App. 2012).
29. 536 U.S. 304 (2002).
30. *Smith*, 112 So. 3d at 1114.
31. *Id.* at 1115, 1127–28.

Effect or any need to adjust scores.[32]

- **Woodcock-Johnson III:** This is a test of school functioning, used to assess intellectual disability. Smith's scores were no more than one standard deviation below the mean in each category, and some scores were average or slightly above average. In fact, Smith's math and spelling skills were at a twelfth grade or college level.[33] Dr. Salekin testified over Smith's counsel's objection that in her opinion, Smith is not intellectually disabled.[34]

- **Scales of Independent Behavior–Revised (SIB-R):** This is a test used to assess adaptive and maladaptive behavior. Dr. Salekin administered it to Smith's family members concerning the skills he reflected at age 17. His overall score was 67, "indicating that it would be very difficult for him to participate in age-appropriate activities."[35] He showed limitations in motor skills, social interaction, and communication skills.[36] However, Dr. Salekin admitted that the test is reliant upon the test-taker's memory. Here, she administered the test to Smith's brother, who had been in prison since 1993 or 1994 and had no contact with him (and so was relying on thirty-year-old memories of him), and to Smith's mother.[37] Dr. Salekin acknowledged that the test "was not normed for individuals to take . . . thirty years later to reach into their memories and try to remember these things from so long ago."[38]

  Moreover, Dr. Salekin testified that drug and alcohol abuse, instead of intellectual disability, could affect one's adaptive functioning.[39] The record indicated that Smith used drugs and alcohol on a regular basis prior to his trial, so some of his deficits in adaptive functioning, even at age seventeen, could be attributable to that.[40]

---

32. *Id.* at 1131.
33. *Id.* at 1116, 1119–20.
34. *Id.* at 1116, 1120, 1128.
35. *Id.* at 1115.
36. *Id.*
37. *Id.* at 1115–16.
38. *Id.* at 1116.
39. *Id.*
40. *Id.* at 1120.

7

Smith also presented Dr. Daniel Marson, a clinical neuropsychologist, who examined him for cognitive deficits related to possible neurological injuries. Dr. Marson testified that Smith scored in the low average to mildly deficient range in certain tested categories and found that "'there's an indication that he has trouble learning new material.'"[41] On tests concerning his personality and emotions, Smith showed severe impairment. However, Smith performed in the average to above-average range on some of the tests Dr. Marson administered.[42] Dr. Marson did not offer an opinion as to whether Smith was intellectually disabled.[43]

The State then presented Dr. Glen King, a clinical and forensic psychologist, who also administered several tests to Smith:

- **Wechsler Adult Intelligence Scale–Third Edition (WAIS-III):** Like the SB-5, the WAIS-III is an intelligence test. Smith had a full-scale IQ of 72, a verbal score of 75, and a performance score of 74.[44] Concerning the Flynn Effect, Dr. King stated that it was merely a theory, not a fact, and that there were problems with Flynn's methodology.[45]

- **Wide Range Achievement Test, 4th Edition (WRAT-4):** This test examines a subject's ability in reading, writing, and arithmetic. Smith read at an 8.6 grade level, spelled at an 11.5 grade level, and did math at a 6.3 grade level.[46]

- **Adaptive Behavior Assessment System, 2nd Edition (ABAS-2):** This test examines adaptive skills in various domains. Dr. King found that

---

41. *Id.* at 1116.
42. *Id.*
43. *Id.* at 1128.
44. *Id.* at 1118.
45. *Id.*
46. *Id.*

Smith had difficulties in the community use, health and safety, self-direction, social skills, and leisure skills categories, but that Smith had no difficulty in communicating with Dr. King or understanding questions.[47]

- **Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-2):** This test is an instrument used to diagnose mental health disorders, including psychosis, anxiety, and depression. Dr. King testified that Smith's scores were invalid, indicating "that he either attempted to feign a mental illness or that he randomly 'sorted items.'"[48]

In sum, Dr. King testified that Smith is not intellectually disabled—rather, he "functioned in the high borderline to low average range of intellectual ability."[49]

While the circuit court gave credence to both Dr. Salekin's and Dr. King's testimony, the court found that Dr. King's IQ calculation was "probably more accurate" than Dr. Salekin's because the verbal score of 75 correlated exactly with Dr. Alan Blotcky's pretrial administration of the Wechsler Adult Intelligence Scale Revised (WAIS-R).[50] The court also noted that Smith dropped out of school in the tenth grade to provide for his family and that he and his siblings "practically raised themselves" from a young age because their father was not present and their mother worked long hours.[51] Indeed, Smith kept one job for two years, then transferred to the Coca-Cola Company, but was fired when he missed work due to drug use.[52] The

---

47. *Id.*
48. *Id.*
49. *Id.*
50. *Id.* at 1115, 1128.
51. *Id.* at 1129.
52. *Id.*

9

court considered Smith's pretrial conversations with Roshell, the informant, that showed his planning and his understanding that he might be caught if he failed to kill his victim because her brother was a police officer.[53] Thus, the court determined that Smith failed to establish intellectual disability so as to preclude execution pursuant to *Atkins*.[54]

The Court of Criminal Appeals affirmed, holding that the circuit court's finding concerning intellectual disability was not an abuse of discretion.[55] The Alabama Supreme Court denied certiorari.[56]

### C.   Federal habeas proceedings

Smith filed a § 2254 petition in the Northern District of Alabama in 2013.[57] As in his Rule 32 proceedings, Smith raised an *Atkins* claim. Four years later, the district court entered a memorandum opinion denying the petition and dismissing it with prejudice.[58] As to the *Atkins* claim,[59] the court held that the state courts' determination that Smith failed to prove intellectual disability was not

