IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIE B. SMITH, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:19-cv-927-ECM |
| | ) | (WO) |
| | ) | |
| JEFFERSON DUNN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

Plaintiff Willie B. Smith, III ("Smith" or "the Plaintiff") is an Alabama death row inmate in the custody of the Alabama Department of Corrections ("ADOC"). Smith is scheduled to be executed by lethal injection on February 11, 2021. On February 4, 2021, the Plaintiff filed an Emergency Motion for Stay of Execution, (doc. 42), asserting that his execution should be stayed until this civil action is resolved. (*Id*. at 1–2).

In this case, Smith alleges that Alabama violated his statutory rights under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*., (hereinafter "ADA").[1] Smith sues Jefferson Dunn, the Commissioner of the Alabama Department of Corrections, and Terry Raybon, the Warden of Holman Correctional Facility, (hereinafter "the

---

[1] Smith also brought a claim pursuant to 42 U.S.C. § 1983, alleging that Alabama's three-drug, lethal injection protocol method of execution violated his right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. (Doc. 36 at 9–11, paras. 41–58; 13, paras. 60–76). The Court dismissed Smith's § 1983 method of execution claim as time-barred on February 8, 2021. (Doc. 46).

Defendants"), in their official capacities. (Doc. 36 at 2–3, paras. 7, 9–10).  The operative complaint (hereinafter "Complaint") was filed on January 29, 2021. (Doc. 36).

Now pending before the Court is the Plaintiff's Emergency Motion for a Stay of Execution. (Doc. 42).  As directed by the Court, on February 5, 2021, the Plaintiff filed evidence in support of the motion, (doc. 44), and, on February 6, 2021, the Defendants filed a brief and evidence in opposition to the motion, (doc. 45).

The Court heard oral argument on the motion on February 8, 2021.  After oral argument, the Plaintiff and the Defendants filed additional evidence in support of and in opposition to the emergency motion to stay. (Docs. 47 and 48).

The motion to stay is fully briefed and ripe for resolution.  For the following reasons, the Court concludes that the Plaintiff's Emergency Motion for a Stay of Execution is due to be DENIED.

## II. BACKGROUND AND PROCEDURAL HISTORY[2]

### A.  Smith's Capital Litigation History

In 1992, after a jury trial, Smith was convicted of "capital murder for the intentional killing of Sharma Ruth Johnson during the course of a robbery and during the course of a

---

[2] The Court takes judicial notice of Smith's underlying conviction and previous litigation. *See Smith v. Dunn*, 2017 WL 1150618 (N.D. Ala. Mar. 28, 2017), *aff'd*, 924 F.3d 1330 (11th Cir. 2019), *cert. denied*, *Smith v. Dunn*, 141 S.Ct. 188 (July 2, 2020); *see also Smith v. State*, 112 So. 2d 1108 (Ala. Crim. App. 2012), *cert. denied*, *Ex parte Smith*, 112 So. 2d 1152 (Ala. 2012).

The Court likewise takes judicial notice of Smith's pending or recently concluded litigation. *See Smith v. Dunn*, 2:20-cv-1026-RAH (M.D. Ala. filed on Dec. 14, 2020) (asserting First Amendment claims regarding Smith's right to exercise his religious beliefs during his execution); *Smith v. Dunn*, 2:21-cv-2021-RAH (M.D. Ala. filed on Feb. 2, 2021) (challenging safety protocols added to the execution protocol in response to the COVID-19 pandemic); and *Smith v. Dunn*, 03-CV-2021-900139.00 (Circuit Ct. Mont. Cnty. Ala. filed on Feb. 4, 2021) (challenging COVID-19 safety precautions as violative of state law).

kidnapping." *Smith v. State*, 838 So. 2d 412, 421 (Ala. Crim. App. 2002).  The facts of

Smith's underlying conviction were summarized by the district court in post-conviction

proceedings:

> The evidence at trial showed that Smith and his girlfriend,
> Angelica Willis, approached Johnson in her car near an
> automated teller machine.  Following Smith's instructions,
> Willis asked Johnson for directions to a restaurant. Then
> Smith, armed with a shotgun, walked up to Johnson's car and
> forced Johnson into the trunk.  After driving to another
> location, Smith and Willis returned to the automated teller
> machine.  There, they located Johnson's dropped bank debit
> card and directed Johnson, still in the car's trunk, to call out the
> card's access code.  At Smith's direction, Willis withdrew $80
> from Johnson's bank account. A bank video camera captured
> images of Smith while Willis withdrew money from the
> machine. After driving around the Birmingham area and
> picking up Smith's brother from a shopping mall, Smith drove
> Johnson's car to a cemetery.  Smith told Willis that he would
> have to kill Johnson because she would report the crime to law
> enforcement.  Willis overheard Johnson pleading for her life
> and promising not to tell the authorities about the
> kidnapping.  Willis then heard a gunshot.  Smith, his brother,
> and Willis abandoned the vehicle at North Roebuck
> School.  Smith later returned to the car and set it on fire to
> destroy any fingerprints left on it.

*Smith v. Dunn,* 2017 WL 1150618, at *1–2 (N.D. Ala. Mar. 28, 2017) (internal citations

omitted), *aff'd*, *sub nom. Smith v. Comm'r, Ala. Dep't of Corrs.,* 924 F.3d 1330 (11th Cir.

