IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIE B. SMITH, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.  2:19-CV-927-ECM |
| | ) | [WO] |
| JEFFERSON S. DUNN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

Plaintiff Willie B. Smith, III (hereinafter "Smith" or "Plaintiff") is a death-row inmate in the custody of the Alabama Department of Corrections ("ADOC").  The State of Alabama has set his execution date for October 21, 2021. (Doc. 132).  On November 25, 2019, the Plaintiff filed a complaint pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. ("ADA"), against the Commissioner of the ADOC, Jefferson Dunn, and the Warden of Holman Correctional Facility, Terry Raybon, (hereinafter "Defendants"), in their official capacities.  After an initial dismissal, the Plaintiff filed an amended complaint on January 29, 2021, in which he seeks declaratory and injunctive relief. (Doc. 36).

Before the Court is the Plaintiff's Motion for Preliminary Injunction. (Doc. 74).  He requests the Court enjoin the State of Alabama, by and through its agents, Defendants Dunn

and Raybon, from executing him by any method other than nitrogen hypoxia before the final adjudication of his ADA claim. (*Id.* at 1–2). During the pendency of this motion, the Court alerted the parties to its jurisdictional doubts. (*See* docs. 118, 119). The parties briefed the jurisdictional issue (*see id.*) and presented evidence and argument in support of jurisdiction at an evidentiary hearing on August 27, 2021. Because the Court now concludes that Smith lacks standing to bring this challenge, the Court lacks jurisdiction to proceed.[1]

## II.   PROCEDURAL HISTORY AND BACKGROUND[2]

In summary, Smith's extensive litigation history is as follows.

### A.  Smith's Litigation History

In 1992, after a jury trial, Smith was convicted of "capital murder for the intentional killing of Sharma Ruth Johnson" during a robbery and kidnapping. *Smith v. State*, 838 So. 2d 413, 421 (Ala. Crim. App. 2002). The facts of Smith's underlying conviction were

---

[1]  On September 24, 2021, the Court issued an order sanctioning Alabama Assistant Attorney General Lauren Simpson and the Office of the Attorney General under FED. R. CIV. P. 11. (Doc. 147). Though the Court and the parties were aware at the time the Court imposed sanctions that the Court harbored doubts as to its jurisdiction, a finding here that the Court lacks jurisdiction does not affect its ability to impose sanctions. "[A] district court appropriately may impose Rule 11 sanctions in a case in which the district court subsequently is determined to have been without subject matter jurisdiction." *Didie v. Howes*, 988 F.2d 1097, 1103 (11th Cir. 1993); *see also Willy v. Coastal Corp.*, 503 U.S. 131, 137–39 (1992) (explaining that Rule 11 sanctions are a "collateral matter" and stating that "there is no constitutional infirmity under Article III in requiring those practicing before the courts to conduct themselves in compliance with the applicable procedural rules in the interim, and to allow the courts to impose Rule 11 sanctions in the event of their failure to do so").

[2]  The Court takes judicial notice of Smith's underlying conviction and previous litigation. *See Smith v. Dunn*, 2017 WL 1150618 (N.D. Ala. Mar. 28, 2017), *aff'd sub nom. Smith v. Comm'r, Ala. Dep't of Corrs.*, 924 F.3d 1330 (11th Cir. 2019), *cert. denied, Smith v. Dunn*, 141 S. Ct. 188 (2020) (mem.); *see also Smith v. State*, 112 So. 3d 1108 (Ala. Crim. App. 2012), *cert. denied, Ex parte Smith*, 112 So. 3d 1152 (Ala. 2012) (mem.).

summarized by the United States District Court for the Northern District of Alabama in

post-conviction proceedings:

> The evidence at trial showed that Smith and his girlfriend, Angelica
> Willis, approached Johnson in her car near an automated teller machine.
> Following Smith's instructions, Willis asked Johnson for directions to a
> restaurant. Then Smith, armed with a shotgun, walked up to Johnson's
> car and forced Johnson into the trunk. After driving to another location,
> Smith and Willis returned to the automated teller machine. There, they
> located Johnson's dropped bank debit card and directed Johnson, still in
> the car's trunk, to call out the card's access code. At Smith's direction,
> Willis withdrew $80 from Johnson's bank account. A bank video camera
> captured images of Smith while Willis withdrew money from the
> machine. After driving around the Birmingham area and picking up
> Smith's brother from a shopping mall, Smith drove Johnson's car to a
> cemetery. Smith told Willis that he would have to kill Johnson because
> she would report the crime to law enforcement. Willis overheard Johnson
> pleading for her life and promising not to tell the authorities about the
> kidnapping. Willis then heard a gunshot. Smith, his brother, and Willis
> abandoned the vehicle at North Roebuck School. Smith later returned to
> the car and set it on fire to destroy any fingerprints left on it.

*Smith v. Dunn*, 2017 WL 1150618, at *1–2 (N.D. Ala. Mar. 28, 2017) (citations omitted),

*aff'd sub nom. Smith v. Comm'r, Ala. Dep't of Corrs.*, 924 F.3d 1330 (11th Cir. 2019).

Upon a 10–2 jury vote in favor, the trial court imposed a sentence of death. (Doc. 48-2 at

2, 20).

Smith appealed his conviction and sentence, which were affirmed by the Alabama

Court of Criminal Appeals. *Smith v. State*, 838 So. 2d 413 (Ala. Crim. App. 2002). Both

the Alabama Supreme Court and the United States Supreme Court denied certiorari. *See*

*id.* (noting the Alabama Supreme Court's denial of certiorari); *Smith v. Alabama*, 537 U.S.

1090 (2002) (mem.).

On August 1, 2003, Smith filed a Rule 32 petition, the denial of which was affirmed

on appeal. *Smith v. State*, 112 So. 3d 1108, 1113–14, 1152 (Ala. Crim. App. 2012).  The Alabama Supreme Court denied certiorari. *Ex parte Smith*, 112 So. 3d 1152 (Ala. 2012).  Smith did not pursue an appeal to the United States Supreme Court.

In March 2013, Smith filed a federal habeas corpus petition, pursuant to 28 U.S.C. § 2254, in the Northern District of Alabama. *Smith*, 2017 WL 1150618.  On July 21, 2017, the district court denied the petition. *Id*. at *73.  On May 22, 2019, the United States Court of Appeals for the Eleventh Circuit affirmed the denial. *Smith*, 924 F.3d at 1347.  The United States Supreme Court denied certiorari on July 2, 2020, concluding Smith's direct and collateral appeals. *Smith v. Dunn*, 141 S. Ct. 188 (2020) (mem.).

However, as his collateral challenge proceeded in federal court, Smith filed additional suits against Alabama state officials.[3]  He filed this action on November 25, 2019, alleging that execution by lethal injection violates his Eighth Amendment right to be free from cruel and unusual punishment, and alleging separately that the Defendants violated his rights under the ADA. (Doc. 1).  After a dismissal for failure to state a claim, (doc. 25), Smith filed the operative complaint on January 29, 2021, (doc. 36).  In response to another Rule 12(b)(6) motion, (doc. 37), the Court dismissed Smith's Eighth Amendment claim but allowed his ADA claim to proceed, (doc. 46).

---

[3]  Beyond the instant case, Smith filed: *Smith v. Dunn,* 2:20-cv-1026-RAH (M.D. Ala. Dec. 14, 2020) (asserting First Amendment and Religious Land Use and Institutionalized Person Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), claims regarding Smith's right to have a spiritual advisor present during his execution); *Smith v. Dunn*, 2:21-cv-2021-RAH (M.D. Ala. Feb. 2, 2021) (challenging safety procedures added to the execution protocol in response to the COVID-19 pandemic); and *Smith v. Dunn*, 03-CV-2021-900139.00 (Circuit Ct. Mont. Cnty. Ala. Feb. 4, 2021) (challenging COVID-19 safety precautions as violative of state law).

While this case proceeded, but upon completion of Smith's post-conviction appeals, the Alabama Attorney General moved the Alabama Supreme Court to set Smith's execution date. (Doc. 17).  On December 1, 2020, the Alabama Supreme Court set his execution date for February 11, 2021. (*Id.*).  On February 4, 2021, Smith moved this Court to stay that execution. (Doc. 42).  On February 9, 2021, the Court declined to do so. (Doc. 49).