---

53. *Id.* at 1129–30.
54. *Id.* at 1130.
55. *Id.* at 1130–36.
56. *Ex parte Smith*, 112 So. 3d 1152 (Ala. 2012).
57. Petition for Writ of Habeas Corpus, *Smith v. Dunn*, 2:13-cv-00557-RDP, 2017 WL 3116937 (N.D. Ala. July 21, 2017), Doc. 1.
58. *Smith v. Dunn*, 2:13-cv-00557-RDP, 2017 WL 1150618 (N.D. Ala. Mar. 28, 2017).
59. *Id.* at *18–30.

unreasonable.[60]

That same day, the United States Supreme Court issued its decision in *Moore v. Texas*[61] concerning Texas's method of determining intellectual disability, which the Court found to be incompatible with *Hall v. Florida*.[62] Specifically, *Hall* mandates that courts must account for an IQ test's standard error of measurement.[63] Moreover, Texas's consideration of adaptive functioning deviated from clinical standards, including consideration of the "*Briseno* factors," which are used in no other state.[64]

Following this decision, the district court vacated its order and reopened Smith's case for the purpose of considering *Moore*'s effect on his *Atkins* claim. Four months later, the court concluded that Smith was still not entitled to relief.[65] The court held that the *Moore* rule was not clearly established federal law at the time that the Alabama courts considered Smith's case. At most, *Moore* was an application of *Hall*, which itself was not decided until after the Alabama courts entered their decisions concerning Smith.[66] Analyzing *Moore* under *Teague v. Lane*,[67] the district

---

60. *Id.* at *26.
61. 137 S. Ct. 1039 (2017).
62. 572 U.S. 701 (2014).
63. *Id.* at 724.
64. *Moore*, 137 S. Ct. at 1051–53.
65. *Smith v. Dunn*, 2:13-cv-00557-RDP, 2017 WL 3116937, at *3 (N.D. Ala. July 21, 2017).
66. *Id.* at *3–4.
67. 489 U.S. 288 (1989).

court held that *Moore*, like *Hall*, announced only a procedural rule, that this procedural rule was not a "watershed" rule, and thus, that *Moore* was not retroactively applicable to Smith.[68] Therefore, the Alabama courts did not unreasonably apply clearly established federal law by failing to consider the standard error of measurement in Smith's IQ tests or by considering Smith's adaptive strengths as well as his deficits.[69]

On May 22, 2019, after oral argument, the Eleventh Circuit Court of Appeals affirmed.[70] First, the court agreed with the district court as to the non-retroactivity of the *Moore* rule under *Teague*,[71] explaining:

> *Moore* established that states cannot disregard current clinical and medical standards in assessing whether a capital defendant is intellectually disabled. *Moore* effectively narrowed the range of permissible methods—the procedure—that states may use to determine intellectual disability. While *Moore* may have the effect of expanding the class of people ineligible for the death penalty, it merely defined the appropriate manner for determining who belongs to that class of defendants ineligible for the death penalty. *Moore* thus announced a new rule, but it is procedural, not substantive.
>
> Because *Moore* announced a procedural rule, it can only be retroactive if it meets *Teague*'s second exception. Doing so is extraordinarily rare. . . . *Moore* is an important development. It provides guidance to states attempting to comply with *Atkins*. But we cannot say that *Moore* altered the bedrock procedural elements essential to the fairness of a criminal proceeding in the way that the *Gideon* rule did. Because Moore cannot meet the requirements of

---

68. *Smith*, 2017 WL 3116937, at *4–6.

69. *Id.* at *6–7.

70. *Smith*, 924 F.3d at 1334.

71. *Id.* at 1337–40.

*Teague*'s second exception, it cannot be applied retroactively.[72]

Second, the Eleventh Circuit considered the Alabama courts' application of *Atkins* to the facts of Smith's case[73] and rejected Smith's contention that the state courts were unreasonable for failing to credit his IQ score of 64:

> *Atkins* did not set forth clearly established federal law on how states must evaluate IQ scores in determining intellectual disability. "*Atkins* did not define intellectual disability, nor did it direct the states on how to define intellectual disability, nor, finally, did it provide the range of IQ scores that could be indicative of intellectual disability." *Kilgore v. Sec'y, Fla. Dep't of Corr.*, 805 F.3d 1301, 1311 (11th Cir. 2015); *see also Bobby v. Bies*, 556 U.S. 825, 83 (2009) ("[*Atkins*] did not provide definitive procedural or substantive guides for determining when a person who claims [intellectual disability] will be so impaired as to fall within [*Atkins*' compass]" (internal citation and quotation marks omitted)). Without clear guidance from *Atkins*, the state court's refusal to average IQ scores or to account for certain statistical adjustments was not an unreasonable application of clearly established federal law.
>
> Smith's specific argument about the state court's failure to consider the standard error is foreclosed by our precedent. As we explained in *Kilgore*, "[n]othing in Atkins suggested that a bright-line IQ cutoff of 70 ran afoul of the prohibition on executing the intellectually disabled." 805 F.3d at 1312. In other words, *Atkins* did not require states to consider the standard error in assessing IQ scores. That requirement did not emerge until *Hall v. Florida*, 572 U.S. 701, (2014), well after the Alabama courts considered Smith's case.
>
> Altogether, Smith's arguments generally conflate what we have previously permitted in evaluating intellectual disability with what is required. While we have previously said that the Flynn Effect may be considered in determining a defendant's IQ, *see Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010), neither this Court nor the Supreme Court has required courts to do so. Similarly, while we have previously permitted district courts to average multiple IQ scores, *see Holladay v. Allen*, 555 F.3d 1346, 1357–58 (11th Cir. 2009), courts are not