2019).

The jury subsequently recommended a death sentence by a 10–2 vote; the trial court

imposed a sentence of death. (Doc. 48-2).

In 1997, Smith appealed his conviction and sentence, which were affirmed by the

Alabama Court of Criminal Appeals. *Smith v. State*, 698 So. 2d 1166 (Ala. Crim. App.

1997).  Smith's petition for a writ of certiorari to the Alabama Supreme Court was denied on June 28, 2002. *See Smith v. State*, 838 So. 2d 413 (Ala. Crim. App. 2002).  On December 16, 2002, the U.S. Supreme Court denied certiorari. *Smith v. Alabama*, 537 U.S. 1090 (2002) (mem.).

On August 1, 2003, Smith filed a Rule 32 petition, the denial of which was affirmed on appeal. *Smith v. State*, 112 So. 3d 1108, 1113–14 (Ala. Crim. App. 2012).  The Alabama Supreme Court denied certiorari. *Ex parte Smith*, 112 So. 3d 1152 (Ala. 2012).  Smith did not pursue an appeal to the U.S. Supreme Court.

In March 2013, Smith filed a federal habeas corpus petition, pursuant to 28 U.S.C. § 2254, in the Northern District of Alabama. *Smith*, 2017 WL 1150618.  On July 21, 2017, the district court dismissed the petition. *Id*.  On May 22, 2019, the Eleventh Circuit Court of Appeals affirmed the denial of Smith's habeas petition. *Smith*, 924 F.3d at 1347.  The United States Supreme Court denied Smith's petition for certiorari on July 2, 2020, concluding Smith's appeals. *Smith v. Dunn*, 141 S. Ct. 188 (2020) (mem.).

Upon completion of Smith's post-conviction proceedings, the Attorney General moved the Alabama Supreme Court to set Smith's execution date.  On December 1, 2020, the Alabama Supreme Court set the Plaintiff's execution date for February 11, 2021. (Doc. 17).

### B.  This Litigation

Smith filed this action on November 25, 2019, alleging that the lethal injection method of execution violates his Eighth Amendment rights, and that the Defendants violated his rights under the ADA. (Doc. 1). The Defendants moved to dismiss the

complaint for failure to state a claim upon which relief may be granted. (Doc. 10).  The motion was fully briefed, and orally argued to the Court. (Docs. 14, 15, 19, 20, and 27). The Court granted the Defendants' motion to dismiss, dismissed the complaint without prejudice, and entered final judgment on December 14, 2020. (Docs. 25 and 26). Thereafter, the Plaintiff filed a motion to vacate the judgment, (doc. 28), and a motion for leave to file an amended complaint, (doc. 32).  On January 29, 2021, the Court granted the motions to vacate and to amend pursuant to Fed. R. Civ. P. 59(e) and 15 respectively.  (Doc. 35).  The Plaintiff filed the operative complaint on the same day. (Doc. 36).  On February 1, 2021, the Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. 37).  On February 4, 2021, the Plaintiff filed a response to the motion to dismiss, (doc. 41), and the emergency motion for a stay of execution, (doc. 42).  The Court heard oral argument on the motions on February 8, 2021.  Thereafter, the Court denied the motion to dismiss as to Smith's ADA claim but granted the motion as to his Eighth Amendment method of execution claim. (Doc. 46).

### C.  Other Litigation

Smith is currently prosecuting multiple cases.

### 1.  *Smith v. Dunn,* 2:20-cv-1026-RAH (M.D. Ala. Dec. 14, 2020)*.*

Smith filed a § 1983 action on December 14, 2020, alleging that the State Defendants' decision to bar his spiritual advisor from the execution chamber violates his First Amendment right to free exercise of his religious beliefs. *See Smith v. Dunn*, 2021 WL 358374 (M.D. Ala. Feb. 2, 2021).  He also sought an emergency preliminary injunction

to permit his spiritual advisor to be physically present with him inside the execution chamber. *Id.* at 1.

On February 2, 2020, the district court denied Smith's motion for preliminary injunction, and Smith appealed.  Smith's appeal is pending. *See Smith v. Comm'r, Ala. Dep't of Corrs.*, 21-10348 (11th Cir. Feb. 3, 2021).

> 2.  *Smith v. Dunn,* 2:21-cv-99-RAH (M.D. Ala. Feb. 2, 2021).

On February 2, 2020, Smith brought a lawsuit challenging the constitutionality of COVID-19 related changes to the execution protocol.  He also filed an emergency motion to stay his execution, which was denied on February 9, 2021.

> 3.  *Smith v. Dunn*, 03-CV-2021-900139.00 (Circuit Ct. Mont. Cnty. Ala. Feb. 4, 2021).

On February 4, 2021, Smith filed a complaint in the Circuit Court of Montgomery County, Alabama challenging, under state law, COVID-19 related changes to the execution protocol.  On February 5, 2021, Smith filed an amended complaint in which he sought "declaratory and injunctive relief barring his execution." That case was dismissed on February 9, 2021.