Smith appealed to the Eleventh Circuit which, on February 10, 2021, granted a stay until February 16, 2021. *Smith v. Comm'r, Ala. Dep't of Corrs.*, No. 21-10413-P (11th Cir. Feb. 10, 2021).  Defendants asked the Supreme Court to vacate the Eleventh Circuit's stay, a request it granted on February 11, 2021. *Dunn v. Smith*, 141 S. Ct. 1290 (2021) (mem.).  However, since the Supreme Court declined to vacate a stay in a separate § 1983 action, *Dunn v. Smith*, 141 S. Ct. 725 (2021) (mem.) (denying an application for vacatur of a stay of execution in Smith's RLUIPA case), Smith's death warrant expired at midnight on February 12, 2021, and he was not executed. (*See* Doc. 74 at 6).

## B. Background[4]

Smith's instant suit orbits Alabama's decision to implement nitrogen hypoxia as a method of execution.  Lethal injection is Alabama's default execution method. ALA. CODE § 15-18-82.1(a).  However, in March 2018, Alabama added nitrogen hypoxia as an

---

[4]  The Court here recites facts with evidentiary support in the record—since discovery has commenced, Smith is no longer entitled to any presumption that the facts are as he alleged in his complaint.  However, within his complaint, Smith asserts that the Federal Defenders for the Middle District of Alabama undertook several actions regarding the nitrogen hypoxia opt-in and the election form discussed below.  Considering that the Federal Defenders currently represent Smith and are officers of the Court, this Court will accept those assertions about the attorneys' actions as true absent any evidence to the contrary.

alternative, effective June 1, 2018. *See* 2018 Ala. Laws Act 2018-353; ALA. CODE § 15-18-82.1(b).  Alabama affords death-row inmates "one opportunity to elect that his or her death sentence be executed by . . . nitrogen hypoxia." ALA. CODE § 15-18-82.1(b).  If an inmate's certificate of judgment from the Alabama Supreme Court affirming a sentence of death was "issued before June 1, 2018, the election must be made and delivered to the warden [of the correctional facility in which the inmate is held] within 30 days of that date." *Id.* § 15-18-82.1(b)(2).  Therefore, any inmate already on death row on June 1, 2018, had until the end of July 2, 2018, to opt into nitrogen hypoxia.[5]  Any election of nitrogen hypoxia is "waived unless it is personally made by the person in writing" within that allotted opt-in window. *Id.*  The statute does not specify the type or manner of writing required to elect, nor does it impose upon the ADOC any affirmative obligation to inform inmates of their opportunity to do so.

On June 26, 2018, attorneys from the Federal Defenders for the Middle District of Alabama (hereinafter "Federal Defenders") met with their death-row clients at Holman Correctional Facility to discuss the opt-in. (Doc. 36, paras. 19–20).[6]  The Federal Defenders

---

[5]  The parties have indicated that the statutory deadline ran through June 30. (*See* Doc. 36, para. 21) (" . . . but before the statutory opt-in deadline *of June 30, 2018*") (emphasis added).  Alabama law states that the "[t]ime within which any act is provided by law to be done must be computed by excluding the first day and including the last.  However, if the last day is Sunday, . . . the last day also must be excluded, and the next succeeding secular or working day shall be counted as the last day within which the act may be done." ALA. CODE § 1-1-4.  Excluding June 1, 2018, the day the statutory period began to run, thirty days is through July 1, 2018.  July 1, 2018 was a Sunday, and so cannot be counted as the last day.  Thus, under Alabama rules of construction, the statutory period to opt in for nitrogen hypoxia was from June 1, 2018, through July 2, 2018.  However, this fact is immaterial to Smith, who did not opt in.

[6]  The Federal Defenders held similar meetings at the William E. Donaldson Correctional Facility and the Julia Tutwiler Prison for Women, two other sites that house Alabama death-row inmates. (Doc. 36, para. 19).

informed their clients of the change in the law, answered questions about nitrogen hypoxia, and distributed a form they prepared to provide any client who wanted to opt into nitrogen hypoxia with a convenient way to do so. (*Id.*).[7]  This "Election Form" states:

> ELECTION TO BE EXECUTED BY NITROGEN HYPOXIA
> Pursuant to Act No. 2018-353, if I am to be executed, I elect that it be by nitrogen hypoxia rather than by lethal injection.
>
> This election is not intended to affect the status of any challenge(s) (current or future) to my conviction(s) or sentence(s), nor waive my right to challenge the constitutionality of any protocol adopted for carrying out execution by nitrogen hypoxia.
>
> Dated this _____ day of June, 2018.
>
> _____          _____
> Name/Inmate Number                             Signature

(Doc. 44-9).   After this meeting, several clients of the Federal Defenders opted into nitrogen hypoxia. (Doc. 44-7 at 3).

Sometime after the Federal Defenders met with their clients on June 26—but before the July 2 opt-in deadline for those already sentenced—Holman's Warden, Cynthia Stewart, on direction from someone above her at the ADOC,[8] had Correctional Captain Jeff Emberton ("Emberton") distribute a copy of the Federal Defenders' Election Form and an envelope to all death-row inmates. (Doc. 139 at 25–26, 46–49).  As he handed out the form, Emberton told inmates that the law had changed and that if they wanted to elect a

---

[7]  Though Smith is currently represented by the Federal Defenders' office, he was not at that time. (Doc. 36, para. 20; Doc. 58, para. 20).

[8]  That Warden Stewart was directed to pass out these forms, rather than choosing to do so of her own volition, was the subject of repeated misrepresentations before this Court by the Defendants.  These misrepresentations form the basis of the order sanctioning Assistant Attorney General Simpson and the Office of the Attorney General. (*See* Doc. 147).  However, the fact that the misrepresentations were made and whether Warden Stewart was directed to hand out these forms or chose to do so herself are wholly immaterial to this Court's ultimate holding that it lacks jurisdiction in this matter.

nitrogen hypoxia execution, they needed to fill out the form and seal it in the envelope provided. (*Id.* at 48–49).  He returned later to collect the envelopes. (*Id.*).  Almost fifty inmates, many not represented by the Federal Defenders, opted into nitrogen hypoxia during this period. (Doc. 44-7 at 3).  Not every inmate who did so utilized the form provided. (Doc. 139 at 183).

### C.  Smith's ADA Claim

Smith did not opt into execution by nitrogen hypoxia.  As the certificate of judgment on his conviction issued prior to June 1, 2018, (doc. 48-2 at 20) (sentencing Smith on July 17, 1992, to death by electrocution), he could opt into nitrogen hypoxia in writing any time before or on July 2, 2018. ALA. CODE § 15-18-82.1(b).  It is undisputed that Smith did not elect, nor attempt to elect, nitrogen hypoxia during this window.

Smith claims he was unable to do so because he could not understand the form Emberton distributed. (Doc. 36, paras. 35–37).  Smith asserts that with an IQ between 64 and 72, (*id.*, para. 33), he "suffers from extreme deficits in encoding new information such that the information would need to be repeated and rehearsed many times for him to encode that same information on a level comparable to his peers." (*Id.*, para. 29).  It is this deficit, he alleges, that prevented him from enjoying the form's benefits and left him unable to opt into nitrogen hypoxia during the statutory period. (*Id.*, paras. 35–37).

Because Smith asserts he could not receive the benefit of the form without a reasonable accommodation, he brings a claim against the Defendants under Title II of the ADA. (*Id.*, paras. 62–67).  Title II bars discrimination by reason of disability from the "benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.  To

succeed on a claim under Title II, a plaintiff must demonstrate that (1) he has a disability; (2) he is a qualified individual under the statute; (3) he was denied access to a public benefit or program; and (4) his denial was due to his disability. *Kornblau v. Dade Cnty.*, 86 F.3d 193, 194 (11th Cir. 1996).

Smith alleges that in handing out the form, the ADOC established a public program or service, the benefits of which he was excluded from due to his intellectual disability. (Doc. 36, paras. 29–38).  Though it is undisputed that Smith can read, (doc. 139 at 248), he argues he could not understand the form and thus could not take advantage of its benefits. (Doc. 36, paras. 35–37).  Instead of simply handing the form out and expecting its return by inmates who wished to elect nitrogen hypoxia, Smith alleges that the ADOC needed to provide him additional, reasonable accommodations to be certain he understood the form and its implications. (*Id.*, para. 36).  He asserts that the ADOC could have read the form to him, given him more time to understand it, answered questions about it, or facilitated extended contact with his attorney to discuss it. (*Id.*; Doc. 139 at 192–93).