---

72. *Id.* at 1339–40 (footnote omitted).
73. *Id.* at 1340–43.

necessarily required to do so.[74]

The Eleventh Circuit then considered the state courts' determinations regarding adaptive functioning:

> Smith argues that the Alabama courts unreasonably applied *Atkins* by favoring Smith's adaptive strengths over his adaptive deficits. The Supreme Court recently rejected this argument in *Shoop v. Hill*, 139 S. Ct. 504 (2019).
>
> In *Hill v. Anderson*, the Sixth Circuit held that *Moore*'s holding about adaptive strengths was clearly established law because *Moore* was "merely an application of what was clearly established by *Atkins*." 881 F.3d 483, 487 (6th Cir. 2018). But the Supreme Court reversed the Sixth Circuit and soundly rejected this argument in *Shoop*, explaining that "*Atkins* did not definitively resolve how [the adaptive functioning prong] was to be evaluated but instead left its application in the first instance to the State." 139 S. Ct. at 508. Because *Atkins* did not provide definitive guidance to states on how to evaluate a petitioner's adaptive functioning, the Alabama courts here could not have unreasonably applied *Atkins* in choosing to weigh Smith's adaptive strengths against his adaptive weaknesses.[75]

While the court was ultimately unimpressed with the state courts' consideration of adaptive strengths and deficits, it acknowledged that "[t]his approach was acceptable at the time."[76]

The Eleventh Circuit denied rehearing en banc in September 2019, and the mandate issued on October 1. Smith's petition for writ of certiorari is due after extension on February 20, 2020.[77]

---

74. *Id.* at 1342 (internal citations edited).
75. *Id.* at 1342–43 (internal citation edited).
76. *Id.* at 1343.
77. Order, *Smith v. Dunn*, No. 19A513 (Nov. 12, 2019).

14

## II.     The introduction of nitrogen hypoxia as a method of execution

### A.      The act and the election period

On March 22, 2018, Governor Kay Ivey signed Alabama Laws Act 2018-353, which made nitrogen hypoxia a statutorily approved method of execution in Alabama. Pursuant to section 15-18-82.1(b)(2) of the Code of Alabama, as modified by the act, an inmate whose conviction was final prior to June 1, 2018, had thirty days from that date to inform the warden of the correctional facility in which he was housed that he was electing to be executed by nitrogen hypoxia. Inmates sentenced after the enactment of the law would have a thirty-day election period from the date that their death sentence became final.

The law—like most state and federal laws—did not include any provision requiring that any particular individual be given special notice of its enactment, nor did it specify how an inmate should make an election beyond "in writing." The ADOC thus did not create a standardized election form for this purpose.

On June 22, 2018, an attorney for the Federal Defenders for the Middle District of Alabama drafted an election form, which was given to death-row inmates represented by that organization, allegedly on June 26.[78] Defendant Cynthia Stewart, Warden of Holman Correctional Facility, obtained a copy of the form, then directed

---

78. Affidavit of John A. Palombi at 2, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Mar. 29, 2019), Doc. 29-3.

15

Captain Jeff Emberton to give every death-row inmate at Holman a copy of the form and an envelope in which he could return it to the warden, should he decide to make the election.[79] Captain Emberton did as instructed before the end of June. The form stated that the inmate's election was made pursuant to Act 2018-353, and its date blank read, "Done this ___ day of June, 2018."[80] Forty-eight Alabama inmates ultimately elected nitrogen hypoxia, including inmates not represented by the Federal Defenders. While Smith, along with every other death-row inmate, was given an election form, he was not among the inmates who made the election. Again, as noted above, Smith was represented at that time by attorneys from three law firms, including Bradley Arant in Birmingham, who continue to represent him in his habeas litigation.[81]

**B.    The *Price* litigation and nitrogen hypoxia's "availability"**

Holman inmate Christopher Price was among those who, like Smith, neglected to make a timely election.[82] The State moved the Alabama Supreme Court to set Price's execution date on January 11, 2019, and Price alleged that his counsel

---

79. Affidavit of Captain Jeff Emberton at 1, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Mar. 29, 2019), Doc. 19-1.

80. Exhibit A, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Mar. 29, 2019), Doc. 29-3.

81. *E.g.*, *Smith v. Comm'r, Ala. Dep't of Corrs.*, 924 F.3d 1330, 1334 (11th Cir. 2019) (listing counsel).

82. *Price v. Comm'r, Ala. Dep't of Corrs.*, 752 F. App'x 701, 703 n.3 (11th Cir. 2018).

only learned of the election opportunity on January 12.[83] On January 27, Price sent a letter to Warden Stewart attempting to elect hypoxia, but the belated request was denied.[84] Price's counsel contacted counsel for the State on February 4 and was likewise informed that the election period had ended.[85] Thus stymied, Price filed a § 1983 complaint in the Southern District of Alabama on February 8, nearly one month after the State moved for an execution date, alleging an equal protection violation because he was not allowed to elect hypoxia.[86] On March 1, the Alabama Supreme Court set Price's execution for April 11.[87]

As Price's litigation was ongoing in the district court, the United States Supreme Court announced its decision in *Bucklew v. Precythe*,[88] a method-of-execution challenge in which a Missouri inmate named nitrogen hypoxia as his alternative without proving its ready availability. In that case, the Court made clear that under *Baze* and *Glossip*, simply naming an alternative method of execution, without more, is insufficient to satisfy an inmate's burden. The Court explained:

---

83. Complaint ¶ 32, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Feb. 8, 2019), Doc. 1.
84. Exhibit C, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Mar. 4, 2019), Doc. 19-3.
85. Exhibit D, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Mar. 4, 2019), Doc. 19-4.
86. Complaint ¶¶ 87–93, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Feb. 8, 2019), Doc. 1.
87. Exhibit E, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Mar. 4, 2019), Doc. 19-5.
88. 132 S. Ct. 1112 (2019).