**D. Alabama's Method of Execution and the Election Form**

Smith is scheduled to be executed by lethal injection, the default method of execution in Alabama. ALA. CODE § 15-18-82.1(a).  In March 2018, the Governor signed into law Senate Bill 272, which added nitrogen hypoxia as an alternative method of execution in Alabama. ALA. CODE § 15-18-82.1(b)(2).  The statute permits a death row inmate one opportunity to elect execution by nitrogen hypoxia. *Id.*  Otherwise, the inmate

waives the right to elect the alternative method and will be executed by lethal injection. *Id.* The law became effective on June 1, 2018. *Id.* Pursuant to the statute, Smith had 30 days, from June 1, 2018 until June 30, 2018, to elect nitrogen hypoxia as his method of execution. *Id.*

It is undisputed that on June 26, 2018, attorneys from the Federal Defenders met with their clients on death row at Holman. They informed their clients of the change in the law, answered their questions regarding nitrogen hypoxia, and provided them with an Election Form that they had drafted for the purpose of electing nitrogen hypoxia. Smith was not represented by the Federal Defenders at that time.

No earlier than June 26, 2018, the Warden at Holman directed correctional officers to distribute the Election Form with an envelope to all prisoners on death row. Prisoners could sign and date the form and deliver it in the envelope to the Warden if they elected execution by nitrogen hypoxia. Smith did not use the form. Nor did he elect execution by nitrogen hypoxia within the prescribed period in 2018 by any other means. (*Id.* at 4–5).

## III. JURISDICTION AND VENUE

The Court has original subject matter jurisdiction of this case pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 2201, and 42 U.S.C. § 12133.

Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## IV. STANDARD OF REVIEW

While a death row inmate may challenge the constitutionality of his execution through a civil action, a stay "is not available as a matter of right," even if execution is

imminent. *Hill v. McDonough*, 547 U.S. 573, 584 (2006).  Rather, "a stay of execution is an equitable remedy," and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.*; *cf. Thompson v. Wainwright*, 714 F.2d 1495, 1506 (11th Cir. 1983) ("Each delay, for its span, is a commutation of a death sentence to one of imprisonment.").  Both the State and the victims of crime "have an important interest in the timely enforcement of a sentence." *Hill*, 547 U.S. at 584.

The standard for granting a stay of execution to a death row inmate is the same as that for granting a temporary restraining order or preliminary injunction.  A federal court may issue a stay of execution only if the inmate demonstrates each of the following elements: (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the stay issues; (3) the threatened injury outweighs the harm the stay would cause the other litigant; and (4) if issued, the stay would not be adverse to the public interest. *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014); *see also Powell v. Thomas*, 784 F. Supp. 2d 1270, 1257 (M.D. Ala. 2011), *aff'd*, 641 F.3d 1255 (11th Cir. 2011).  A "death row inmate is afforded no preferential treatment by his filing of a motion to stay, and all requirements for a stay must be satisfied." *Powell*, 784 F. Supp. 2d at 1273.  The inmate must, "by a clear showing," carry the burden of persuasion on all four requirements. *Hill*, 547 U.S. at 584; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

"The Supreme Court has made clear that "[l]ast-minute stays should be the extreme exception, not the norm . . . ." *Bucklew v. Precythe,* 139 S. Ct. 1112, 1134 (2019).

## V.  DISCUSSION

Smith filed his motion for a stay of execution on February 4, 2021, (doc. 42), one week prior to his scheduled execution. The Defendants filed an objection to the motion, (doc. 45), and the Court heard oral argument on February 8, 2021.

Smith asks this Court to stay his execution "to allow him a fair opportunity to have his pending claims heard on the merits." (Doc. 42 at 2).  Smith contends that he has made the requisite showing of substantial likelihood of success on the merits of his ADA claim. (*Id*. at 2–7).  He further asserts that a stay would not harm the State, but, if the Court denies his motion for stay, he will suffer irreparable harm in that he will be executed and "unable to vindicate his rights." (*Id*. at 7).  Finally, Smith contends that granting a stay is in the public interest because he "has a right to have his claims heard on the merits." (*Id*. at 9).

In opposition to the motion to stay, the Defendants assert that Smith's motion for a stay is untimely; that he cannot demonstrate a substantial likelihood of success on the merits of his ADA claim; and that the public interests of the State and victims weigh against Smith. (Doc. 45 at 5–17).

As outlined above, Smith must make a clear showing that he satisfies the requirements for a stay of execution.  Because Smith cannot establish a substantial likelihood of success on the merits of his ADA claim, and equities weigh against granting a stay, the Court concludes that Smith's motion for a stay of execution is due to be denied.

### A.  Substantial Likelihood of Success on the Merits

This Court begins with "the first and most important question" to grant a stay of execution: whether Smith is substantially likely to succeed on the merits of his claims.  *Ray*

*v. Comm'r, Ala. Dep't of Corrs.*, 915 F.3d 689, 695 (11th Cir. 2019) (citing *Jones v. Comm'r, Ga. Dep't of Corrs.,* 811 F.3d 1288, 1292 (11th Cir. 2016)).  Smith alleges that the Defendants failed to provide him reasonable accommodation in violation of Title II of the ADA, and as a result, he was not able to elect nitrogen hypoxia as an alternative method of execution.  To demonstrate substantial likelihood of success, Smith must show not just that his claim under the ADA is plausible, but that the evidence demonstrates he would likely succeed on the merits of his claim.[3]

The ADA was enacted "for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  The Act responds to an extensive history of discrimination in public services against individuals with disabilities. *Nat'l Assoc. of the Deaf v. Florida*, 980 F.3d 763, 773 (11th Cir. 2020).  Its provisions are to be construed broadly to protect those interests. *Kornblau v. Dade County*, 86 F.3d 193, 194 (11th Cir. 1996).  The statute provides:

---

[3] The Court engages in a three-step process to determine whether Smith has demonstrated a substantial likelihood of success on the merits of his claim.  "In the first step, the court decides a question of law: whether the plaintiff has stated a claim for relief." *Grayson v. Warden, Comm'r, Ala. Dep't of Corrs.*, 869 F.3d 1204, 1239 (11th Cir. 2017).  If the court concludes the plaintiff has stated a claim for relief, "the court takes the second and third steps. In those steps, the court functions as a fact finder." *Id.*

  For the reasons stated in the Memorandum Opinion denying the Defendants' motion to dismiss, the Court concludes that Smith has stated a plausible claim for relief under the ADA. (Doc. 46).  Thus, the Court now turns to the second and third steps in the process:

> In the second step, the court considers the evidence the prisoner has proffered in support of his claim and finds whatever facts the evidence establishes.  In the third step, the court weighs the facts found in the second step to determine whether they demonstrate a likelihood that the prisoner's claim will succeed at trial.  The outcome in most cases will depend on whether the court finds the testimony of the prisoner's . . . witnesses credible and persuasive.

*Grayson*, 869 F.3d at 1239.

> [N]o qualified individual with a disability shall, by reason of
> such disability, be excluded from participation in or be denied
> the benefits of the services, programs, or activities of a public
> entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  First, it is well-settled that prisons fall within the statutory definition

of "public entity" under the ADA. *Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210

(1998).  Second, to establish a substantial likelihood of success on the merits of his Title II

ADA claim, Smith must show: (1) he has a disability, (2) he is a qualified individual under

the statute, (3) he was denied access to a public benefit, and (4) that the denial was due to

his disability. *Kornblau*, 86 F.3d at 194; *see also Goldberg v. Fla. Int'l Univ.*, 2020 WL

7703136, at *4 (11th Cir. Dec. 29, 2020); *Bircoll v. Miami-Dade County*, 480 F.3d 1072,

1081 (11th Cir. 2007).  To make the requisite showing at this stage, Smith must present the

Court with evidence sufficient to demonstrate substantial likelihood of success on the

merits of his ADA claim. *See generally Brooks v. Warden*, 810 F.3d 812, 823 (11th Cir.

2016) (holding that because the plaintiff "provided no evidence," he was unable to establish

substantial likelihood of success on the merits of his claim).

    *1.    Disability*

    The ADA defines "disability" as "a physical or mental impairment that substantially

limits one or more major life activities . . . ." 42 U.S.C. § 12102(1)(A).  "[M]ajor life

activities include, but are not limited to, caring for oneself, performing manual tasks,

seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing,

learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C.

§ 12102(2)(A).  The word "disability" is construed to provide broad coverage. 42 U.S.C.
§ 12102(3)(A).

The evidence submitted by Smith supports a finding that he has an intellectual
disability under the ADA.  Specifically, he produced a report wherein his full IQ score was
found to be 64 in the Stanford-Binet Intelligence Scales. (Doc. 44-3 at 1).   And a
psychologist determined that Smith "has difficulty encoding new information, verbal
information that's presented to him. . . . [Material] would need to be repeated and rehearsed
many times for him to get to a comparable level." (Doc. 44-5 at 20).

But the Defendants dispute the existence of Smith's disability. (Doc. 45 at 7–12).
A classification document from Smith's inmate file reveals that classification officials
"[r]ecommend[ed] Smith receive his GED By [sic] enrolling in the ABE Program held for
Death Row Inmates.  Subject completed the eleventh grade." (Doc. 44-2 at 4). The test
results of another psychological interview on January 24, 2008 found Smith to have a Full
Scale IQ of 72 on the Wechsler Adult Intelligence Scale-III: "Mr. Smith has relatively good
literacy skills . . . . He is currently reading at an 8.6 grade level, spelling at an 11.5 grade
point level, and doing math computations at a 6.3 grade level." (Doc. 44-4 at 1).   In that
same report, the psychologist noted that Smith was malingering during the psychological
evaluation regarding mental illness.[4] (*Id.*).

---

[4] Specifically,

> [r]esults of this testing are invalid as Mr. Smith attempted to present
> himself as having mental illness symptoms that are simply not present.  As
> a consequence, the profile should be seen as an attempt on Mr. Smith's

Weighing the evidence under the ADA's broad definition of disability, the Court finds that Smith has a substantial likelihood of establishing some degree of intellectual disability that "substantially limits one or more major life activities . . . ." *See* 42 U.S.C. § 12102(1)(A).

    2.    *Qualified individual*

The next hurdle for Smith is demonstrating that he is substantially likely to establish that he was a *qualified* individual with a disability under the ADA.  Smith pled sufficient facts to show he is a qualified individual with a disability for purposes of a motion to dismiss, (doc. 46), but he must proffer evidence to meet the significantly higher burden on a motion to stay.

Under Title II, a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).  In June 2018, prison staff passed out the Election Form to all death row inmates. (Doc. 44-6 at 1).  And, as an inmate on death row, the Election Form was distributed to Smith during that time. (Doc. 36 at 4).