Smith seeks two kinds of relief.  The first is declaratory:  he asks the Court to "declar[e] Defendants to be in violation of the ADA for failing to develop and implement reasonable accommodations concerning the nitrogen hypoxia opt-in for disabled death-sentenced prisoners." (Doc. 36 at 14).  The second is equitable:  he asks the Court to order Defendants to implement a reasonable accommodation for the opt-in, and to enjoin the State from executing him "by lethal injection to permit him time to avail himself of the reasonable accommodations developed and implemented as to the nitrogen hypoxia opt-in." (*Id.* at 15).

9

During discovery for this case, on July 6, 2021, the Alabama Attorney General once again moved the Alabama Supreme Court to set Smith's execution date. (Doc. 70). Smith filed the pending Motion for Preliminary Injunction on July 14, 2021, asking the Court to enjoin Alabama, by and through its agents, Defendants Dunn and Raybon, from executing him by any method other than nitrogen hypoxia while his ADA claim remains pending. (Doc. 74).[9] Upon review of this motion and the parties' submissions, the Court became concerned about its jurisdiction over this case. It is that issue to which the Court now turns.

## III.   DISCUSSION

A court is under obligation to address doubts that "go[] to subject-matter jurisdiction" *sua sponte*. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (citation omitted). "The requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)). The court must "ask and answer [this question] for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." *Id.* at 95 (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)).

Federal courts are restricted by Article III of the Constitution to adjudicate only "Cases" and "Controversies." U.S. CONST. art. III, § 2. To be either, "[a]t all stages of litigation, a plaintiff must maintain a personal interest in the dispute. The doctrine of

---

[9] After Smith filed his motion, but before the Court ruled on it, the Alabama Supreme Court granted the State's renewed motion to set Smith's execution date. (Doc. 132). Smith is currently set for execution on October 21, 2021.

standing generally assesses whether that interest exists at the outset . . . ." *Uzuegbunam v. Preczewski*, 592 U.S. ____, 141 S. Ct. 792, 796 (2021).  Before a court can proceed to the merits of a given dispute, a plaintiff must satisfy the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To do so requires satisfying three elements.  A plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. ____, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61).[10]  For a court to find standing, it "must affirmatively appear in the record"—it "cannot be inferred argumentatively from averments in the pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotations omitted).  Smith, as the "party who seeks the exercise of jurisdiction in his favor," *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936), has the burden to clearly "allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

However, standing is not a mere pleading formalism, "but rather an indispensable part of the plaintiff's case, each element [of which] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  "It is the plaintiff's burden to plead *and prove* injury in fact, causation, and redressability." *Steele v. Nat'l Firearms Act Branch*, 755 F.2d 1410, 1414 (11th Cir. 1985)

---

[10]  If the plaintiff asserts a statutory cause of action, he must also satisfy the requirements for standing pursuant to the statute under which he brings the claim. *See United States v. $38,000 Dollars in U.S. Currency*, 816 F.2d 1538, 1544 (11th Cir. 1987) ("In addition to establishing Article III standing, claimants must also satisfy applicable statutory standing requirements.").  Since the Court here finds that Smith cannot satisfy the constitutional requirements of standing, it does not address any statutory standing issue.

(emphasis added) (citing C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure*, § 3522 at 63–65 (1984)).  While "the Supreme Court has mandated a liberal pleading standard for civil complaints," that standard is "inapplicable after discovery has commenced." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004).  If the underlying facts supporting standing are disputed, these issues "may be resolved at a pretrial evidentiary hearing or during the course of trial." *Id.* (citing *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 67–68 (1978)).  Against this background, the Court turns to Smith's case.

### A. Injury-in-Fact

Among the requirements of standing, "[f]oremost . . . is injury in fact—a plaintiff's pleading and proof that he has suffered the 'invasion of a legally protected interest' that is 'concrete and particularized,' *i.e.*, which 'affect[s] the plaintiff in a personal and individual way.'" *Gill v. Whitford*, 585 U.S. ____, 138 S. Ct. 1916, 1929 (2018) (second alteration in original) (quoting *Lujan*, 504 U.S. at 550, 560 & n.1).  The Court "must not confuse weakness on the merits with absence of Article III standing." *Ariz. St. Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (quotation omitted).

When prospective relief is sought, the "injury-in-fact demanded by Article III requires an additional showing." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328–29 (11th Cir. 2013).  Since he seeks an injunction and a declaratory judgment, Smith must satisfy not only traditional requirements of an injury-in-fact but must also "show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir.

2001); *see also Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1357 (11th Cir. 2021) (explaining that standing to seek a declaratory judgment requires a showing of future injury). As injunctions do not address past conduct, "a party has standing to seek injunctive relief only if the party shows 'a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury.'" *Houston*, 733 F.3d at 1329 (quoting *Wooden*, 247 F.3d at 1284). Thus, Smith must show an ongoing or future injury to demonstrate standing. Though the Court takes pains to disaggregate the merits of Smith's ADA claim from his standing to bring it, it remains that Smith does not adequately allege, or prove, facts that show a sufficient likelihood that he will be concretely harmed by any ADA violation.

After the Court requested additional briefing on his standing to bring this claim, Smith asserted as his injury that the Defendants' conduct has "barr[ed him] from the benefit of avoiding a substantially painful execution via lethal injection [in violation of] the ADA." (Doc. 119 at 4) (quoting Doc. 36, para. 65). According to Smith, the alleged ADA violation—that the ADOC did not provide him a reasonable accommodation to ensure he understood the nitrogen hypoxia form it distributed—thus condemns him to execution via lethal injection. However, execution via lethal injection has been Smith's status quo since 2002.[11] That he faces execution by lethal injection is insufficient to confer standing. Smith must plead and prove that he now faces such an execution *because* of an ADA violation.

---

[11] Though Smith was sentenced to death in 1992, not 2002, his original sentence was death by electrocution. (Doc. 48-2 at 20). Smith's sentence was changed to death by lethal injection upon passage of SB 240, 2002 Ala. Laws Act 2002-492, which made lethal injection, rather than electrocution, the primary method of execution in Alabama.

Otherwise, Smith's position is no different than it has been for almost two decades, and he fails to show a future injury traceable to a violation of the ADA by these Defendants.

While the Court agrees that "it is beyond dispute that the potential loss of life is a cognizable injury for purposes of Article III," mere assertion that his execution is in violation of his legal rights is not enough. *Moody v. Holman*, 887 F.3d 1281, 1286 (11th Cir. 2018).  Smith must demonstrate that he will be "*concretely harmed*" by the alleged ADA violation, for "an injury in law is not an injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. ____, 141 S. Ct. 2190, 2205 (2021).  There is "an important difference" between "a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law" and that plaintiff "suffering concrete harm *because* of the defendant's violation of federal law." *Id.* (emphasis added).  The latter confers standing, the former does not.  Courts have power only to "redress harms that defendants *cause* plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Id.* (emphasis added) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019)).

Smith's ADA claim rests on the premise that he was excluded from a benefit because of his disability.  However, Smith does not plead or prove that in 2018 he wanted the benefit from which he claims exclusion.  If Smith did not want any benefit deriving from the distribution or use of the form, his inability to access it does not "affect [him] in a personal and individual way," and thus cannot constitute an injury in fact. *Spokeo*, 578 U.S. at ____, 136 S. Ct. at 1548 (quotations and citation omitted).

Though the parties disagree on the scope of the benefit provided by the distribution of the form, it is undisputed that the form made a nitrogen hypoxia opt-in easier for inmates

who wanted to do so. (Doc. 139 at 188–90, 237–39). Smith also argues that the form offered access to § 15-18-82.1 such that it represented Alabama's implementation of the statute, and that the form contained a reservation of rights beyond any offered by the statute. (*Id.* at 182, 184). Finally, Smith argues that the form provided notice to inmates that they now had a new choice of method of execution. (*Id.* at 192). If this was indeed the benefit, to confer standing, Smith must demonstrate that failure to receive this notice in the *past* can sustain a *future* injury.