*First*, an inmate must show that his proposed alternative method is not just theoretically "'feasible'" but also "'readily implemented.'" *Glossip*, 135 S. Ct., at 2737–38. This means the inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out "relatively easily and reasonably quickly." *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017); *Arthur v. Comm'r, Ala. Dep't of Corrs.*, 840 F.3d 1268, 1300 (11th Cir. 2016). Mr. Bucklew's bare-bones proposal falls well short of that standard. He has presented no evidence on essential questions like how nitrogen gas should be administered (using a gas chamber, a tent, a hood, a mask, or some other delivery device); in what concentration (pure nitrogen or some mixture of gases); how quickly and for how long it should be introduced; or how the State might ensure the safety of the execution team, including protecting them against the risk of gas leaks. Instead of presenting the State with a readily implemented alternative method, Mr. Bucklew (and the principal dissent) point to reports from correctional authorities in other States indicating that additional study is needed to develop a protocol for execution by nitrogen hypoxia. . . . That is a proposal for more research, not the readily implemented alternative that *Baze* and *Glossip* require.[89]

Price, like Bucklew, failed to make this critical showing. He pointed to nitrogen hypoxia as a statutory method of execution, but the ADOC did not have a hypoxia protocol at that time—indeed, as of this filing, the ADOC is still in the process of developing a safe protocol—and he failed to offer the ADOC a protocol that could be readily used. Instead, Price pointed out that Oklahoma had conducted preliminary research on the issue[90] and showed that his counsel's associate was able

---

89. *Id.* at 1129 (citations edited).
90. Affidavit of Aaron M. Katz, Ex. A, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Mar. 29, 2019), Doc. 29-2.

to purchase a tank of nitrogen in Massachusetts.[91] Not until he was denied relief and filed a motion for reconsideration did Price even offer a protocol of sorts, one purportedly based on two books published by right-to-die organizations.[92] Aside from the fact that this proposed protocol was offered only six days before Price's scheduled execution, Price still failed to show that it was an available method for the ADOC to employ. His claim that the necessary components "can be purchased from commercial sources, no questions asked (including from sources such as Amazon.com)"[93] was belied by the fact that he failed to identify a commercial source willing to sell the ADOC a so-called "exit bag,"[94] a key component of his protocol.

On April 5, the district court, citing *Bucklew*, found that Price had failed to carry his burden of proving that nitrogen hypoxia was readily available to the ADOC.[95] The court remained unpersuaded in its order of April 6 after Price moved for reconsideration:

> First, relative to his Eighth Amendment claim, Price argues that in the event *Bucklew v. Precythe*, 139 S. Ct. at 1129–31, now requires a death

---

91. Affidavit of Sean B. Kennedy, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Mar. 29, 2019), Doc. 29-4.
92. Motion for Relief from Judgment and for Reconsideration at 4 & n.2, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Apr. 5, 2019), Doc. 33.
93. *Id.* at 5.
94. For example, Sharlotte Hydorn, who sold "GLADD" exit bags by mail, was raided by the FBI in 2011 and died in 2013. Faye Girsh, *Charlotte Hydorn of GLADD Exit Bags Dies at 94*, ASSISTED-DYING BLOG (Dec. 13, 2013), https://bit.ly/2IhYeYK.
95. Order at 20, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Apr. 5, 2019), Doc. 32.

row inmate to submit a "sufficiently detailed" execution protocol proposal in a method of execution challenge case (which he disputes, arguing *Bucklew* is distinguishable), he has now submitted such proposal (submitting same with his motion) at least to the level of satisfaction for a stay/preliminary injunction (substantial likelihood of success on the merits). Additionally, Price contends that *Bucklew* held that a state's own statutory scheme cannot control the outcome of an Eighth Amendment challenge, such that the Court's ruling—that his failure to timely elect nitrogen hypoxia by June 30, 2018 constitutes a legitimate penological justification—lacks merit. Although Price presents a protocol/proposal with his motion, he still fails to show that it may be readily implemented by the State and that the State does not have legitimate reason for refusing his untimely request to be executed by nitrogen hypoxia.[96]

But the Eleventh Circuit's decision just four days later muddied the waters.

The court held that hypoxia **was** available—an inquiry the Supreme Court has always treated as a factual matter—solely because the method of execution was authorized by statute. The court's full reasoning is of relevance to the present matter:

Price claims that nitrogen hypoxia is an available method of execution for him because the Alabama legislature has authorized it. In proposing nitrogen hypoxia as an alternative to the State's midazolam lethal-injection protocol, Price emphasizes that he is merely seeking to be executed by a method of execution that the Alabama legislature, "after considerable thought, has expressly authorized." He also argues that nitrogen hypoxia is feasible and readily implemented because pure nitrogen gas is easily purchased. No supply concerns exist for nitrogen, and counsel for Price notes that he was recently able to easily purchase a tank of 99.9% pure compressed nitrogen gas.

The State retorts that nitrogen hypoxia is not an available method of execution to Price as a matter of state law because he failed to make a timely election under the applicable statute. It also claims nitrogen hypoxia is neither feasible nor readily implemented at this date, since

---

96. Order at 2, *Price v. Dunn*, 1:19-cv-00057-KD-MU (S.D. Ala. Apr. 6, 2019), Doc. 35 (internal citation edited).

the ADOC has not yet finalized a nitrogen hypoxia protocol, and it is not likely that one will be in place by April 11, 2019. Finally, the State asserts Price did not meet his burden to prove a known and available alternative method of execution because he did not provide sufficient details of how the State could induce nitrogen hypoxia.