But part of establishing that he is a qualified individual with a disability includes showing that some form of accommodation exists that would make him eligible for the receipt of benefits.  For example, the Eleventh Circuit recently determined that a medical

---

part to malinger the presence of mental illness symptoms and no further interpretation is warranted.

(Doc. 44-4 at 2).

student who made accommodation requests of his post-secondary school was not a "qualified individual" under Title II. *Goldberg*, 2020 WL 7703136, at \*4. The Circuit held there was no accommodation that could have made the student a qualified individual under the ADA for the purposes of his post-secondary education program. *Id.* at \*5 ("But the larger flaw in Goldberg's case is that, even if he could have been qualified with the right accommodations, he did not meet his burden to identify a reasonable accommodation that would have allowed him to meet the standards of the medical school program despite his disability.").

Beyond Smith's initial pleading, he proffers little evidence to articulate a reasonable accommodation that would make him qualified in this instance. His Complaint reads, "[s]uch reasonable accommodations may have included, but are not limited to, use of simple language, a comprehension check, additional time, or assistive technology." (Doc. 36 at 8). The Defendants wholly fail to argue that these accommodations would be unreasonable. And, specifically for this prong of the prima facie case, they do not establish that there is no reasonable accommodation that could have made Smith qualified for the "essential eligibility requirements for the receipt of services . . . ." 42 U.S.C. § 12131(2).

Accordingly, the evidence weighs slightly in favor of Smith having a substantial likelihood of establishing himself as a qualified individual with a disability.

3. *Exclusion from or denial of the benefits of services, programs, or activities*

The third step for Smith is to proffer evidence that he was excluded from or denied access to a public benefit.

As a threshold issue, a "public benefit" is a "service, program, or activity" under the ADA. 42 U.S.C. § 12132. The Department of Justice's regulations teach that Title II applies to "all services, programs, and activities provided or made available by public entities." 28 C.F.R. § 35.102(a). Courts across the country recognize the term "services, programs, or activities" to be a "catch-all phrase." *See Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816, 822 (11th Cir. 1998) (citing *Innovative Health Sys.*, *Inc. v. City of White Plains*, 117 F.3d 37, 44–45 (2d Cir.1997) (overruled on other grounds)); *Am. Council of Blind of N.Y., Inc. v. City of New York*, 2020 WL 6151251, at *11 (S.D. N.Y. Oct. 20, 2020); *Clifton v. Ga. Merit Sys.*, 478 F. Supp. 2d 1356, 1365 (N.D. Ga. 2007) (disputing but applying the "catch-all" analysis to the phrase "services, programs, or activities"). Indeed, courts have found the existence of a service, program, or activity in actions by public entities ranging from weddings at municipal courts, *Soto v. City of Newark*, 72 F. Supp. 2d 489, 494 (D. N.J. 1999), to a prisoner's access to telephone privileges, *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1046 (S.D. N.Y. 1995).

At this point, the Court will assume without finding that providing the Election Form is a service under the ADA.

When it comes to the exclusion itself, an individual may be excluded from a public benefit not just when prevented from enjoying the benefit, but when it is not "readily accessible." *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001). "However, mere difficulty in accessing a benefit is not, by itself, a violation of the ADA." *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1216 (S.D. Ala. June 15, 2020).

Smith claims he was excluded from using the Election Form when he was not given

an accommodation. (Doc. 36 at 4).  The Election Form reads, in its entirety, as follows:

ELECTION TO BE EXECUTED BY NITROGEN HYPOXIA

Pursuant to Act No. 2018-353, if I am to be executed, I elect that it be by nitrogen hypoxia rather than by lethal injection.
This election is not intended to affect the status of any challenge(s) (current or future) to my conviction(s) or sentence(s), nor waive my right to challenge the constitutionality of any protocol adopted for carrying out execution by nitrogen hypoxia.

Dated this _____ day of June, 2018.

_____          _____
Name/Inmate Number                             Signature

(Doc. 44-9).  The document itself does not indicate that it is educational or that it

communicates statutory rights to the inmates on death row.

At oral argument, Smith asserted that the document served as notice of his rights;

the Defendants responded that it was "courtesy notice."  And in an affidavit executed on

January 31, 2019, the prison official who passed out the Election Form at Holman

explained,

[i]n mid-June 2018, after Alabama introduced nitrogen asphyxiation as a method of execution, Warden Cynthia Stewart tasked me with giving every death row inmate an election form and an envelope. If an inmate wished to be executed by nitrogen asphyxiation, he was to sign and date the form and put it in the envelope, which would be delivered to Warden Stewart.

(Doc. 44-6 at 1–2).  The Election Form appears to be an opportunity for the inmates who

decided to elect nitrogen hypoxia to communicate that decision to the Warden. (*Id.*).

Indeed, the Election Form is written in first person, conveying information from, not to, the inmate.

Either way, the evidence weighs in favor of Smith having a substantial likelihood of establishing he has been excluded from a public benefit.

### 4.   *Exclusion or denial based on a disability*

As to the fourth element of his claim, Smith fails to establish that he is substantially likely to demonstrate that he was excluded or denied access to the Election Form based on his disability.  In fact, the evidence before the Court weighs heavily against Smith on the merits of this prong.