Smith has not sufficiently made any of these showings. In his complaint, he makes no assertion that he wanted to opt into nitrogen hypoxia during the statutory window. He also produces no evidence to that effect. Though he explained at the August 27, 2021 evidentiary hearing that discovery for this case to date totaled more than 14,000 pages of documents, none of the evidence submitted to the Court indicates that Smith wanted to opt into nitrogen hypoxia in June 2018. (*Id.* at 222).

Smith inartfully argues that filing this lawsuit in 2019 indicates he wanted to opt for nitrogen hypoxia during the statutory period. (*Id.* at 184). If he did not actually want to opt in at the time of the election, so the story goes, he would not have wasted his time in court seeking an opt-in now. Indeed, during this litigation, Smith's attorneys emailed the Office of the Attorney General in December 2020 to request a late opt-in. (Doc 45-6). His attorneys asked Assistant Attorney General Lauren Simpson if the ADOC would "accept a 'late' opt-in to nitrogen hypoxia on Mr. Smith's behalf from his attorneys . . . as a reasonable accommodation of his intellectual disability[.]" (Doc. 45-6 at 4). If so, the email was to represent his opt-in. (*Id.*). Ms. Simpson responded on December 16 that the statute

did not authorize a late opt-in, and so the ADOC was powerless to accept one. (*Id.* at 2). Smith asserts the fact that he filed this lawsuit and attempted to opt in late is evidence that he wished to elect nitrogen hypoxia in June 2018 but was unable to do so.

The Court declines to leap these inferential chasms. The timing of either action makes it difficult, if not impossible, to reasonably draw the inference Smith champions. Smith's lawsuit and late-election request came seventeen and thirty months, respectively, after the close of his election period. Neither include any statement, allegation, affidavit, or testimony that Smith wanted to opt into nitrogen hypoxia in June 2018. Without any such indication, that he undertook either pursuit is evidence only that he wished to opt in by at least November 2019, not evidence that he wished to do so in June 2018. Smith points the Court to no other evidence to demonstrate he wanted the benefit the form offered to him at the time of his alleged discrimination. The Court finds nothing in the record to support, either directly or circumstantially, that Smith wanted to elect nitrogen hypoxia in June 2018. Thus, even if he was denied the form's benefit at that time in violation of his ADA rights, Smith has not shown that he was concretely injured by this violation, either retrospectively or prospectively. [12]

---

[12] That the evidence does not support, and the complaint does not allege, this fact is not a new concern for the Court. On February 8, 2021, the Court held a combined hearing on a motion to dismiss and a motion for preliminary injunction. During the evidentiary portion of the hearing, the Court inquired if there was "any evidence that [Smith] wanted to elect nitrogen hypoxia during the election period." (Doc. 57 at 42). Smith, through counsel, answered that there was not "any evidence to present to the Court." (*Id.*). Months later, at the August 27, 2021 evidentiary hearing for another motion for preliminary injunction, the Court posed the same question, asking "[w]here in the record is there evidence that Mr. Smith wanted to elect nitrogen hypoxia . . . in June of 2018?" (Doc. 139 at 184). Smith pointed only to the fact that he filed the instant lawsuit in 2019, noting that he could have "attempted to . . . futilely ask for a late opt-in," but did not do so. (*Id.* at 185). He asserted that since "[h]e could not understand that form . . . he could not make the decision to make the one election in the time period required," and, presumably, could not have formed a desire to elect. (*Id.*).

Similar shortcomings plague Smith's assertion that the form was the ADOC's official *implementation* of § 15-18-82.1, and so its benefit was access to the statutory right to opt into nitrogen hypoxia.  This assertion has two flaws.  First, it is unsupported by evidence.  Though the Federal Defenders passed the form out to their death-row clients at other Alabama facilities, there is no evidence that the ADOC at those facilities gave every inmate the form.  The fact that only some inmates on death row received this form undercuts Smith's contention that it represented the ADOC's official implementation of § 15-18-82.1.  Instead, critically, the record contains at least one example of an inmate opting into nitrogen hypoxia without using the form, (doc. 139 at 183), with no indication (or argument by Smith) that this was an invalid opt-in that the ADOC should not and did not accept.  There are also no allegations or any fact from Smith that the form was, to the best of his understanding, the only way to opt into nitrogen hypoxia.[13]  Nothing indicates that Smith believed only this specific form would effectuate his opt-in.  Second, Smith still has not shown that he wanted to opt in during June 2018.  If Smith had no desire to exercise his statutory right to opt into nitrogen hypoxia in June 2018, being unable to do so by way of the form is not an injury in fact.

---

More foundationally, Smith, through counsel, acknowledges that he does not "allege anywhere in the complaint that [he] wanted to opt[ into] nitrogen hypoxia from June 1, 2018 to June 30, 2018." (Doc. 57 at 22).  Explaining this omission, counsel represented that Smith "did not comprehend that [choosing nitrogen hypoxia was] the choice he needed to make." (*Id.*).  In doing so, Smith's counsel not only concedes that such an allegation was not made, and such evidence has not been presented, but also indicates that Smith did not, in June 2018, actually want to elect nitrogen hypoxia. (*Id.* at 23).

[13] It is doubtful that he could even make such an allegation.  If Smith believed, however erroneously, that the form was the only way to opt into nitrogen hypoxia, he understood the form's purpose.  That understanding would seemingly doom his ADA claim.

Nor can Smith successfully establish standing by asserting that the form benefited inmates by reserving legal rights.  The form provides that any election evidenced thereby is "not intended to affect the status of any challenge(s) (current or future) to [the inmate's] conviction(s) or sentence(s), nor waive [the inmate's] right to challenge the constitutionality of any protocol adopted for carrying out execution by nitrogen hypoxia." (Doc. 44-9).  Smith argues that this reservation, not required or mentioned by the statute, was an added benefit the ADOC offered through this program. (Doc. 139 at 184).  Even if the Court agrees, Smith does not make clear how a reservation of rights for a hypoxia opt-in benefits an inmate who did not want to opt in.  Without alleging or proving he wanted to opt into nitrogen hypoxia in June 2018, this additional benefit was immaterial to Smith, and that he did not obtain it does not constitute an injury in fact.[14]

In the alternative, Smith asserts that the form benefited inmates by providing explicit *notice* that the law had changed and that they now had a new choice of their method of execution. (Doc. 57 at 17).  If the purpose of the form was to provide notice of an inmate's new statutory rights, a claim that Smith could not understand the form, and so did not receive such notice, could explain his inability to demonstrate that he wanted to opt in during June 2018.

The Court is unconvinced an injury lies here either.  The assertion that the form's purpose was to notify inmates of their right to opt in is belied by the form's own language and the evidence.  The form is explicitly drafted to convey information *from* the inmate *to*

---

[14]  There is also no indication that inmates who chose nitrogen hypoxia without this specific reservation of rights have waived any rights by making such an election.

the ADOC.  Smith's own complaint contends as much. (*See* Doc. 36, para. 25) ("The Election Form constituted written notification *to the Warden* that a death row prisoner elected to be executed by nitrogen hypoxia as required by the statute.") (emphasis added). The form is written in the first person.  It declares that "if *I* am to be executed, *I* elect that it be by nitrogen hypoxia." (Doc. 44-9) (emphasis added).  It reserves "*my* right to challenge the constitutionality" of any nitrogen hypoxia protocol. (*Id.*) (emphasis added).  It does not clarify what nitrogen hypoxia is, does not mention or explain the change in the law, and does not provide any information about the statutory deadline.  If any notice or explanation accompanied the form, it came from Emberton, who explained that the law had changed and that inmates now how had a choice about their method of execution. (Doc. 139 at 191–92).  Inmates were to make their choice, sign the form, and *return it* to the warden.  There is no allegation or support for the contention that Smith could not understand Emberton's explanation, and no further information is written into the form's own text.  That the form may have operated as notice of the law's change appears to be an unintended or collateral consequence, rather than its principal benefit.  Denial of this unintended consequence is also not an injury in fact.

Regardless, even if notice of his statutory rights *was* a benefit of the program, Smith cannot demonstrate prospective harm.  While he might have been denied notice of the change in law in June 2018, he clearly knows about it now.  His complaint focuses only on this form and his nitrogen hypoxia election period, rather than any continuing or future distribution of information he is unable to understand—the ADOC cannot "notify" him of this information in the future. *Cf. Yelapi v. DeSantis*, _____ F. Supp. 3d _____, 2021 WL

1918784 (N.D. Fla. Mar. 12, 2021) (holding that the plaintiffs had standing to bring an ADA claim derived from their *prospective* inability to understand state broadcasts without a provided sign language interpreter).