To resolve this issue, we turn to *Bucklew* for guidance. *Bucklew* sheds some light on the "availability" prong of the *Baze-Glossip* test, and it specifically addresses an inmate's proposal of nitrogen hypoxia as an alternative method of execution.

In *Bucklew*, the Supreme Court determined that the inmate had not presented a triable question on the viability of nitrogen hypoxia as an alternative to lethal injection for two reasons. First, the Court noted, to establish that a proposed alternative method is available, an inmate must do more than show that it is theoretically "feasible"; he must also show that it is "readily implemented." *Bucklew*, 139 S. Ct. at 1129 (citing *Glossip*, 135 S. Ct. at 2737–38). To meet this burden, the inmate's proposed alternative must be "sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly.'" *Id.* (quoting *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017); *Arthur*, 840 F.3d at 1300).

The Court in *Bucklew* found that the inmate had failed to meet this burden because he presented no evidence on details such as how nitrogen gas would be administered, in what concentration, and for how long the gas would be administered. *Id.* The inmate also did not suggest how the State could ensure the safety of the execution team. *Id.* Instead, the inmate pointed only to reports from correctional institutions in other states revealing that additional study was needed to put in place a protocol for execution by nitrogen hypoxia. *Id.*

Second, the Court in *Bucklew* determined that the State had a legitimate reason for not switching its current lethal-injection protocol: nitrogen hypoxia was an "entirely new method—one that had 'never been used to carry out an execution' and had 'no track record of successful use.'" *Id.* (quoting *McGehee*, 854 F.3d at 493). The Court concluded by stating that the Eighth Amendment "does not compel a State to adopt 'untried and untested' (and thus unusual in the constitutional sense) methods of execution." *Id.* (quoting *Baze*, 553 U.S. at 41).

Here, the State argues that although the Code of Alabama now contemplates nitrogen hypoxia as a means of execution, it is not "available" because the ADOC is still developing a protocol, and the

21

process will not be complete in time for Price's April 11, 2019, execution. We are not persuaded. If a State adopts a particular method of execution—as the State of Alabama did in March 2018—it thereby concedes that the method of execution is available to its inmates. Unlike in *Bucklew*, where the inmate proposed the adoption of a new method, here, the State of Alabama chose, on its own, and after careful consideration, to offer nitrogen hypoxia as a method of execution for its death-row inmates. So unlike the inmate in *Bucklew*, Price is not attempting to "compel" the State to adopt a different and new method of execution at all. The method was already adopted well before Price's Eighth Amendment challenge—and more than a year before Price's scheduled execution date.

A State may not simultaneously offer a particular method of execution and deny it as "unavailable." Rather, because the State voluntarily included nitrogen hypoxia in its statute, we reject the State's argument that nitrogen hypoxia is not "available" to Price simply because the State has not yet developed a protocol to administer this method of execution. If we were to find otherwise, it would lead to an absurd result. States could adopt a method of execution, take no action at all to implement a protocol to effectuate it, and then defeat an inmate's Eighth Amendment challenge by simply claiming the method is not "available" due to a lack of protocol.

Roughly two years ago, the Alabama legislature introduced a bill that would make nitrogen hypoxia a statutorily authorized method of execution in Alabama. The bill was also passed and enacted into law more than a year ago, and inmates have been electing nitrogen hypoxia since June 2018. Under these circumstances, we cannot agree that nitrogen hypoxia is not available in the State of Alabama. Indeed, Alabama's official legislature-enacted policy is that nitrogen hypoxia is an available method of execution in the State.

We also reject the State's suggestion that nitrogen hypoxia is not available to Price only because he missed the 30-day election period. If nitrogen hypoxia is otherwise "available" to inmates under *Bucklew*, that the State chooses to offer the chance to opt for it for a period of only 30 days does not somehow render it "unavailable" by *Bucklew*'s criteria. To the contrary, for the same reason that *Bucklew* abrogates *Arthur*'s requirement that a state offer a method of execution for it to be "available," *Bucklew* renders a state's time limit on a given execution option of no moment to whether that option is "available."

The closer question is whether Price's alleged lack of detail with

22

respect to *how* the State would implement his execution by nitrogen hypoxia defeats his Eighth Amendment claim. We agree that Price did not come forward with sufficient detail about how the State could implement nitrogen hypoxia to satisfy *Bucklew*'s requirement where the inmate proposes a new method of execution. But under the particular circumstances here—where the State by law previously adopted nitrogen hypoxia as an official method of execution—we do not believe that was Price's burden to bear. Rather, an inmate may satisfy his burden to demonstrate that the method of execution is feasible and readily implemented by pointing to the executing state's official adoption of that method of execution.

True, in *Bucklew*, the Supreme Court discussed how Bucklew had failed to set forth evidence of essential questions like how the nitrogen gas would be administered, and it used this as a basis to defeat the Eighth Amendment claim. But as we have noted, a key distinction between *Bucklew* and our case is present. Again, in *Bucklew*, the *inmate* was *proposing* a new alternative method of execution that had not yet been approved by the state. And in addressing whether the suggested alternative method was "feasible" and "readily implemented," the Supreme Court explained that the *inmate's proposal* must be sufficiently detailed. *Bucklew*, 139 S. Ct. at 1129.