The final prong of the Title II prima facie claim requires a plaintiff to show that the plaintiff lacks "meaningful access" to a public benefit *because of* a disability.  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).  "When an individual is unable to access services or benefits because of a disability, the ADA requires that the public entity provide reasonable accommodations to ensure that individual is permitted access to the same benefits and services as others." *Arenas v. Ga. Dep't of Corrs.*, 2020 WL 1849362, at *11 (S.D. Ga. Apr. 13, 2020).  A plaintiff may establish discrimination under the ADA by showing that a public entity failed to provide reasonable accommodations. *Id.* (citing *Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009)).  A defendant's duty to provide a reasonable accommodation is not usually triggered until the plaintiff makes a specific demand for accommodation. *Rylee*, 316 F. App'x at 906 (citing *Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361, 1363 (11th Cir. 1999)).  The ADA does not require public entities to "guess at what accommodation they should provide." *Randolph v. Rodgers*,

170 F.3d 850, 858 (8th Cir. 1999).   However, an explicit request for a reasonable accommodation may sometimes be unnecessary where "the need for an accommodation is obvious." *Arenas*, 2020 WL 1849362, at *12 (citing *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1327 n.33 (N.D. Ga. 2017)).

Therefore, in this failure to accommodate case, Smith must show either that he requested an accommodation or the need for one was obvious, and the public entity failed to provide a reasonable accommodation.   There is no evidence that Smith requested an accommodation when the form was distributed in 2018. Instead, he argues that his disability was known, and his "need for an accommodation was obvious" to the ADOC. (Doc. 36 at 7, para. 33).   A plaintiff does not have to request an accommodation where the disability, its limitations, and the plaintiff's necessary reasonable accommodations are "*open, obvious, and apparent*." *Arenas*, 2020 WL 1849362, at *12. (emphasis added). Further, a plaintiff does not have to request an accommodation if "the defendant otherwise had knowledge of an individual's disability *and needs* but took no action." *Nattiel v. Fla. Dep't of Corrs.*, 2017 WL 5774143, at *1 (N.D. Fla. Nov. 28, 2017) (emphasis added) (quoting *McCoy v. Tex. Dep't of Crim. Just.*, 2006 WL 2331055, at *7 (S.D. Tex. 2006)). Thus, it is not just the disability that must be obvious; the Plaintiff must also show that his "need" resulting from the disability—the necessary reasonable accommodation—is also obvious.

Courts have found a disability and need for a reasonable accommodation to be obvious when the defendants either assessed the plaintiff's disability before failing to accommodate or treated the plaintiff for his disability in the past.   In *Nattiel v. Florida*

*Department of Corrections*, the court concluded the defendant knew of the plaintiff's disability—asthma and a glass eye—because it had "assessed him for whether chemical agents should be used against him." 2017 WL 5774143, at *1.  For that reason, there was no need for the plaintiff to request a specific accommodation not to be sprayed with a chemical agent when the prison both knew about his disability and had considered, as a result of his disability, whether chemical agents should be used against him. *Id.*  Similarly, in *Wolfe v. Florida Department of Corrections*, that court concluded that a prison and its agents had "knowledge of [the plaintiff's] asthma[] and dangers housing him" in a dormitory where he ultimately had a fatal asthma attack. 2012 WL 4052334, at *4 (N.D. Fla. Sept. 14, 2012).  There, even though the prison argued it did not have notice of the inmate's severe medical condition, the court concluded there was enough evidence of the plaintiff's "long history of asthma and [being] treated for numerous asthma emergencies while incarcerated," including a life threatening asthma attack two years before his fatal asthma attack, that he should have been placed in a safer dorm. *Id.* at *4.  In both cases, the evidence established that the prison officials not only knew about the inmates' disabilities but had dealt with those disabilities in the past and were aware of the need for accommodations.

However, in cases where the evidence did not demonstrate that defendants were explicitly aware of the prisoner's disabilities and resultant needs, courts have found the plaintiffs' disabilities and need for accommodations were not obvious.  For example, in *Arenas*, after a prisoner committed suicide, his family sued the prison. 2020 WL 1849362, at *10.  They argued his need for a safer suicide proof cell was obvious because he had

been diagnosed as bipolar. *Id.* at 12. Even though the prison was aware of a previous suicide attempt years before his incarceration, and the prison assented to his request to be housed in another cell the night of his suicide, the court found that, in the absence of evidence that the inmate's suicidal thoughts were apparent to the prison guards, his need for a suicide resistant cell was not obvious. *Id.* at *12–13 (citing *Gonzales v. Bexar County, Texas*, 2014 WL 12513177, at *5 (W.D. Tex. Mar. 20, 2014), *aff'd, sub nom. Gonzales v. Bexar County*, 584 F. App'x 232 (5th Cir. 2014); *Zaragoza v. Dallas County*, 2009 WL 2030436, at *1 (N.D. Tex. July 13, 2009)).

Thus, for a needed accommodation to be obvious, the Plaintiff must establish that ADOC had more than constructive knowledge of his disability; it must be obvious that an *accommodation* was needed. Evidence that the need for an accommodation was obvious may include a showing that prison officials had contemplated accommodations for an inmate's particular disability in the past, or when there is a history of the disability being treated in the prison setting.