All told, Smith has not yet alleged or proven sufficient facts to demonstrate that any potential ADA violation will concretely harm him.  If he did not want to opt into nitrogen hypoxia in June 2018, this form, whatever benefit it may have conferred, was immaterial to him.  That he faces execution by lethal injection, his status quo since 2002, is not, without more, sufficient to sustain an injury in fact linked to an ADA violation.

Although Smith cannot demonstrate that his execution by lethal injection is because of an ADA violation, he might have standing if he could demonstrate "facts giving rise to an inference that he will suffer *future* discrimination by the defendant[s]." *Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001) (emphasis added) (citations omitted).  Smith does not attempt to do so.  He does not claim that his failure to understand this form was representative of a systemic or repeated problem he faced at Holman; instead, his claim concerns, and seeks to remedy, only discrimination with respect to this form *on this single occasion*.[15]  The benefit of this form no longer exists for Smith.  There is no evidence in the record that indicates this form is still being distributed by the ADOC. (*See* Doc. 139 at 244).  Even if such evidence exists, Smith's statutory election period has closed—any

---

[15]  Smith represented at the hearing that this form was "far more complicated than the forms that are normally passed out to inmates," and that those other forms were "repetitive" and seen "repeatedly[.]" (Doc. 139 at 181).  These admissions undercut any potential assertion that this *is* a problem Smith repeatedly encounters at Holman.

election form handed to him by the ADOC is no longer legally operable.[16]  He has no present or future ability to opt in using this form, no ability to reserve legal rights to bring a constitutional challenge using this form, and no ability to receive any sort of future notice through the distribution of this form.  Since Smith is powerless to enjoy this form's benefits in the future, there is no chance of future discrimination, and no future injury to rectify through injunctive relief.

Though Smith does not establish that his execution by lethal injection is *because* of an ADA violation or that he faces future discrimination by the ADOC, he also alludes to a more global injury.  Smith contends that he is subject now to a less humane method of execution, while a safer and less painful method exists and was available to him. (*Id.* at 182, 200).  According to Smith, even though he has faced lethal injection since 2002, it is only upon passage of SB 272 that his execution became comparatively more painful. (*Id.*).  He argues his inability to access the benefits of § 15-18-82.1, and its more humane execution, represent a continuing injury that will culminate in an unnecessarily painful execution.

Smith relies upon *Baze v. Rees*, 553 U.S. 35 (2008), arguing that the baseline presumption is that each new execution method by a state tends toward the more humane. (Doc. 139 at 182, 200).  According to Smith, since nitrogen hypoxia is a new alternative to lethal injection, it is therefore more humane and less injurious. (*Id.*).

---

[16]  The Court addresses its power to reopen Smith's opt-in period, notwithstanding the statutory deadline, in Section III.C, *infra*.  It concludes there that, under the circumstances in the present case, it lacks the power to order the ADOC to accept a late opt-in.  Since the statute has closed Smith's election period, and since the Court finds it lacks power to reopen it, any election form handed to Smith now lacks legal effect.

Smith reads *Baze* too broadly.  Though the plurality opinion noted that the federal government and the thirty-six states that sanctioned capital punishment had all "altered [their] method of execution over time to more humane means of carrying out the sentence," *Baze*, 553 U.S. at 40 (plurality opinion),[17] the plurality nevertheless spent considerable time evaluating whether Kentucky's lethal injection protocol embodied this trend.  There is no indication in *Baze* that the Court was doing so with a thumb on the scale, presuming that just because a method is new that it is *ipso facto* more humane than older methods.  No presumption frees Smith from his burden to plead and prove that nitrogen hypoxia is *actually* more humane than lethal injection to demonstrate an injury in fact.  Because Alabama's nitrogen hypoxia protocol is not yet finalized, any assertion that this method of execution is more humane than Alabama's lethal injection protocol is purely speculative.[18] The Court declines to make such an assumption, which it would have to in order to find injury in fact.

Smith struggles to articulate and support the harm he will face in the future.  He has not adequately alleged nor demonstrated facts that show his execution by lethal injection is because of a possible ADA violation by the Defendants.  He has not pleaded or proven facts that give rise to imminent, future disability discrimination he faces.  He also offers purely speculative argument that nitrogen hypoxia, without reference to a specific protocol,

---

[17]  Under the principle set out in *Marks v. United States*, 430 U.S. 188 (1977), the Chief Justice's plurality opinion in *Baze* is controlling.  *See Glossip v. Gross*, 576 U.S. 863, 879 n.2 (2015) (holding to that effect).

[18]  That Smith asserts the form benefitted inmates by reserving a right to challenge the nitrogen hypoxia protocol is an implicit acknowledgement that the protocol might not be impervious to challenge.

is more humane and less harmful than his future execution by lethal injection such that a denial of that method represents an injury in fact.  These deficiencies doom his standing to bring this claim.

### B. Traceability

Though the Court finds Smith has not demonstrated a future, concrete injury, it will also address Smith's other arguments suggesting he has standing.  Not only must Smith demonstrate that he has suffered an injury in fact, he must also show that his injury is "fairly . . . trace[able] to the challenged action of the [Defendants]." *Lujan*, 504 U.S. at 560 (quotation and citation omitted) (first alteration in original).  If Smith wrought his own injury, this "controversy is not justiciable." *Swann v. Sec'y*, 668 F.3d 1285, 1288 (11th Cir. 2012) (explaining that a plaintiff lacks standing when he "independently caused his own injury").  Nor is this controversy justiciable if Smith's injury was "the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (citing *Lujan*, 504 U.S. at 560–61).

Although the Court finds that Smith has not met his burden of alleging and proving an injury in fact, it will assume, *arguendo*, that he has.  However, even if his execution via lethal injection rather than via nitrogen hypoxia represents an injury in fact, Smith has not yet demonstrated that these Defendants *caused* that injury through the actions he challenges.[19]

---

[19]  While the Court believes it purely speculative that Smith's execution via lethal injection, rather than via nitrogen hypoxia, itself comprises an injury in fact, the existence of myriad litigation that fights for access to nitrogen hypoxia lacks much sense if that method was more painful than lethal injection.  The Court proceeds above as if Smith has indeed established that his execution via lethal injection rather than via nitrogen hypoxia represents an injury in fact.

Any assertion that Smith's injury is traceable to these Defendants rests on the premise that this form was the sole method of exercising his statutory right. The issue, crystallized both by the statute's text and by the facts in the record, is that it was not.

First, the statute is silent as to the form or type of writing any inmate must produce and deliver to effectuate the election. It says only that the election must be "personally made by the person in writing." ALA. CODE § 15-18-82.1(b)(2). It does not mention a specific form, indicate that a form or other opt-in aid is to be produced and distributed, or otherwise place any restrictions or guidelines upon the necessary writing. Smith conceded that the record contained evidence of a "couple of inmates whose attorneys . . . submitted a different form[,]" that a handwritten opt-in "would be possible under the statute[,]" and that the form was not the only manner of opt-in permitted. (Doc. 139 at 183–84). All three concessions cleave Smith's injury from the actions he challenges: if he could have opted into nitrogen hypoxia by any writing on any day between June 1 and July 2, 2018, then the fact that he could not use a single, non-exclusive form from June 26 to July 2 is not the cause of his injury. Put directly, Smith's *own* inaction, rather than any inaction by these Defendants, caused his harm.

Smith appears to argue that prior to this form's distribution, neither he, nor anyone else at Holman, knew about the opt-in. (*Id.* at 183, 186, 188). And if he did not know about the opt-in, he could not functionally opt in prior to the form's distribution. According to Smith, it would thus be wrong to say he could have opted into nitrogen hypoxia by any method other than the form at issue. This argument ignores a key point: this statute imposed no obligation upon the ADOC to *inform* the inmates of the law's change. *Price v.*

*Dunn*, 139 S. Ct. 1533, 1535 (2019) (mem.) (Thomas, J., concurring in the denial of certiorari) (noting that "the Alabama statute neither required special notice to inmates nor mandated the use of a particular form").  Absent any external right to be informed, Smith, like all people, is presumed to know the law. *Id.* ("As an initial matter, petitioner (like all other individuals) is presumed to be aware of the law and thus the . . . deadline."); *see also Atkins v. Parker*, 472 U.S. 115, 130 (1985) ("All citizens are presumptively charged with knowledge of the law[.]").  While it is true that "[t]he law does not entertain the legal fiction that every individual has achieved a state of legal omniscience," *Grayden v. Rhodes*, 345 F.3d 1225, 1243 (11th Cir. 2003), the months-long "grace period" between the law's signing and its effective date provided Smith "with an adequate opportunity to become familiar with [his] obligations under it," *Atkins*, 472 U.S. at 130.