Here, Price did not "propose" a new method of execution; he pointed to one that the State already made available. The State, on its own, had already adopted nitrogen hypoxia as an alternative to lethal injection. Under these circumstances, the State bears the responsibility to formulate a protocol detailing how to effectuate execution by nitrogen hypoxia. Indeed, it would be bizarre to put the onus on Price to come up with a proposed protocol for the State to use when the State has already adopted the particular method of execution and is required to develop a protocol for it, anyway. For these reasons, we conclude that Price's lack of detail as to how the State would implement death by nitrogen hypoxia does not prevent him from establishing that this method of execution is available to him.

Finally, we acknowledge the potential for abuse in delaying execution that a state's decision to make multiple methods of execution available could present. Under *Bucklew*, 139 S. Ct. at 1133 (citation and quotation marks omitted), "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." So to the extent that a particular available method of death reasonably requires a certain period for the state to prepare for execution, a prisoner

may not successfully seek execution by an alternative method inside that window of time. But this is not that case.

Here, Price sought execution by nitrogen hypoxia in January 2019, and his execution is not scheduled to occur until April 11, 2019. While the State has not yet developed a protocol for execution by nitrogen hypoxia, it has submitted no evidence to suggest that once it has satisfied its burden to develop its execution-by-nitrogen-hypoxia protocol, preparing to carry out execution by nitrogen hypoxia will reasonably require more than two-and-one-half months.[97]

The problem with the panel's reasoning is that the distinction it drew between Bucklew's case and Price's was no distinction at all. While the Eleventh Circuit believed that Bucklew had proposed "a new alternative method of execution that had not yet been approved by" Missouri,[98] that belief was mistaken. In fact, as Justice Breyer noted, "Bucklew identified as an alternative method of execution the use of nitrogen hypoxia, which is a form of execution by lethal gas. **Missouri law permits the use of this method of execution**."[99] The panel's decision, therefore, was based on overlooked facts that led it to misinterpret the law.

Price's position was virtually identical to that of Bucklew, who challenged Missouri's plan to execute him by lethal injection and "claimed that execution by 'lethal gas' was a feasible and available alternative method," "later clarif[ying] that the lethal gas he had in mind was nitrogen."[100] "Lethal gas" and "lethal injection"

---

97. *Price v. Comm'r, Ala. Dep't of Corrs.*, 920 F.3d 1317, 1326–29 (11th Cir. 2019).
98. *Id.* at 1328.
99. *Bucklew*, 139 S. Ct. at 1142 (Breyer, J., dissenting) (citing MO. REV. STAT. § 546.720 (2002)) (emphasis added).
100. *Id.* at 1121.

24

are Missouri's two statutorily approved methods of execution.[101] Thus, everyone involved in that litigation agreed that nitrogen hypoxia, a form of lethal gas, was statutorily available. Indeed, the Eighth Circuit noted that "[n]itrogen hypoxia is an authorized method of execution under Missouri Law,"[102] and Missouri "did not dispute that lethal gas is legally authorized in Missouri under Mo. Rev. Stat. § 546.720."[103]

But even though nitrogen hypoxia was a statutorily authorized method of execution in Missouri, the Supreme Court held that Bucklew needed to "show that his proposed alternative method is not just theoretically 'feasible' but also 'readily implemented.'"[104] In other words, mere statutory authorization of a method of execution did not relieve him of his burden to submit a "proposal . . . sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly."[105]

The Eleventh Circuit, perhaps unaware of the full facts of Bucklew's case and how similar it was to Price's—understandable, given the rushed nature of last-minute execution litigation—reached the opposite conclusion: "nitrogen hypoxia is

---

101. MO. REV. STAT. § 546.720 (1).
102. *Bucklew v. Precythe*, 883 F.3d 1087, 1094 (8th Cir. 2018) (citing MO. STAT. ANN. § 546.720).
103. Brief of Respondents at 33, Bucklew v. Precythe, 139 S. Ct. 1112 (2019) (17-8151).
104. *Id.* at 1129 (quoting *Glossip*, 135 S. Ct. at 2737–38).
105. *Id.* (quotation omitted).

25

an available method of execution for [Price] because the Alabama legislature has authorized it."[106] Departing from *Bucklew*, the panel held that "[i]f a State adopts a particular method of execution—as the State of Alabama did in March 2018—it thereby concedes that the method of execution is available to its inmates."[107] But as the facts and reasoning of *Bucklew* make clear, statutory authorization alone does not make a method of execution "available" for *Baze* and *Glossip*'s purposes. Bucklew could not satisfy this requirement, and neither could Price.[108]

Thanks to a flurry of filings on his scheduled execution day, Price's execution was stayed by the Eleventh Circuit hours before it was to begin.[109] The Supreme Court vacated the stay, but not until approximately 1:30 AM on April 12, after the execution warrant had expired.[110] In vacating the stay, the Court explained that Price did not make a timely hypoxia election in June 2018, though he was aware of the election period, that he waited until February 2019 to initiate his § 1983 action, and that he filed additional evidence on his execution day.[111] The Alabama Supreme Court reset Price's execution for May 30, and he was ultimately executed by lethal

---

106. *Price*, 920 F.3d at 1326.

107. *Id.* at 1327–28.

108. *Id.* at 1328 ("We agree that Price did not come forward with sufficient detail about how the State could implement nitrogen hypoxia to satisfy *Bucklew*'s requirement where the inmate proposes a new method of execution.").

109. *Price v. Comm'r, Ala. Dep't of Corrs.*, 19-11268-P, 2019 WL 1591475 (11th Cir. Apr. 11, 2019).

110. *Dunn v. Price*, 139 S. Ct. 1312 (2019).

111. *Id.* at 1312.

injection.