Here, Smith argues that his mental disability was obvious, and, therefore, the prison should have accommodated him with respect to the Election Form. To support this assertion, he points to his 1992 prison intake form and past testing during his post-conviction proceedings to show that his disability was obvious. First, Smith alleges, "intake records from 1992 demonstrate that ADOC was on notice that Mr. Smith struggled with comprehension and understanding . . . even after explaining the purpose and subjects of the intake interview that he did not believe Mr. Smith understood." (Doc. 36 at 7, para. 34). The intake record in question reads: "[p]ersonally, I feel he didn't understand why the

interview was being held.  Although I did explain." (Doc. 44-1).  This notation from a 29-year-old intake form falls far short of the sort of information necessary to put the ADOC on notice that Smith required any accommodation.  The Plaintiff also points to a prison record of an interview where it was noted, "[h]e didn't understand the interview per say [sic]; however, I tried to explain what this interview was about and the reason." (Doc. 44-2 at 4).  Notably, the same record reflects that Smith "wanted to obtain his GED," and that it recommended he be enrolled in a program for him to do so. (*Id.*).  Neither of these documents provide sufficient evidence that the Defendants knew or should have known of Smith's need for an accommodation.

Smith argues that the "State of Alabama *was aware* [of] *and acknowledged*" his IQ testing because of Smith's previous litigation regarding his disability. (Doc. 41 at 11).  At oral argument, Smith asserted that the ADOC had constructive knowledge of his disability because Commissioner Dunn was a defendant in those cases.  And the Defendants themselves submitted evidence from those cases pertaining to Smith's intellectual deficiencies, including the trial transcript of a psychologist stating Smith's intelligence category is, at most, "low average." (Doc. 45-2 at 5).  The evidence presented by the Defendants certainly suggests they had constructive notice of Smith's intellectual limitations—or, at the very least, that he was claiming to have an intellectual disability.  However, even if the State's knowledge of the Plaintiff's IQ scores are properly imputed to the ADOC, that knowledge alone does not establish that the ADOC should have known that Smith needed an accommodation.

And the hundreds of pages of Smith's inmate and health records do not reveal any evidence to demonstrate that his need for an accommodation was known or obvious to the the ADOC.[5]  In fact, Smith's inmate and health file provide the strongest evidence that it was not obvious the prison needed to accommodate him.  First, the Court has scoured the Plaintiff's medical and psychological records and can find no comments or notations that indicate the staff was even aware of his intellectual disability. (*See*, *e.g.*, docs. 47-1 at 22, 31–37, 41–53, 76–79, 83–84; 47-3 at 17–50; 47-4 at 1–16, 42).  For example, on June 18, 2009, a form for the "Identification of Special Needs" did not have "yes" checked for "Developmentally Disabled" or "Special Mental Health Needs." (Doc. 46-1 at 92).  As recently as 2016, prison officials screened Smith for prison victimization risk factors, and checked "no" in response to the question, "[h]ave you ever been told you have a mental disorder, learning disability . . . or developmental disability," and they indicated that he had no difficulty verbalizing. (Doc. 47-4 at 40).

More importantly, none of the documents produced show that Smith was accommodated for an intellectual disability.  His inmate and prison files are replete with forms signed by Smith with no indication the ADOC accommodated him in any way.  Smith signed forms selecting next of kin,[6] (doc. 47-25 at 6, 16), agreeing not to work in

---

[5]  After oral argument on February 8, 2021, both Parties submitted additional evidence to the Court.  Part of the evidence submitted by the Defendants included Smith's entire prison and health record.  Smith obtained a copy of his file on December 30, 2019. (Doc. 44-2 at 1).  The evidence submitted to the Court consists of one thousand, six hundred and thirty-two pages of records from Smith's almost thirty years with the ADOC, in addition to two affidavits. (*See generally* doc. 47).

[6]  "In the event of a serious injury or illness, I request the following person be notified . . . ." (Doc. 47-25 at 6).

the kitchen while sick,[7] (*id.* at 8; doc. 47-29 at 35, 41), attesting to a Tuberculosis notice form,[8] (doc 47-25 at 26), consenting to medical treatment,[9] (*id.* at 34; doc. 47-30 at 34, 35; 47-37 at 45-47), refusing medical treatment,[10] (doc. 47-29 at 14, doc. 47-33 at 39, 40, 42, 44, 46, 48; doc. 47-37 at 50), and consenting to speak to the news media, [11] (doc. 47-2 at 14).   Many of these forms included the signature line below a statement agreeing that the signing party had read and understood the form.   Some of the forms show annotations that appear to be made by Smith himself.   For example, Smith wrote on a medical services release of responsibility form on April 13, 2009, "[a]ll I wanted was to see the dentist. I'm not sick." (Doc. 47-25 at 52).   He signed beneath the note. (*Id.*).   None of these forms suggest that Smith had the contents of any form read aloud to him, that he did not understand any form, or—crucially—that it appeared obvious that he needed an accommodation.   Smith's record also includes handwritten letters by him to the Warden in 2002. (Doc. 47-2 at 10–12).   And, in a notarized affidavit, the Holman ADA coordinator stated that he "would be made aware of any request for accommodation made by an

---

[7]   "I have received education on washing and personal hygiene, and I understand the need for both, especially when handling food on kitchen detail." (Doc. 47-29 at 35).

[8]   "I have received a fact sheet on TB and have had the opportunity to have my questions answered. I agree to TB testing by PPD . . . ." (Doc. 47-25 at 26).

[9]   "I understand the above procedure(s) is/ are necessary to treat my condition and has/have been fully explained. I also understand the nature of the risks associated with this/these procedure(s)." (Doc. 47-25 at 34).