Smith notes that the Lexis database in Holman's law library was not updated between the months of February and July, enough time for SB 272 to be passed, become effective, and the deadline to run. (Doc. 119 at 27; Doc. 119-28 at 2–3).  While this may be true (and there is nothing in the record to suggest that it is not), such fact is immaterial. Smith does not direct the Court to any case in which a court held that prisons have an affirmative duty to monitor and inform inmates of legal changes that affect them.  It is not even clear that the ADOC could have explained changes in the law to those affected by them, considering that most inmates on death row, including Smith, were represented by counsel. (Doc. 139 at 237).  If a change in the law was pertinent to Smith, it was his counsel, not the ADOC, who was tasked with informing and advising him.  Absent any duty on behalf of the ADOC to tell him about the opt-in, that Smith may have been uninformed of

25

it (a conclusion unsupported by evidence) speaks at most to his attorney's failure to inform and advise him.[20]

The ADOC violated no duty in failing to inform Smith of the opt-in period. Its only potential transgression under the ADA was in a failure to accommodate Smith's intellectual disability with respect to this form. But any such failure does not explain Smith's greater injury. Even if these Defendants violated the ADA and held from Smith the form's benefit, it remains unexplained why they are responsible for Smith's greater inability to opt into nitrogen hypoxia for the entire month of June. Though inmates had this form for no more than seven days before the deadline, (doc. 57 at 48–49), Smith did not opt in for over thirty. While an inability to understand the form may have closed the door on its use, Smith has conceded that other options remained open for him. That he did not utilize the form does not explain his broader failure to exercise any other option if he did, in fact, wish to elect nitrogen hypoxia in June 2018. This failure is the result of his own choices, not the choices of the ADOC, and thus any injury is not traceable to the Defendants but rather is attributable to his own inaction.

---

[20] That Smith's attorney did *not* inform him of the change in the law is a fact neither alleged nor supported. Smith not only could, but did, contact his attorney during the opt-in period. (Doc. 88-23). During the month of June, Smith spoke to his attorney for a total time of more than twenty-four minutes. (*Id.*). From June 26 to June 28 alone, Smith spoke to his attorney for 516 seconds across three calls. (*Id.*). The Court is unaware of what Smith and his attorney discussed during those calls, but the fact of the communications evidences that Smith had the opportunity to discuss the form and the opt-in with legal counsel. Smith also could have discussed the upcoming opt-in period with his attorney between March, when the law was signed, and June, when the law became effective.

### C. Redressability

The Court concludes that Smith has not demonstrated an injury in fact, or alternatively, that he has not shown his injury is traceable to the Defendants he has sued. Even if the Court assumes that Smith has suffered an injury, and that injury is traceable to these Defendants, he must still demonstrate that the Court can fashion a remedy that provides relief. *Lujan*, 504 U.S. at 561 (citations omitted). If he cannot, "the court should not take the case; in the absence of an effective remedy its decision can amount to nothing more than an advisory opinion." *Knight v. Fla. Dep't of Corrs.*, 936 F.3d 1322, 1334 (11th Cir. 2019) (quotation omitted). Smith can establish redressability if he can demonstrate that "a favorable decision would amount to a significant increase in the likelihood that [he] would obtain relief that directly redresses the injury suffered." *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1304 (11th Cir. 2011) (quotation and citation omitted). If instead, the "requested relief, if granted, would no longer have any practical effect on the rights or obligations of the litigants," the case is non-justiciable. *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1264 (11th Cir. 2017) (quotations, citation, and footnote omitted).

As noted above, Smith seeks both declaratory and equitable relief. He requests the Court declare that the ADOC violated the ADA by not implementing "reasonable accommodations concerning the nitrogen hypoxia opt-in for disabled death-sentenced prisoners," and requests the Court enjoin his execution by lethal injection until such time

27

that he can utilize the opt-in accommodations the Court orders implemented. (Doc. 36 at 14–15).[21]

After the Court expressed doubts that it could order these Defendants to implement the relief Smith seeks because the opt-in procedure, set by statute, is outside their purview, Smith made several arguments in favor of this Court's ability to do so. The Court addresses each.

### a. Defendants' Admission of Redressability

The first, and least convincing, is that the Defendants have admitted that Smith's injury is redressable. (Doc. 119 at 5). Smith argues that, in his complaint, he alleged that Defendant Dunn "has the authority to alter, amend, or make exceptions to the protocol and procedures governing the execution of death-sentenced prisoners in the State of Alabama," (doc. 36, para. 8), a fact the Defendants admitted in response. (Doc. 119 at 5 (argument); Doc. 58, para. 8 (admission)). Thus, according to Smith, Defendant Dunn can provide a late "opt-in for a person with cognitive disabilities . . . as required under the ADA,"—just the sort of "alter[ation]" or "exception" he admits he has the authority to grant. (Doc. 119 at 5).

It bears emphasizing that the elements of standing are matters for the Court to determine, not something the parties can admit to, consent to, or waive. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986) ("When . . . Article III

---

[21] In his motion for preliminary injunction, Smith alters his requested injunctive relief, seeking an order enjoining the State of Alabama, through the Defendants, from executing him "by any means other than nitrogen hypoxia as provided in ALA. CODE § 15-18-82.1 until the conclusion of the instant litigation." (Doc. 74 at 1–2). Because the Court concludes Smith lacks standing to bring the instant litigation, it need not address any issues regarding Smith's ability to request that separate relief.

limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect."). Despite that fundamental deficiency, however, other issues with Smith's argument abound.

While it may be true that Defendant Dunn admitted that he has authority over Alabama's execution protocols, Smith does not demonstrate how the statutory deadline falls under Dunn's authority. Any assertion of Defendant Dunn's authority to alter the statutory deadline is unsupported by the statute's text. Section 15-18-82.1 does not mention any ability of the Commissioner to alter the opt-in deadline. It mentions the Commissioner only once, noting that if electrocution, nitrogen hypoxia, and lethal injection are all declared unconstitutional, "then all persons sentenced to death shall be executed by any constitutional method of execution based on the sole discretion of the Commissioner of the [ADOC]." ALA. CODE § 15-18-82.1(c). Section 15-18-82, which specifies when, where, and by whom executions are to be conducted, also does not appear to grant the Commissioner the power Smith believes him to have. It too mentions the Commissioner only once, granting him the power to appoint an executioner should both the warden of Holman and his or her deputy be unavailable. *Id.* § 15-18-82(c). The statute does not mention any wholesale power the Commissioner has over statutory deadlines or requirements.

Smith suggests that § 15-18-82(a) "provides the commissioner of the [ADOC] the authority to declare lethal injection to be unavailable," which, if he were to exercise, "would result in nitrogen hypoxia becoming the method of execution." (Doc. 139 at 168) (citing ALA. CODE § 15-18-82(a)). If Dunn had such authority, Smith reasoned, he could

"declare lethal injection unavailable as to a single prisoner[.]" (*Id.*).  The Court disagrees

with Smith's interpretation of § 15-18-82(a).  The statute says that "[i]f lethal injection is

held unconstitutional *or otherwise becomes unavailable*, the method of execution shall be

by nitrogen hypoxia." ALA. CODE § 15-18-82(a) (emphasis added).  Nothing in the text

grants the Commissioner authority to *declare* that lethal injection is unavailable, either to

a specific inmate or to all inmates on death row.  Though the statute is not explicit under

what circumstances lethal injection would "otherwise become[] unavailable," it clearly

directs that a sentence of death "shall be executed . . . by lethal injection unless the convict"

elects some other method. *Id.*  If the Commissioner has the authority to declare lethal

injection unavailable to any given inmate, this baseline directive is meaningless—the

primary method of execution in Alabama would become whatever remains after the

Commissioner declares alternates unavailable, contrary to clear text that it be lethal

injection.  Absent clearer statutory direction and considering the "cardinal principle . . .

that a statute ought, upon the whole, to be so construed that . . . no clause, sentence or word

shall be superfluous, void, or insignificant," *United States v. Garcon*, 997 F.3d 1301 (11th

Cir. 2021) (quotation and citation omitted), the Court does not read the plain language of

§ 15-18-82 or § 15-18-82.1 in the manner encouraged by Smith.  Defendant Dunn does not

appear to have the authority to waive the opt-in statutory deadline, and any claim or

admittance that he does is unsupported.

       Smith also took a slightly different tack.  He argued that the State (by and through

its agents) represented that it would abide by an order from this Court to accept a late

election. (Doc. 139 at 204).   This admission, according to Smith, should support an inference that the Court has the power to issue the order in the first place. (*Id.*).

The Court is unconvinced.  That the State recognizes it would be bound by a federal court order is not noteworthy. *See Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958).  Any admission to that effect is not underlying evidence that the Court has the *power* to issue such an order—it is nothing more than a commitment to the judicial process and the rule of law.  Nor does the admission demonstrate redressability.  Smith's argument to the contrary just asserts again that the State has conceded redressability, something the State cannot do.

### b.  The Federal Supremacy Power and Preemption

In the alternative, Smith argues that the Supremacy Clause of the United States Constitution grants the Court authority to waive state statutory requirements that conflict with the execution of federal law. (Doc. 119 at 6–9).  He argues that if it is "impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of the federal law," the state law should give way. (*Id.* at 6) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008)).  Here, if the ADA requires an accommodation, and the state statute does not allow it, federal law trumps and the Court should order the accommodation given. (*Id.*).

Undoubtedly, the federal Constitution, and laws passed thereunder, are supreme to state law. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) ("The Supremacy Clause establishes that federal law 'shall be the supreme Law of the Land[.]'") (quoting U.S. Const., art. VI, cl. 2).  So too is it true that "[w]here state and federal law 'directly conflict,'

state law must give way." *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 583 (2009) (Thomas, J., concurring in judgment)).   Federal law preempts a conflicting state law "when it is physically impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of the federal law." *Browning*, 522 F.3d at 1167 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)).   Smith argues that here, state law is preempted by the requirements of the ADA.

In support of his position, Smith points the Court to several cases.  The first is *Mary Jo C. v. New York State & Local Retirement System*, 707 F.3d 144 (2d Cir. 2013).  In *Mary Jo C.*, the plaintiff, terminated from her job as a librarian, sought access to disability retirement benefits under New York state law. *Id.* at 148–49.  By statute, the state was to "provide[] disability retirement benefits for members of the [New York State and Local Retirement System ("NYSLRS")] who are physically or mentally incapacitated for the performance of gainful employment." *Id.* at 150 (citing N.Y. Ret. and Soc. Sec. Law § 605(b)(1), (b)(3)(c)) (quotations omitted).  However, due to a "mental illness" "suffered . . . since adolescence," the plaintiff "failed to recognize the filing deadline," which the statute pegged as "within three months of her last day of employment." *Id.*  Because her filing was untimely, she was denied benefits, and so sued under Title II of the ADA. *Id.*

The plaintiff argued that the NYSLRS should have accommodated her disability by waiving the filing deadline. *Id.* at 151.  The district court dismissed the case, finding instead that the deadline represented an "essential eligibility requirement" not subject to waiver under the ADA, and that any accommodation that contravened state law, as an extension of the deadline would, was unreasonable. *Id.*   Without a possible reasonable

accommodation, the plaintiff was not a qualified individual subject to protection under the ADA. *Id.*

The Second Circuit reversed, explaining that Congress "meant Title II to sweep broadly." *Id.* at 163. "If all state laws were insulated from Title II's reasonable modification requirement solely because they were state laws, state law [would serve as] an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting Title II." *Id.* (quotations omitted) (alterations in original). Thus, the ADA "would be powerless to work any reasonable modification in any requirement imposed by state law, no matter how trivial the requirement and no matter how minimal the costs of doing so." *Id.* It concluded that the "ADA's reasonable modification requirement contemplates modification to state laws, thereby permitting preemption of inconsistent state laws when necessary to effectuate Title II's reasonable modification provision." *Id.* (footnote omitted).

Smith also cites to a similar case in the Seventh Circuit. In *Quinones v. City of Evanston*, the Seventh Circuit held that the existence of a state law mandating differential treatment based on age was no defense to a cause of action under a federal law prohibiting age discrimination. 58 F.3d 275, 277–78 (7th Cir. 1995). No matter the law of the state, "[t]he Supremacy Clause of the Constitution requires a different order of priority. A discriminatory state law is not a *defense* to liability under federal law; it is a *source* of liability under federal law." *Id.* at 277 (citation omitted). The state statute barring pensions to firefighters hired after age 34 had to yield to the federal Age Discrimination in Employment Act requiring equal treatment to those hired at any age. *Id.* at 280.

The other cases Smith cites are those in which a federal court extends a voter registration deadline set by state statute considering some extrinsic and unforeseeable circumstance. *See Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757 (W.D. Wis. 2020) (extending a state registration deadline twelve days past the original deadline due to the COVID-19 pandemic); *Georgia Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344 (S.D. Ga. 2016) (enjoining a state voter registration deadline due to disruptions caused by Hurricane Matthew); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. 2016) (same).

In each case, the federal court enjoined a state statutory deadline that stood counter to a federal objective.  However, none of the cases parallel Smith's situation.  Where Smith's argument errs is in his conflation of the program he faults (*i.e.*, the form) with the statute he claims preempted.  The cases cited by Smith are all distinguishable from his own in this dispositive way.  In each case he cites, the plaintiffs sought relief from a statute to access a program *established by that statute. See Mary Jo C.*, 707 F.3d at 150–51 (seeking to enjoin the state from enforcing the deadline in N.Y. RET. & SOC. SEC. LAW § 605(b)(2) so she could access the disability retirement system established by the same statute); *Quinones*, 58 F.3d at 277 (seeking to enjoin enforcement of the age limitation in 40 ILL. COMP. STAT. 5/4-107 so the plaintiff could access the pension plan established by that article of the code).  So too with the voter registration cases:  the state statutes themselves both offered the benefit of voter registration and set some deadline on access to that benefit. *See Democratic Nat'l Comm.*, 447 F. Supp. 3d at 761–62 (noting that WIS. STAT. § 6.28(1) set both the procedures for registering to vote as well as the deadline to do so); *Fla.*

*Democratic Party*, 215 F. Supp. 3d at 1257–58 (examining how "Florida's statutory framework" itself burdens the right to vote). In this way, there was a close nexus between the program at issue and the state deadline a federal court enjoined. That nexus is absent here. Unlike those cases, it is entirely possible for the ADOC to adhere to both the strictures of federal law and those of § 15-18-82.1. But the ADA violation Smith alleges, and the accommodations he seeks, concern only the form, not the overall statutory language.

Occasionally, the underlying disjunction between the statute and the form surfaces in Smith's allegation and arguments. He alleges that his "cognitive impairments render him unable to personally make an election in the manner *specified in Senate Bill 272*." (Doc. 36, para. 64) (emphasis added). He further argues that given his inability, the ADOC should have accommodated him by "permitting [him] to opt-in via an agent (as opposed to doing so 'personally')." (Doc. 119 at 4) (quoting ALA. CODE § 15-18-82.1(b)(2)). Smith's problem is that the form imposed no such requirement—the statute did. The form makes no mention of any ability, or lack thereof, to opt in via an agent. If Smith takes issue with the *statute's* lack of accommodations for inmates with disabilities, an issue the Court does not reach, his claims are misplaced. The Defendants did not draft § 15-18-82.1 and did not prevent him from opting in through a method better suited to his abilities.

Essentially, Smith tries to slide himself into a class of plaintiffs to which he does not belong. His complaint does not challenge the statute. Rather, his complaint challenges a program separate from the statute imposing the barrier he wishes to pass. While the program undoubtedly made accessing a statutory benefit *easier*, the program's benefit was

not the statute itself.  Nor was the statute the program.  While § 15-18-82.1 establishes the right to opt into nitrogen hypoxia, and temporally conditions that right, it does not establish the program from which Smith claims his discrimination arises.  Had the statute itself directed the distribution of some form, Smith's argument would be more persuasive. Instead, the statute, its benefits, its requirements, and its deadlines, all ran concurrently with the ADOC offering this separate opt-in form.  Nor does the record, as explained above, establish that this form was the ADOC's *implementation* of the statute, such that it would not accept any other method of opt-in.  There is nothing in the record that ties this form with the election statute such that relief from the latter is appropriate to rectify issues with the former.  That the Defendants allegedly failed to accommodate him regarding the use of the discrete form is not the fault of the statute.

The Court is unaware of any case in which a court enjoins a statutory deadline to rectify an issue in a program the statute did not create nor sanction.  Aside from his assertion that he should have been permitted to use an agent, Smith's entire claim focuses on his inability to understand and utilize the *Election Form*.  But the remedy he seeks is far broader in nature.  In essence, Smith requests a do-over of a month-long statutory period for a seven-day (at most) deficiency in a program not mandated or prescribed by that statute.  For over three weeks prior to and for seven days after the form was distributed, Smith had the statutory authority to opt into nitrogen hypoxia.  Smith never exercised that authority.  While the Supremacy Clause undoubtedly raises federal law above state law, the Court has not been directed to any authority that indicates the Supremacy Clause grants it the power to override a state statutory deadline in this circumstance.

Nor has Smith directed the Court to any case where a court ordered access to the benefits of a program that no longer exists. By all indication, the program Smith claims he could not access—the use of the form—has ended. There is no evidence in the record that this form is still being distributed. By analogy, Smith seeks an order directing accommodations for a building that has burned down or reinstatement to a job for a company that is out of business. The Court would be powerless to grant either, just as it is powerless to grant an analogous remedy here.

Smith's underlying ADA issue, as brought against these Defendants, lies in his inability to access the benefit of the *form*. That benefit is separate from the statute that sets the deadline Smith claims is preempted by the ADA. Absent any authority to the contrary, the Court concludes it does not have the power to enjoin a statutory deadline for any discriminatory deficiencies in a separate, defunct program that the statute did not establish nor contemplate.

### c. Equitable Tolling of the Statutory Deadline

Smith also argues that the Court should equitably toll the statutory deadline. (Doc. 119 at 9–10). He correctly notes that federal courts recognize equitable tolling, even of mandatory deadlines. (*Id.* at 9) (citing *Holland v. Florida*, 560 U.S. 631, 650 (2010)). Equitable tolling is an "extraordinary remedy which should be extended only sparingly." *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993) (citing *Irwin v. Dep't of Veterans Admin.*, 498 U.S. 89, 96 (1990)). The burden falls on Smith as "the plaintiff to show that equitable tolling is warranted." *Id.* at 1479 (citing *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 661 (11th Cir. 1993)). Smith does not meet this burden.

37

Smith argues that since "circumstances outside [his] control—wholly of Defendants' making— . . . prevented him from opting-in within the statutory deadline," the Court should toll that deadline. (Doc. 119 at 10). Smith misrepresents the causes of his situation. As explained above, the Court is unconvinced that the situation Smith now faces is wholly of the Defendants' making. Just as he is unable to claim as such for injury purposes, so too is he unable to claim so for purposes of equitable tolling. Smith had months to consider his opt-in, and weeks to effectuate it. Even if Smith remained unable to use the form handed out by the ADOC, he conceded that he could have opted in through other methods. Since Smith allowed the deadline to run through his own inaction, he has failed to establish that the equities weigh in his favor.

Smith also fails to provide the Court with any guidance on what kinds of deadlines the Court can toll, or which circumstances are sufficiently inequitable and unexpected to warrant the tolling he seeks. He points the Court only to cases where a court tolls a statute of limitations keeping a plaintiff from filing an action. *See Holland*, 560 U.S. 631 (holding that equitable tolling applies to the one-year statute of limitations on petitions for federal habeas); *Ex parte Ward*, 46 So. 3d 888 (Ala. 2007) (holding that equitable tolling applies to the one-year limitations period on petitions for postconviction review under ALA. R. CRIM. P. 32).

That is not the situation Smith faces. His ADA claim is not barred by any statute of limitations. He does not seek relief from a procedural deadline. Instead, the deadline in the election statute that Smith seeks to escape is substantive in nature: it conditions the right he wishes to access, rather than his ability to challenge a denial of that right. Smith

has not directed the Court to, nor has the Court independently found, any authority for the proposition that it can toll this deadline.  Without authority on the issue, the Court declines to hold that the deadline in § 15-18-82.1, different in kind from those in cases Smith cites to, is subject to equitable tolling.  Even if it were, Smith fails to establish that equitable tolling is appropriate here.

### d.  Waiver and Estoppel

Finally, Smith argues that since he did not know of his ability to opt-in, he could not "waive" it. (Doc. 119 at 10–11).  If he could not waive it, the statute did not run for him, and so he retains his allotted thirty days.[22]

Generally, a federal court "defers to a state court's interpretation of a state statute." *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000).  However, Smith has not provided, and the Court has not found, any guidance from an Alabama state court on the meaning of the word "waive" as contained in § 15-18-82.1.  In the absence of such guidance, this Court "must predict how the highest court would" decide the issue. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018).

The statute says that an election for nitrogen hypoxia "is *waived* unless it is personally made by the person in writing." ALA. CODE § 15-18-82.1(b)(2) (emphasis added).  While a legal waiver is "the intentional relinquishment of a known right," *Edwards v. Allied Home Mortg. Cap. Corp.*, 962 So. 2d 194, 208–09 (Ala. 2007), the Court is

---

[22]  This argument underscores the shifting nature of Smith's positions and underlines the lack of evidence to support that Smith wanted the form's benefit in June 2018.  If he could show he did in fact want that benefit in June 2018, such that being kept from accessing it supports an injury in fact, he could not simultaneously assert he was not aware of the opt-in and so could not knowingly waive his right to it.

unpersuaded that the statute's use of "waive" has the meaning Smith ascribes to it. The "waiver" is the statute's baseline condition: it grants to inmates a thirty-day period during which they may opt into nitrogen hypoxia, a right that the statute itself erases upon the running of the thirty days. The circumstances of the "waiver" are created *by the statute*: "[t]he election for death by nitrogen hypoxia *is waived unless*" the inmate acts. ALA. CODE § 15-18-82.1(b)(2) (emphasis added). Based on the statute's text, an inmate's failure to elect within thirty days operates as the intentional relinquishment of a known right.

But even if Smith is correct, and the statute does mean that any "waiver" of a right to opt-in must be expressly knowing and voluntary, his argument still fails. However the statute meant to employ the word "waive," it remains that Smith is presumed to know the law. *Atkins*, 472 U.S. at 130. As explained above, Smith does not present evidence sufficient to overcome that presumption. Armed with the knowledge of the statute and the opt-in right it provided, that Smith failed to exercise his right within the statutory period operates as a knowing and voluntary waiver of it. The Court declines to hold that the statutory deadline has not yet run for Smith on account of his failure to "waive" his right to opt into nitrogen hypoxia. His statutory period began on June 1, 2018 and closed at the end of the day on July 2, 2018, just as it did for all death-row inmates already sentenced.

For the reasons stated, the Court concludes that Smith has failed to demonstrate an injury in fact, or that any injury he may have is traceable to these Defendants. It further concludes that Smith has failed to demonstrate that the Court can order any meaningful relief for his alleged claims. Consequently, Smith's failure to show any of the three renders Smith without standing and thus, this Court is without jurisdiction.

## IV.   CONCLUSION

The fundamental flaw at this juncture is Smith's conflation of the Alabama statute and its attendant restrictions with the form distributed by the ADOC.  This form was not required, directed, or sanctioned by the statute.  For the entire month of June 2018, both before and after this form was distributed, Smith had the ability to opt into execution by nitrogen hypoxia through any writing he chose.  His ultimate failure to do so is not the fault of these Defendants.  Smith does not have standing to bring this claim, and the Court does not have the power to give him the relief he seeks.

Accordingly, it is

ORDERED that the Plaintiff's case, including all pending motions, is DISMISSED without prejudice for lack of jurisdiction.

A separate judgment will enter.

DONE this 24th day of September, 2021.

                              /s/ Emily C. Marks
                    EMILY C. MARKS
                    CHIEF UNITED STATES DISTRICT JUDGE