As for the Eleventh Circuit's erroneous reasoning in its April 10 opinion, the State petitioned for rehearing and rehearing en banc, pointing out the panel's flawed interpretation of *Bucklew*, but was denied on the afternoon of May 30, Price's second execution day.[112] While the State presented the error to the Supreme Court that day in its brief in opposition to Price's application for stay of execution,[113] the Court denied the application without opinion.[114] Thus, while the panel decision as to availability after *Bucklew* remains undisturbed, its reasoning is facially flawed.

## STANDARD OF REVIEW

In analyzing the sufficiency of pleading in a complaint, courts are guided by a two-pronged approach: (1) the court is not bound to accept conclusory statements of the elements of a cause of action, and (2) where there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[115] "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions,

---

112. Order, 19-11268-P (11th Cir. May 30, 2019).
113. Brief in Opposition at 24–27, *Price v. Dunn*, 139 S. Ct. 1794 (2019) (No. 18A1238).
114. *Price v. Dunn*, 139 S. Ct. 1794 (2019) (mem.).
115. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

and a formulaic recitation of the elements of a cause of action will not do."[116]

Although a complaint need not contain "detailed factual allegations," to survive a

motion to dismiss, it must contain "enough facts to state a claim to relief that is

plausible on its face."[117] Further, the factual allegations "must be enough to raise a

right to relief above the speculative level."[118]

## ARGUMENT

I.   **The Court should dismiss Smith's Eighth Amendment claim because Smith has not met his pleading burden under *Baze*, *Glossip*, and *Bucklew*.**

Smith's first claim should be dismissed because he cannot satisfy his burden

under *Baze*, *Glossip*, and now *Bucklew* of (1) showing that the ADOC's current

lethal injection protocol—the protocol approved in *Glossip*—"presents a risk that is

sure or very likely to cause serious illness and needless suffering, amounting to an

objectively intolerable risk of harm,"[119] and (2) naming an alternative method of

execution that is "feasible, readily implemented, and in fact significantly reduce[s]

a substantial risk of severe pain."[120]

As to the first prong, Smith has failed to plead sufficient facts showing that

_____

116. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and punctuation omitted).
117. *Id.* at 570.
118. *Id.* at 555.
119. *Glossip*, 135 S. Ct. at 2736 (quotation omitted).
120. *Baze*, 553 U.S. at 52.

28

the use of the midazolam protocol creates "an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment."[121] First, he simply asserts that "[t]here is a high likelihood that midazolam is incapable of reliably causing the sustained anesthetic state of sufficient depth necessary to prevent an inmate from experiencing the intolerable pain associated with the second and third drugs."[122] But that statement "amount[s] to nothing more than a 'formulaic recitation of the elements' of a constitutional . . . claim," and that "conclusory" allegation is "not entitled to be assumed true."[123]

Next, Smith asserts that midazolam "could sedate an individual to the point of being incapable of communicating that he or she is in pain while" failing to prevent the pain.[124] But that allegation at most shows that there could be *some* risk of pain associated with use of midazolam, and merely *some* risk alone is inadequate to meet the Supreme Court's high standard. "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual."[125] Smith's allegation does nothing to show that any purported

---

121. *Glossip*, 135 S. Ct. at 2737 (cleaned up).
122. Doc. 1 ¶ 17.
123. *Ashcroft*, 556 U.S. at 681.
124. Doc. 1 ¶ 18.
125. *Baze*, 553 U.S. at 50 (plurality op.).

risk associated with midazolam rises to the level of "objectively intolerable."

Smith's remaining allegations likewise fail to meet that standard; indeed, they are internally inconsistent. In paragraph 19, he alleges that midazolam creates a "high likelihood that an inmate who receives" it "will not respond to ADOC's consciousness check, but will feel" excruciating pain from the other two drugs. But he then asserts in paragraphs 22 and 23 that two inmates did respond to consciousness checks after receiving midazolam. In either event, Smith fails to show that any risk posed by midazolam rises to the level contemplated in *Baze*, *Glossip*, and *Bucklew*. Likewise, Smith's assertion that "approximately 2% of people experience a paradoxical effect when given benzodiazepines like midazolam"[126] does not suggest that it is "*sure or very likely*" that he will be subject to severe pain.[127]

In sum, the fact remains that Alabama uses the lethal injection protocol approved in *Glossip*.[128] This protocol is safe, effective, and constitutionally sound, and it begins with a 500-milligram bolus of midazolam, a dose well beyond any used in a clinical setting.[129] Smith cannot establish that the protocol is "sure or very likely

---

126. Doc. 1 ¶ 20.
127. *Glossip*, 135 S. Ct. at 2737.
128. *E.g.*, *Price*, 358 F. Supp. 3d 1221 (noting that *Glossip* protocol is "functionally identical to Alabama's").
129. *E.g.*, *Arthur v. Dunn*, 137 S. Ct. 725, 728 (2017) (Sotomayor, J., dissenting) ("Because Dr. Strader's experience was limited to *clinical* doses of midazolam, which typically range from 2 to 5 mg, the court concluded that he had no basis

to cause serious illness and needless suffering."

Turning to the second prong, while Defendants acknowledge that the Eleventh Circuit's April 10 opinion deeming nitrogen hypoxia "available" purely because it is contemplated by statute remains in effect, Defendants also stress that the opinion was wrongly decided and flies in the face of what the Supreme Court held in *Bucklew*. Although the ADOC has been working on a hypoxia protocol for more than a year, there is still no working protocol in place, and Smith offers no protocol of his own.

Therefore, this claim should be dismissed.

## II. The Court should dismiss Smith's ADA claim because Smith is not intellectually disabled, and even if he were, the ADA would offer no ground for relief.

Smith's second claim is ripe for dismissal, as he has failed to state a claim upon which relief can be granted.[130]

Smith contends that he is entitled to "reasonable accommodations" under the ADA because he is a "qualified individual with a disability; specifically, he is intellectually disabled."[131] Defendants acknowledge that intellectual disability is a

---

to extrapolate his experience to non-clinical, *lethal* doses, such as the 500-mg bolus required by Alabama's lethal-injection protocol.").

130. FED. R. CIV. P. 12(b)(6).

131. Doc. 1 ¶¶ 53, 55.

recognized disability under the ADA.[132] However, Smith's argument fails for two reasons.

First, Smith is not intellectually disabled. While he received a full-scale score of 64 on the SB-5 administered by his expert during the Rule 32 proceedings, he contemporaneously received a full-scale score of 72 on the WAIS-IV, as well as a verbal score of 75 on that test, which matched the pretrial verbal score of 75 he received on the WAIS-R.[133] Notably, the DSM-IV-TR, which was the edition in use at the time of Smith's Rule 32 proceedings, does not recommend adjusting either Stanford-Binet or Wechsler scores for the "Flynn effect."[134] None of Smith's Woodcock-Johnson scores was lower than one standard deviation below the mean, and his math and spelling skills were at least at a twelfth-grade level.[135] Smith's own

---

132. 42 U.S.C. § 12102(1)(A); 29 C.F.R. § 1630.2(h)(2) ("Physical or mental impairment means [. . .] [a]ny mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation') . . . .").

133. *Smith*, 112 So. 3d at 1115, 1128.

134. *Id.* at 1115; Rule 32 Evidentiary Hearing Transcript at R. 91 (see Volume 29 of the habeas record filed in *Smith v. Thomas*, 2:13-cv-00557-RDP (N.D. Ala.)). While the current edition of the DSM makes passing reference to the Flynn effect, it does not make any recommendation about adjusting scores. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 37 (5th ed. 2013). Indeed, an examination of over 700,000 IQ scores received by Norwegians aged 18–19 who were born between 1962 and 1991 revealed a recent *decline*, a "negative Flynn effect" noted in several Western countries. Bernt Bratsberg & Ole Rogeburg, *Flynn Effect and Its Reversal are Both Environmentally Caused*, 115 PNAS 6674–78 (2018), https://www.pnas.org/content/pnas/115/26/6674.full.pdf.

135. *Smith*, 112 So. 3d at 1116, 1119–20.

expert, Dr. Salekin, testified that he is not intellectually disabled.[136] Dr. King, the State's expert, concurred, opining that Smith "functioned in the high borderline to low average range of intellectual ability."[137] The federal courts correctly found that the state courts' resolution of Smith's *Atkins* claim was not an unreasonable application of federal law and that *Moore* did not invalidate that resolution.[138] As Smith is not intellectually disabled, he is not entitled to ADA accommodation.

Moreover, the doctrine of issue preclusion should bar this claim. The Eleventh Circuit has explained that it

> give[s] preclusive effect to the judgment of a state court provided that two conditions are met: first, that the courts of the state from which the judgment emerged would do so themselves; and second, that the litigants had a "full and fair opportunity" to litigate their claims and the prior state proceedings otherwise satisfied "the applicable requirements of due process."[139]

An Alabama court, in turn, gives preclusive effect to a claim if four elements are met:

> (1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions.[140]

---

136. *Id.* at 1116, 1120, 1128.
137. *Id.* at 1118.
138. *Smith*, 2017 WL 3116937, at *6–7; *Smith*, 924 F. 3d at 1341–43.
139. *E.g.*, *Shields v. Bellsouth Advertising & Pub. Co., Inc.*, 228 F.3d 1284, 1288 (11th Cir. 2000).
140. *Smith v. Union Bank & Trust Co.*, 653 So. 2d 933, 934 (Ala. 1995).

33

The issue in this litigation turns on the same issue raised during Smith's Rule 32 and habeas proceedings: whether he is intellectually disabled. That issue was fully litigated—indeed, four courts have now spoken on the issue—and resolution of the issue was necessary to settle Smith's previous postconviction litigation. Moreover, the same parties—Smith and the State of Alabama (and its agents)—were involved in these actions. Finally, the state courts gave the issue of Smith's alleged intellectual disability full and fair consideration, including consideration of expert testimony, and this Court should give that finding preclusive effect.

Second, Smith's claim is nonsensical. If he were intellectually disabled, he would not be entitled under the ADA to a longer period of time in which to elect a method of execution because he would be **categorically ineligible for execution**. *Atkins* holds that intellectually disabled offenders cannot be executed.[141] If the state or federal courts had deemed Smith intellectually disabled, then his death sentence would have been vacated, and he would have been resentenced to life without parole. But the courts made the opposite finding, Smith's death sentence stands, and the ADA does not entitle him to elect a method of execution seventeen months late based on a nonexistent disability. Therefore, this claim is due to be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

141. 536 U.S. at 321.

## CONCLUSION

For the reasons set forth above, Defendants ask this Honorable Court to dismiss Smith's complaint.

Respectfully submitted on January 31, 2020.

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA
BY—

***/s/ Lauren A. Simpson***
Lauren A. Simpson
*Alabama Assistant Attorney General*
Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 31, 2020, I served a copy of the foregoing upon counsel for the Plaintiff by filing the same via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to: **Spencer J. Hahn** and **John Anthony Palombi**.

Respectfully submitted,

Steve Marshall
*Alabama Attorney General*

***/s/ Lauren A. Simpson***
Lauren A. Simpson
*Alabama Assistant Attorney General*
Counsel for Defendants

OF COUNSEL:

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-1209
Fax: (334) 353-8400
lsimpson@alabamaag.gov