[10]   "I acknowledge that I have been fully informed of and understand the above treatment recommendations and the risks involved in refusing them. I hereby release and agree to hold harmless the state . . . and I personally assume responsibility for my welfare." (Doc. 47-33 at 48).

[11]   "The undersigned consents and authorizes that any such photographs or interview materials may be utilized by the news media through their normal sources." (Doc. 47-2 at 14).

inmate," and that after reviewing all of Holman's ADA files, none "contained any request for accommodation made by inmate Willie B. Smith." (Doc. 47-38 at 2).

By comparison, the record does present evidence of other medical conditions Smith was diagnosed with over the years.  For example, there are several items in the record that reflect Smith was diagnosed with depression in 1994.  (Doc. 47-2 at 16 and 17).  A mental health services review from August 1, 2002 shows the he was evaluated as "rational" in speech and thoughts and "want[ed] to talk about library books usually." (Doc. 47-3 at 20).

Even if the Court assumes that the intake officer described a comprehension issue and that the prison was on notice of the results of Smith's intelligence testing during his previous litigation, these two points are insufficient to show that Smith's need for a reasonable accommodation was obvious.  This is particularly true in light of the voluminous records presented by the Defendants.  There is no evidence that ADOC had previously contemplated an accommodation like in *Nattiel*, where the plaintiff's asthma and glass eye had been specifically discussed by prison officials. *See* 2017 WL 5774143, at *1.  And, unlike the plaintiff in *Wolfe*, who had a "long history of asthma and [being] treated for numerous asthma emergencies while incarcerated," there is no evidence that Smith had any history of apparent needs for accommodation for his intellectual disability. *See* 2012 WL 4052334, at *4.  Instead, Smith's case is closer to *Arenas*, where the prison knew of pre-incarceration suicide attempts and a bipolar diagnosis, but the need for a suicide proof cell was not obvious. *See* 2020 WL 1849362, at *13.

Smith fails to present evidence that it was obvious in 2018 that he needed an accommodation to fully participate in the public benefit of the Election Form.

Consequently, this Court cannot find that Smith is substantially likely to succeed on the merits of his Title II claim.

### B.  Equitable Factors

A stay of execution is an equitable remedy, and "[e]quity strongly disfavors inexcusable delay." *Woods,* 951 F.3d at 1293.  The U.S. Supreme Court explicitly directed lower courts to "police carefully" against efforts to use last-minute motions to stay an execution "as tools to interpose unjustified delay." *Bucklew*, 139 S. Ct. at 1134.  The Court further cautioned that "last-minute stays should be the *extreme exception*, not the norm," and the "last-minute nature of an application that could have been brought earlier . . . may be grounds for denial of a stay." *Id.*  (emphasis added) (internal quotation marks omitted). *See also Woods*, 951 F.3d at 1293 (11th Cir. 2020) (finding that the last-minute nature of the filing of a motion to stay was unjustified when filed ten days before the scheduled execution).

Based on the foregoing principles, a stay of execution is not warranted.  Smith has not surmounted the "strong equitable presumption" against granting a stay, and his unexplained delay in seeking a stay of execution also weighs against equitable relief. *Hill*, 547 U.S. at 584; *see also Long v. Sec., Dep't of Corrs.*, 924 F.3d 1171, 1176 (11th Cir. 2019).

Smith could have filed his motion to stay as early as December 1, 2020 when the Alabama Supreme Court set his execution date.  He offers no reasonable explanation as to why a motion to stay was not filed at that time.  Smith did not file his emergency motion for a stay until February 4, 2021, one week before his scheduled execution.

(Doc. 42).  When asked at oral argument why the motion to stay was not filed earlier, counsel for Smith acknowledged that the motion was one of last resort.

The Court further finds that the State's strong interest in enforcing its criminal judgments and the public interest in seeing capital sentences completed both weigh heavily against Smith in this case.  "[E]quity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill*, 547 U.S. at 584; *see also Bowles v. DeSantis*, 934 F.3d 1230, 1247–48 (11th Cir. 2019) (collecting cases which discuss the importance of the State's interest in enforcing judgments).

Smith has been under a death sentence since 1992.  After almost thirty years, the State and the family of the victim of Smith's crimes "have an important interest in the timely enforcement of a sentence." *Hill*, 547 U.S. at 584; *Woods*, 951 F.3d at 1293; *Brooks*, 810 F.3d at 825; *Arthur v. King,* 500 F. 3d 1335, 1340 (11th Cir. 2007); *Jones v. Allen*, 485 F.3d 635, 638 (11th Cir. 2007).  "Stays of executions where the conviction and sentence are valid impose a cost on the State and the family and friends of the murder victim." *Bowles*, 934 F.3d at 1248.  Consequently, the Court concludes that the principles of equity weigh against Smith.

The Court concludes that, because Smith has not shown a substantial likelihood of success on the merits of his ADA claim, and, because the equities weigh against him, Smith has not met his burden of establishing his right to a stay, and his motion is due to be denied.

## VI.  CONCLUSION

For the reasons as stated, it is

ORDERED that the Plaintiff's Emergency Motion for a Stay of Execution, (doc.

42), is DENIED.

Done this the 9th day of February, 2021.

　　　　　　　　　　　　　/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE