IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIE B. SMITH, III,                    )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )         CASE NO.  2:19-CV-927-ECM
                                         )                    [WO]
JEFFERSON S. DUNN, *et al.*,             )
                                         )
            Defendants.                  )
                                         )

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION

This matter is before the Court on the Plaintiff's Motion for Preliminary Injunction, wherein he seeks to enjoin the Commissioner of the Alabama Department of Corrections ("ADOC"), Jefferson Dunn, and the Warden of Holman Correctional Facility, Terry Raybon ("Defendants"), from executing him by any method other than nitrogen hypoxia before the conclusion of the present litigation.  The Plaintiff is currently scheduled to be executed via lethal injection on October 21, 2021.

On June 1, 2018, Alabama Act 2018-353 went into effect.  This new law granted death-row inmates one opportunity to elect that their execution be carried out by a new method, nitrogen hypoxia, in lieu of Alabama's default method, lethal injection.  The process was simple:  any inmate who wanted to elect this new method of execution had only to notify their warden of that choice in writing before the expiration of the thirty-day

statutory deadline.  Any writing from the inmate is sufficient under the statute.  A failure to elect nitrogen hypoxia within the thirty-day period (June 1, 2018 through July 2, 2018) operated as a waiver of that method of execution.  Other than the implicit duty of the warden to accept written elections from death-row inmates during the statutory election period, the statute imposed no duty on the Defendants.

Sometime between June 26 and June 28, but before the July 2, 2018 statutory deadline, the ADOC directed that an election form be distributed to death-row inmates at Holman Correctional Facility ("Holman").  This form, to be filled out by inmates who wanted to elect nitrogen hypoxia, offered a non-exclusive way for those inmates to submit their statutory writing to the warden.  Some inmates used the form to elect nitrogen hypoxia.  Some elected nitrogen hypoxia by a different writing.  Many others made no election.

Plaintiff Willie B. Smith, III ("Smith" or "Plaintiff") is a death-row inmate in the custody of the ADOC at Holman.  From June 1, 2018 to June 26, 2018, Smith made no efforts to elect nitrogen hypoxia.  Though Smith thereafter received the election form, he alleges that due to his intellectual disabilities, he could not understand it.  He asserts that his inability to understand the form prevented him from exercising his statutory right to elect nitrogen hypoxia as his method of execution.

On November 25, 2019, Smith filed a complaint pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. ("ADA"), against the Defendants in their official capacities.  After an initial dismissal, Smith filed an amended complaint on January 29, 2021, in which he seeks declaratory and injunctive

relief. (Doc. 36).  Smith alleges that the distribution of the election form between June 26 and June 28, 2018 constituted a public benefit to which he was denied meaningful access on account of his disability in violation of the ADA.  Specifically, Smith asserts that because he did not understand the election form, he faces a more painful execution by lethal injection, a future injury redressable through injunctive relief.

This Court previously dismissed Smith's suit for lack of standing. (Doc. 148).  On appeal, the Eleventh Circuit reversed, holding that Smith has standing to bring this suit, and accordingly, that this Court has jurisdiction to hear it. *Smith v. Comm'r, Ala. Dep't of Corrs.*, No. 21-13298-P (11th Cir. Oct. 15, 2021).  This matter returns to this Court on an order to remand.  Because the Court finds Smith has not demonstrated a sufficient likelihood of success on the merits of his underlying ADA claim, or that the equities weigh in his favor, his motion for preliminary injunction is due to be DENIED.

## II.   PROCEDURAL HISTORY AND BACKGROUND[1]

In summary, Smith's extensive litigation history is as follows.

### A.  Smith's Litigation History

In 1992, after a jury trial, Smith was convicted of "capital murder for the intentional killing of Sharma Ruth Johnson" during a robbery and kidnapping. *Smith v. State*, 838 So. 2d 413, 421 (Ala. Crim. App. 2002).  The facts of Smith's underlying conviction were

---

[1]  The Court takes judicial notice of Smith's underlying conviction and previous litigation. *See Smith v. Dunn*, 2017 WL 1150618 (N.D. Ala. Mar. 28, 2017), *aff'd sub nom. Smith v. Comm'r, Ala. Dep't of Corrs.*, 924 F.3d 1330 (11th Cir. 2019), *cert. denied, Smith v. Dunn*, 141 S. Ct. 188 (2020) (mem.); *see also Smith v. State*, 112 So. 3d 1108 (Ala. Crim. App. 2012), *cert. denied, Ex parte Smith*, 112 So. 3d 1152 (Ala. 2012) (mem.).

summarized by the United States District Court for the Northern District of Alabama in

post-conviction proceedings:

> The evidence at trial showed that Smith and his girlfriend, Angelica
> Willis, approached Johnson in her car near an automated teller machine.
> Following Smith's instructions, Willis asked Johnson for directions to a
> restaurant. Then Smith, armed with a shotgun, walked up to Johnson's
> car and forced Johnson into the trunk. After driving to another location,
> Smith and Willis returned to the automated teller machine. There, they
> located Johnson's dropped bank debit card and directed Johnson, still in
> the car's trunk, to call out the card's access code. At Smith's direction,
> Willis withdrew $80 from Johnson's bank account. A bank video camera
> captured images of Smith while Willis withdrew money from the
> machine. After driving around the Birmingham area and picking up
> Smith's brother from a shopping mall, Smith drove Johnson's car to a
> cemetery. Smith told Willis that he would have to kill Johnson because
> she would report the crime to law enforcement. Willis overheard Johnson
> pleading for her life and promising not to tell the authorities about the
> kidnapping. Willis then heard a gunshot. Smith, his brother, and Willis
> abandoned the vehicle at North Roebuck School. Smith later returned to
> the car and set it on fire to destroy any fingerprints left on it.

*Smith v. Dunn*, 2017 WL 1150618, at *1–2 (N.D. Ala. Mar. 28, 2017) (citations omitted),

*aff'd sub nom. Smith v. Comm'r, Ala. Dep't of Corrs.*, 924 F.3d 1330 (11th Cir. 2019).

Upon a 10–2 jury vote in favor, the trial court imposed a sentence of death. (Doc. 48-2 at

2, 20).

Smith appealed his conviction and sentence, which were affirmed by the Alabama

Court of Criminal Appeals. *Smith v. State*, 838 So. 2d 413 (Ala. Crim. App. 2002). Both

the Alabama Supreme Court and the United States Supreme Court denied certiorari. *See

id.* (noting the Alabama Supreme Court's denial of certiorari); *Smith v. Alabama*, 537 U.S.

1090 (2002) (mem.).

On August 1, 2003, Smith filed a Rule 32 petition, the denial of which was affirmed

on appeal. *Smith v. State*, 112 So. 3d 1108, 1113–14, 1152 (Ala. Crim. App. 2012).  The Alabama Supreme Court denied certiorari. *Ex parte Smith*, 112 So. 3d 1152 (Ala. 2012). Smith did not pursue an appeal to the United States Supreme Court.

In March 2013, Smith filed a federal habeas corpus petition, pursuant to 28 U.S.C. § 2254, in the Northern District of Alabama. *Smith*, 2017 WL 1150618.  On July 21, 2017, the district court denied the petition. *Id*. at *73.  On May 22, 2019, the United States Court of Appeals for the Eleventh Circuit affirmed the denial. *Smith*, 924 F.3d at 1347.  The United States Supreme Court denied certiorari on July 2, 2020, concluding Smith's direct and collateral appeals. *Smith v. Dunn*, 141 S. Ct. 188 (2020) (mem.).

However, as his collateral challenge proceeded in federal court, Smith filed additional suits against Alabama state officials.[2]  He filed this action on November 25, 2019, alleging that execution by lethal injection violates his Eighth Amendment right to be free from cruel and unusual punishment, and alleging separately that the Defendants violated his rights under the ADA. (Doc. 1).  After a dismissal for failure to state a claim, (doc. 25), Smith filed the operative complaint on January 29, 2021, (doc. 36).  In response to another Rule 12(b)(6) motion, (doc. 37), the Court dismissed Smith's Eighth Amendment claim but allowed his ADA claim to proceed, (doc.  46).

---

[2]  Beyond the instant case, Smith filed: *Smith v. Dunn,* 2:20-cv-1026-RAH (M.D. Ala. Dec. 14, 2020) (asserting First Amendment and Religious Land Use and Institutionalized Person Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), claims regarding Smith's right to have a spiritual advisor present during his execution); *Smith v. Dunn*, 2:21-cv-2021-RAH (M.D. Ala. Feb. 2, 2021) (challenging safety procedures added to the execution protocol in response to the COVID-19 pandemic); and *Smith v. Dunn*, 03-CV-2021-900139.00 (Circuit Ct. Mont. Cnty. Ala. Feb. 4, 2021) (challenging COVID-19 safety precautions as violative of state law).

While this case proceeded, but upon completion of Smith's post-conviction appeals, the Alabama Attorney General moved the Alabama Supreme Court to set Smith's execution date. (Doc. 17).  On December 1, 2020, the Alabama Supreme Court set his execution date for February 11, 2021. (*Id.*).  On February 4, 2021, Smith moved this Court to stay that execution. (Doc. 42).  On February 9, 2021, the Court declined to do so. (Doc. 49).

Smith appealed to the Eleventh Circuit which, on February 10, 2021, granted a stay until February 16, 2021. *Smith v. Comm'r, Ala. Dep't of Corrs.*, No. 21-10413-P (11th Cir. Feb. 10, 2021).  Defendants asked the Supreme Court to vacate the Eleventh Circuit's stay, a request it granted on February 11, 2021. *Dunn v. Smith*, 141 S. Ct. 1290 (2021) (mem.). However, since the Supreme Court declined to vacate a stay in a separate § 1983 action, *Dunn v. Smith*, 141 S. Ct. 725 (2021) (mem.) (denying an application for vacatur of a stay of execution in Smith's RLUIPA case), Smith's death warrant expired at midnight on February 12, 2021, and he was not executed. (*See* Doc. 74 at 6).

**B. Background**

Smith's instant suit orbits Alabama's decision to implement nitrogen hypoxia as a method of execution.  Lethal injection is Alabama's default execution method. ALA. CODE § 15-18-82.1(a).  However, in March 2018, Alabama added nitrogen hypoxia as an alternative, effective June 1, 2018. *See* 2018 Ala. Laws Act 2018-353; ALA. CODE § 15-18-82.1(b).  Alabama affords death-row inmates "one opportunity to elect that his or her death sentence be executed by . . . nitrogen hypoxia." ALA. CODE § 15-18-82.1(b).  If an inmate's certificate of judgment from the Alabama Supreme Court affirming a sentence of death

was "issued before June 1, 2018, the election must be made and delivered to the warden [of the correctional facility in which the inmate is held] within 30 days of that date." *Id.* § 15-18-82.1(b)(2).  Therefore, any inmate already on death row on June 1, 2018, had until the end of July 2, 2018, to opt into nitrogen hypoxia.[3]  Any election of nitrogen hypoxia is "waived unless it is personally made by the person in writing" within that allotted opt-in window. *Id.*  The statute does not specify the type or manner of writing required to elect, nor does it impose upon the ADOC any affirmative obligation to inform inmates of their opportunity to do so.

On June 26, 2018, attorneys from the Federal Defenders for the Middle District of Alabama (hereinafter "Federal Defenders") met with their death-row clients at Holman to discuss the opt-in. (Doc. 36, paras. 19–20).  The Federal Defenders informed their clients of the change in the law, answered questions about nitrogen hypoxia, and distributed a form they prepared to provide any client who wanted to opt into nitrogen hypoxia with a convenient way to do so. (*Id.*).[4]  This "Election Form" reads:

> ELECTION TO BE EXECUTED BY NITROGEN HYPOXIA
> Pursuant to Act No. 2018-353, if I am to be executed, I elect that it be by nitrogen hypoxia rather than by lethal injection.
> This election is not intended to affect the status of any challenge(s) (current or future) to my conviction(s) or sentence(s), nor waive my right

---

[3]  Alabama law states that the "[t]ime within which any act is provided by law to be done must be computed by excluding the first day and including the last.  However, if the last day is Sunday, . . . the last day also must be excluded, and the next succeeding secular or working day shall be counted as the last day within which the act may be done." Ala. Code § 1-1-4.  Excluding June 1, 2018, the day the statutory period began to run, thirty days is through July 1, 2018.  July 1, 2018 was a Sunday, and so cannot be counted as the last day.  Thus, under Alabama rules of construction, the statutory period to opt in for nitrogen hypoxia was from June 1, 2018, through July 2, 2018.

[4]  Though Smith is currently represented by the Federal Defenders' office, he was not at that time. (Doc. 36, para. 20; Doc. 58, para. 20).

to challenge the constitutionality of any protocol adopted for carrying out execution by nitrogen hypoxia.

       Dated this _____ day of June, 2018.

_____     _____

Name/Inmate Number          Signature

(Doc. 44-9). After this meeting, several clients of the Federal Defenders opted into nitrogen hypoxia. (Doc. 44-7 at 3; Doc. 118-20).

Sometime after the Federal Defenders met with their clients on June 26—but before the July 2 opt-in deadline for those already sentenced—Holman's Warden, Cynthia Stewart, on direction from someone above her at the ADOC, had Correctional Captain Jeff Emberton ("Emberton") distribute a copy of the Federal Defenders' Election Form and an envelope to all death-row inmates. (Doc. 139 at 25–26, 46–49). As he handed out the form, Emberton told inmates that the law had changed and that if they wanted to elect a nitrogen hypoxia execution, they needed to fill out the form and seal it in the envelope provided. (*Id.* at 48–49; Doc. 118-28 at 24–30). He returned later to collect the envelopes. (Doc. 139 at 48–49). Almost fifty inmates, many not represented by the Federal Defenders, opted into nitrogen hypoxia during this period. (Doc. 44-7 at 3). Not every inmate who did so utilized the form provided. (Doc. 139 at 183).

### C. Smith's ADA Claim

Smith did not opt into execution by nitrogen hypoxia. As the certificate of judgment on his conviction issued prior to June 1, 2018, (doc. 48-2 at 20) (sentencing Smith on July 17, 1992, to death by electrocution), he could opt into nitrogen hypoxia in writing any time

before or on July 2, 2018. ALA. CODE § 15-18-82.1(b).  It is undisputed that Smith did not elect, nor attempt to elect, nitrogen hypoxia during this window.

Smith claims he was unable to do so because he could not understand the form Emberton distributed. (Doc. 36, paras. 35–37).  Smith asserts that with an IQ between 64 and 72, (*id.*, para. 33), he "suffers from extreme deficits in encoding new information such that the information would need to be repeated and rehearsed many times for him to encode that same information on a level comparable to his peers." (*Id.*, para. 29).  It is this deficit, he alleges, that prevented him from enjoying the form's benefits and left him unable to opt into nitrogen hypoxia during the statutory period. (*Id.*, paras. 35–37).

Because Smith asserts he could not receive the benefit of the form without a reasonable accommodation, he brings a claim against the Defendants under Title II of the ADA. (*Id.*, paras. 62–67).  Title II bars discrimination by reason of disability from the "benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.  Title II supports claims under three theories of discrimination:  intentional discrimination, disparate treatment, or a failure to make reasonable accommodations. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008); *see also Friedson v. Shoar*, 479 F. Supp. 3d 1255, 1263 n.6 (M.D. Fla. 2020) (citing the same).  To succeed on a Title II claim under a failure to reasonably accommodate theory, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) he lacked meaningful access to the benefits of a public entity's services, programs, or activities by reason of his disability; and (3) the public entity failed, despite a request, to provide a reasonable accommodation for

his disability. *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1327–28 (N.D. Ga. 2017) (citing *Nadler v. Harvey*, 2007 WL 2404705, at *5 (11th Cir. Aug 24, 2007)).

Smith alleges that in handing out the form, the ADOC established a public program or service, the benefits of which he was excluded from due to his intellectual disability. (Doc. 36, paras. 29–38).  Though it is undisputed that Smith can read, (doc. 139 at 248), he argues he could not understand the form and thus could not take advantage of its benefits. (Doc. 36, paras. 35–37).  Instead of simply handing the form out and expecting its return by inmates who wished to elect nitrogen hypoxia, Smith alleges that the ADOC needed to provide him additional, reasonable accommodations to be certain he understood the form and its implications. (*Id.*, para. 36).  He asserts that the ADOC could have read the form to him, given him more time to understand it, answered questions about it, or facilitated extended contact with his attorney to discuss it. (*Id.*; Doc. 139 at 192–93).

Smith seeks two kinds of relief.  The first is declaratory:  he asks the Court to "declar[e] Defendants to be in violation of the ADA for failing to develop and implement reasonable accommodations concerning the nitrogen hypoxia opt-in for disabled death-sentenced prisoners." (Doc. 36 at 14).  The second is equitable:  he asks the Court to order Defendants to implement a reasonable accommodation for the opt-in, and to enjoin the State from executing him "by lethal injection to permit him time to avail himself of the reasonable accommodations developed and implemented as to the nitrogen hypoxia opt-in." (*Id.* at 15).

On July 6, 2021, while discovery was ongoing in this case, the Alabama Attorney General once again moved the Alabama Supreme Court to set Smith's execution date.

10

(Doc. 70).  Smith filed the pending Motion for Preliminary Injunction on July 14, 2021, asking the Court to enjoin Alabama, by and through its agents, Defendants Dunn and Raybon, from executing him by any method other than nitrogen hypoxia while his ADA claim remains pending. (Doc. 74).[5]  The Court turns now to Smith's motion.

## III.   DISCUSSION

Smith is entitled to a preliminary injunction only if he demonstrates that: (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the threatened injury outweighs the harm the injunction would cause the other litigant; and (4) if issued, the injunction would not be adverse to the public interest. *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014).  However, "when the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest," and so the third and fourth elements are the same. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken v. Holder* 556 U.S. 418, 426 (2009)).

A preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion for each prong of the analysis." *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (quotations and citation omitted).  Smith, as the movant, must satisfy his burden on all four

---

[5]  After Smith filed his motion, but before the Court ruled on it, the Alabama Supreme Court granted the State's renewed motion to set Smith's execution date. (Doc. 132).  Smith is currently set for execution on October 21, 2021.

requirements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

### a. *Substantial Likelihood of Success on the Merits*

The Court now turns to whether Smith demonstrates a "substantial likelihood of success on the merits" of his underlying ADA claim. *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997). Smith alleges that the Defendants violated Title II of the ADA by failing to reasonably accommodate his intellectual disability in the distribution and use of the Election Form. As a result, Smith alleges, he was unable to exercise his statutory rights and elect nitrogen hypoxia as his preferred method of execution. As noted above, under a reasonable accommodation theory, Smith must show that "(1) [he] is a qualified individual with a disability, (2) [he] is unable, because of [his] disability, to meaningfully access a public benefit to which [he] is entitled, and (3) the public entity failed, despite [his] request, to provide a reasonable accommodation for [his] disability." *Todd*, 236 F. Supp. 3d at 1327 ; *see also Nadler*, 2007 WL 2404705, at *5 ("If establishing discrimination by failure to make reasonable accommodation, a plaintiff must merely show that (1) he was disabled, (2) he was otherwise qualified, and (3) a reasonable accommodation was not provided.");[6] *Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274, 1299 (S.D. Fla. 2016) (stating that the Rehabilitation Act—and thus the ADA—"requires only those accommodations that are

---

[6] While the Court recognizes that *Nadler v. Harvey* is an unpublished opinion, and thus non-precedential, the Court finds its analysis to be persuasive.

necessary to ameliorate a disability's effect of preventing meaningful access to the benefits of, or participation in, the program at issue").

Smith argues he has satisfied his burden and shown by clear evidence that he has a substantial likelihood to succeed on all three elements.  The Court addresses each in turn.

### i. *Qualified Individual with a Disability*

To sustain an ADA claim, Smith must first demonstrate that he is a qualified individual with a disability cognizable under the statute.  The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).  Such activities include "speaking, breathing, learning, reading, concentrating, thinking, communication, and working." *Id.* § 12102(2)(A).  The term "disability" is construed broadly. *Id.* § 12102(4)(A).

While Smith's disability is contested, the record indicates that he is indeed disabled under the broad construction of the ADA.  Previous IQ testing found Smith's IQ to be between 64 and 72 (Doc. 44-3 at 1; Doc. 44-4 at 1).  Though he can read "at an 8.6 grade level, [spell] at an 11.5 grade point level, and [do] math computations at a 6.3 grade level[,]" (Doc. 44-4 at 1), scores that demonstrate a relatively good degree of literacy, he nevertheless was found to "[have] difficulty encoding new information" and that "[material] would need to be repeated and rehearsed many times for him to get to a comparable level." (Doc. 44-5 at 20).

The Defendants note that Smith's own expert concluded that he was not intellectually disabled under the standard set out in *Atkins v. Virginia*, 536 U.S. 306 (2002), (doc. 88-16 at 15), and that many other experts did not reach a conclusion on the issue, (*id.*

at 15–16).  Beyond that, the ADOC recommended that Smith enroll in GED courses, and he completed the eleventh grade. (Doc. 44-2 at 4).  However, the ADOC also concedes that Smith was found to have difficulties in "the community use, health and safety, self-direction, social skills, and leisure skills categories," as well as "an indication that [Smith] has trouble learning new material." (Doc. 88-16 at 16).

The bar to be considered "disabled" per the ADA is not a high one. *See, e.g.*, *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 & n.2 (11th Cir. 2014) (explaining that Congress instructed that "the establishment of coverage under the ADA should not be overly complex nor difficult" (quoting H.R. REP. NO. 110-730, at 9 (2008))).  Given the broad construction the ADA demands in finding a "disability," Smith is likely to win on this point.  Though he may not be mentally impaired enough to qualify as "mentally disabled," Smith's difficulty in encoding new information sufficiently affects his major life activities to place him under the ambit of the ADA.

However, to succeed on his ADA claim, Smith must also demonstrate that he is a qualified individual under the statute.  The ADA defines a "qualified individual" as one who "with or without reasonable modifications to rules, policies or practices, . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."

42 U.S.C. § 12131(2).  To be a qualified individual, Smith must demonstrate that the prison was offering a program or service that he was eligible to participate in.[7]

The parties have long disagreed on whether a program or service was offered.  Smith maintains that Warden Stewart established a "policy, protocol, and program whereby corrections staff were instructed to distribute the Election Forms . . . to all death row prisoners." (Doc. 36, para. 22).  The Defendants "disagree that passing out the form constituted a public benefit under the ADA," (doc. 88-16 at 27), but rather that it was merely a "courtesy at the end of the election period," (*id.* at 28), one not directed by the statute.

The Defendants' framing of what constitutes a program or service under the ADA is too narrow.  As courts across the country have long emphasized, "[t]he ADA, as a remedial statute, must be broadly construed to effectuate its purpose." *Soto v. City of Newark*, 72 F. Supp. 2d 489, 493 (D.N.J. 1999) (citations omitted); *see also Niece v. Fitzner*, 922 F. Supp. 1208, 1217 (E.D. Mich. 1996) (explaining that, "to give effect to the ADA's purpose of eliminating discrimination . . . most courts have given a broad reading to the term 'service'" (citations omitted)).  Activities as diverse as planning municipal

---

[7]  Prisons are "public entities," which the statute defines as "any department, agency, . . . or other instrumentality of a State . . . or local government." 42 U.S.C. § 12131(1)(B); *see also Yeskey*, 524 U.S. 206 (holding that state prisons are "public entit[ies]" under Title II of the ADA).

weddings,[8] facilitating prisoner access to phone calls,[9] or holding county quorum meetings[10] have all be found to be "services" under the ADA.

Department of Justice regulations, promulgated pursuant to the ADA, are similarly expansive.[11] The Department instructs that Title II and its own regulations apply "to all services, programs, and activities provided or made available by public entities." 28 C.F.R. § 35.102(a).  At least one court interpreted this "broad language [as] intended to 'appl[y] to *anything a public entity* does.'" *Yeskey v. Penn. Dep't of Corrs.*, 118 F.3d 168, 171 (3d Cir. 1997) (second alteration in original) (emphasis added) (quotation and citations omitted).

The Court declines to construe the ADA as narrowly as the Defendants encourage. The record makes clear the non-trivial nature of the ADOC's undertaking.  Emberton took over a hundred copies of this form, with over a hundred envelopes, and gave every inmate on death row one of each. (Doc. 139 at 48).  He explained to each inmate that the law had changed and that they now had a new choice of execution method. (Doc. 74-1 at 122).  He was directed to do this by Holman's warden, who herself was directed by someone above

---

[8]  *Soto*, 72 F. Supp. 2d at 494.

[9]  *Niece*, 922 F. Supp. at 1218–19.

[10]  *Layton v. Elder*, 143 F.3d 469, 472–73 (8th Cir. 1998).

[11]  Title II of the ADA directs the Attorney General to "promulgate regulations in an accessible format that implement [that Title]." 42 U.S.C. § 12134.

her in the chain of command. (Doc. 139 at 14).[12]  The record clearly establishes that this was just the sort of "service" or "program" the ADA, in its broad sweep, includes.

However, even if the Court finds a "service" was offered, Smith must still demonstrate that he was eligible to participate. *See* 42 U.S.C. § 12131(2) (defining a qualified individual as one who "meets the essential eligibility requirements for the receipt of services").  The somewhat nebulous nature of how this service has been defined makes it difficult to determine its "essential eligibility requirements."  The parties do not address what the eligibility requirements of the service were, or if Smith was eligible to participate under those requirements.  They debate only how Smith could have *enjoyed the benefits* of the "service," not whether he was eligible to do so.

The record is more informative.  Emberton handed out a form to *every inmate on death-row*. (Doc. 139 at 48).  Nothing in the record indicates he first tried to discern if a particular inmate wanted to opt into nitrogen hypoxia and handed them a form only if they did.  His only criterion, and thus the only apparent eligibility requirement for this service, is whether an inmate was on death-row at the time of the form's distribution.  If they were, they got a form.

Smith, as a death-row inmate during the form's distribution, was clearly eligible to receive one.  It is uncontested that he did so.  If the ADOC's provided service is defined as

---

[12]  Though the Defendants have long maintained that Warden Stewart "took it upon herself" (doc. 126-2 at 63:1–6) to direct the distribution of the forms, her testimony later established that position to be false. (Doc. 69).  The Court addressed the Defendants' counsel's representations to the contrary in a separate order on September 24, 2021. (Doc. 147).  Though he alludes to it in his brief, Smith does not establish that granting his requested injunction would be an appropriate sanction for that conduct.

the distribution of the nitrogen hypoxia Election Form to all death-row inmates, Smith was eligible to participate, and so is a qualified individual with a disability under the ADA.

### ii. *Lack of Meaningful Access due to Disability*

Though the Court agrees Smith can likely show he is a qualified individual with a disability under the ADA, Smith must still demonstrate that he lacked meaningful access to the benefits of the service for which he was eligible. *Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("[A]n otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers."); *see also Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 888 (8th Cir. 2009) (explaining that to bring a valid Title II claim, a plaintiff "must specify a benefit to which he was denied meaningful access based on his disability").

"However, mere difficulty in accessing a benefit is not, by itself, a violation of the ADA." *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1216 (N.D. Ala. 2020). Indeed, "equal access is not the standard under the law." *Medina v. City of Cape Coral*, 72 F. Supp. 3d 1274, 1280 (M.D. Fla. 2014); *see also A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 680 (E.D.N.Y. 2012) ("'Meaningful access' . . . does not mean 'equal access' or preferential treatment.").

The Eleventh Circuit has held a claimant had meaningful access to a public service even if their disability made that access more difficult than it would otherwise be. For example, in *Bircoll v. Miami-Dade County*, the court held that a plaintiff described as "profoundly deaf" nevertheless had meaningful access to a public entity's activities even though interpreters were denied, and perfect understanding escaped him. 480 F.3d 1072,

1075, 1085–89 (11th Cir. 2007).  After he was subjected to a traffic stop, the plaintiff was unable to effectively communicate with the officer attempting to administer field sobriety tests. *Id.* at 1076–78.  Though he requested an interpreter, or that someone be called "to help [him] out with" communicating, neither request was honored. *Id.* at 1077.  He brought a claim under Title II, alleging that he was denied "effective communication with the police" since no one accommodated his hearing impairment. *Id.* at 1085.  The court held that the plaintiff did not lack meaningful access, noting that though communication was not "perfect," the plaintiff acknowledged that he "usually understands fifty percent of what is said" and "understood that he was being asked to perform field sobriety tests." *Id.* at 1087.

Similarly, in *Ganstine v. Secretary, Florida Department of Corrections*, the Circuit held that an inmate who used a wheelchair was not denied meaningful access to prison services. 502 F. App'x 905, 910 (11th Cir. 2012) (per curiam).  Though the inmate claimed he "was unable to access certain areas of the prison," he nevertheless admitted that "inmate orderlies were available 'most of the time' to push his wheelchair wherever he needed to go." *Id.* (citation omitted).  Though "most of the time" is clearly not all of the time, the court held that "a reasonable jury could not have concluded that the [prison] denied [the inmate] access because of his disability." *Id.*

By comparison, in *Shotz v. Cates*, two plaintiffs brought a Title II suit against a county, claiming that "the wheelchair ramps and bathrooms at the [county's] courthouses impeded their ability to attend trials." 256 F.3d 1077, 1080 (11th Cir. 2001).  Even though the plaintiffs managed to attend a trial at the courthouse, the court nevertheless upheld their

19

claim, explaining that "[i]f the Courthouse's wheelchair ramps are so steep that they impede a disabled person or if its bathrooms are unfit for the use of a disabled person, then it cannot be said that the trial is 'readily accessible.'" *Id.* (quoting 29 C.F.R. § 35.150(a)).

The line between meaningful access and lack thereof is a difficult line to draw, and the parties make no attempt to place Smith on either side. Indeed, the parties do not even concretely identify what the service's benefit was, a necessary step to any coherent discussion on whether Smith was denied that benefit. While there is general agreement that the form made an election easier, Smith also argues that the form offered access to ALA. CODE § 15-18-82.1 such that it represented Alabama's implementation of the statute, and that the form contained a reservation of rights beyond any offered by the statute. (Doc. 139 at 182, 184). He additionally argues that the form provided notice to inmates that they now had a new choice of method of execution. (*Id.* at 192).

Smith argues that he was denied meaningful access to the form because he did not understand it. As an initial matter, it is notable that Smith has yet to provide direct evidence, either through testimony or affidavit, that he was in fact unable to understand the form. Nothing in the record, contemporaneous or otherwise, speaks to how Smith understood the form, how he interacted with it, or what he gleaned from its text when it was distributed. Though Smith asserts in his complaint, and repeatedly argues through counsel, that he was unable to understand, and so could not utilize, the form, the record contains no testimonial evidence from Smith to support that assertion. Instead, Smith submitted an affidavit wherein he speaks only to his failure to pass the GED—he does not address his inability to understand the form. (Doc. 119-23). After over two years of

litigation, Smith still has not demonstrated to the Court what about the form he could not understand.

In that absence, the Court is forced to divine the record. Read generously, the record seems to support Smith's overall assertion that he did not understand the form in two ways—both heavy on inference and light on evidence. The first is simply that Smith did not utilize the form, and so the Court could infer he did not use it because he did not clearly understand it, and thus was denied, by reason of his disability, its benefits. The Court finds that inference unconvincing. Simply that Smith did not utilize the form equally supports the inference that he *chose* not to do so as it does that he could not to do so because he could not understand it. Indeed, not every inmate who received the form opted into nitrogen hypoxia—receiving and understanding the form did not inexorably lead to an inmate choosing nitrogen hypoxia. Without evidence tipping the scale in either direction, the Court is left to speculate as to what Smith understood and how that understanding affected his action or inaction. The Court declines to fill in those gaps.

However, the record provides sounder support for a different inference: that because the form has been evaluated to require a reading level beyond Smith's measured capabilities, he could not, in fact, understand it. (*See* Doc. 74 at 25–26). In support, Smith submits a report by Dr. Kathleen R. Fahey. (Doc. 145-1). Dr. Fahey evaluates the form to be "at the 11th grade level" and notes that it "far exceeds Mr. Smith's ability to read and comprehend it." (*Id.* at 6). She further evaluates Smith's literacy ability to fall between the second and fourth grades. (*Id.*). Other experts have evaluated Smith's reading ability to roughly correspond to an eighth-grade level. (Doc. 44-4 at 1). No matter his true ability,

21

both evaluations far below the eleventh-grade level Dr. Fahey finds the form required, or the college-senior level that Smith asserts in his complaint. (Doc. 36, para. 35). This evidence is largely unrebutted—the Defendants deny that the form's required reading level was so high, (doc. 58, para. 35), but produce no evidence of their own to indicate what reading level they believe the form to instead require.

However, despite those inferences, the record also contains support for the proposition that Smith did receive information about the form sufficient to satisfy the ADOC's obligation to provide him meaningful access. When the form was distributed, Emberton explained its purpose, and notified every inmate that because the law had changed, they now had a new choice of execution method. (Doc. 74-1 at 122). Even if Smith could not understand the form, Emberton's explanation appears to make clear what the form was for and how it was to be utilized.

Smith asserts that Emberton's explanation of the legal change and the form's purpose "falls far short of what an adequate ADA accommodation would be for a person with cognitive disabilities." (Doc. 74 at 15). Smith does not explain why or explain what Emberton should have informed inmates about their choice. Nor does Smith allege, or provide evidence to support, that he could not understand Emberton's explanation, or that he never heard it.

The crux of this assertion, though, is fundamentally misguided. It is immaterial whether Emberton's explanation was sufficient to endow inmates with an understanding of the form, their new choice, or the greater implications of execution by nitrogen hypoxia. What matters is how Smith's understanding and access to the program differs from those

qualified inmates who lacked disabilities.   Without making clear what explanation he sought, Smith fails to identify anything in the record indicating that Emberton's explanation bestowed Smith's preferred level of understanding upon *any* inmate.   Smith does not demonstrate that the ADOC explained the implications, be they legal[13] or factual,[14] of the form or this choice to anyone—indeed, the statute imposed upon it no obligation to do so.   Neither the form's text nor Emberton's explanation defines nitrogen hypoxia or provides any information on what is required by ALA. CODE § 15-18-82.1. Emberton explained only that the law had changed and that inmates now had a new choice of execution method, and Smith produces no evidence that he did not receive, or did not understand, that information.   While it is true that Emberton testified he could not provide *further* information about the form beyond his initial explanation, (doc. 74-1 at 119–20), he could not do so to anyone.   Smith was not entitled to a more comprehensive explanation than his fellow inmates received.   *See A.M. ex rel. J.M.*, 840 F. Supp. 2d at 680 ("'Meaningful access' . . . does not mean . . . preferential treatment.").

---

[13]  If Smith's contention is that Emberton should have explained the legal implications of the form and the election, Smith has not demonstrated that was possible.  Emberton is not a lawyer—he cannot provide legal explanations or advice, especially to inmates already represented by counsel.  Indeed, Smith, like many death-row inmates, was represented by counsel during the statutory period. (*See* Doc. 88-16 at 8–9).  Smith not only could, but did, contact his attorney during the opt-in period. (Doc. 88-23).  During the month of June, Smith spoke to his attorney for a total time of more than twenty-four minutes. (*Id.*).  From June 26 to June 28 alone, Smith spoke to his attorney for 516 seconds across three calls. (*Id.*).  The Court is unaware of what Smith and his attorney discussed during those calls, but the fact of the communications evidences that Smith had the opportunity to discuss the form and the opt-in with legal counsel.

[14]  It is not clear anyone could explain to inmates the factual implications of this choice to inmates without prognostication.  The State of Alabama had not yet finalized a nitrogen hypoxia protocol, and the future implications of an inmate opting for that method—be they timing, protocol, procedure, or whatever else— amounted to little more than speculation.

The Court now turns to Smith's more general contention that the form was the ADOC's official implementation of the statute, and so its benefit was merely the choice of execution method.  Even if the Court assumes without finding that Smith is correct, and that this form's benefit *was* to provide inmates with a choice of execution method, Smith produces no evidence that he lacked meaningful access to that benefit.  Smith's statutory right to elect nitrogen hypoxia vested on June 1, 2018, the day ALA. CODE § 15-18-82.1 became effective.  That right continued, unimpeded, until July 2, 2018, the day the statutory period expired.  During that time, Smith held the power to choose his execution method by submitting to the warden any writing he wished, a fact conceded by his counsel. (Doc. 139 at 183–84) (agreeing that something like a handwritten opt-in "would be possible under the statute").  That this form was distributed during the final few days of that period did not impede or supplant Smith's contemporaneous right to elect under the statute during the entire month of June.  Nothing in the record indicates that Smith believed that this form was the only way to effectuate his opt-in, nor is there any evidence or allegation that the form served as a barrier to Smith's concomitant statutory right to opt into nitrogen hypoxia by any writing.  He had, like every other inmate on death row, "any number of other ways to" elect nitrogen hypoxia and Smith has not shown that he "has meaningfully explored these options or that they [were] unavailable to [him]." *Todd*, 236 F. Supp. 3d at 1330.

Even if Smith could not understand the form, its benefit—a new choice of execution method—remained open to him.  Smith's counsel admits that "[t]here are a couple of inmates whose attorneys . . . submitted a different form." (Doc. 139 at 183).  Indeed, Smith could have simply flipped the form over and written "I elect nitrogen hypoxia" across the

back.  He could have used any sheet of paper and writing utensil available to him.  This form did not create Smith's right to choose nitrogen hypoxia, and that Smith did not use this form did not extinguish or even impede his statutory right to do so.

The Court finds that Smith fails to demonstrate, on this record, that he is substantially likely to succeed on this prong.  That Smith produces little direct evidence that shows he was held from the form's benefits—no matter what they were—is a large gap in his case.  Though Smith has had months to submit an affidavit or other explanation of what he understood and when, he has yet to do so.  Indeed, when the parties jointly requested that this Court delay Smith's deposition from September 2, 2021, to October 11, 2021, (doc. 121), the Court ordered a status conference to discuss whether to reschedule the hearing on the motion for preliminary injunction until after Smith's deposition, (doc. 122).  At that conference, both parties responded that there was no reason for delay, that Smith's testimony was not necessary, and that the Court had all the evidence before it needed to rule on the motion for preliminary injunction. (Doc. 127).  Absent direct testimony from Smith himself, the Court is left instead with the allegations in the complaint, inference, and circumstance.  It finds none of these sufficient to satisfy Smith's burden.

### iii.  *Lack of Provided Reasonable Accommodation*

Though the Court finds that Smith does not show he lacked meaningful access to the ADOC's service, even if he did, Smith must still establish that he was denied a reasonable accommodation.  If Smith's disability prevented him from receiving the form's benefit, the ADOC is required to "provide reasonable accommodations to ensure that [he]

is permitted access to the same benefits and services as others." *Arenas v. Ga. Dep't of Corr.*, 2020 WL 1849362, at *11 (S.D. Ga. Apr. 13, 2020).  However, no duty to provide such accommodations is triggered before a claimant makes a specific demand for one. *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).  The claimant himself must explain what it is he requires—public entities are not required to "guess at what accommodation they should provide." *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999); *see also Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) (noting the "ADA does not require clairvoyance").  It is undisputed that Smith did not make any such request of the ADOC.[15]  Absent a request, Smith can only succeed if his disability, limitations, and need for an accommodation were "open, obvious, and apparent." *Arenas*, 2020 WL 1849362, at *12; *see also Nattiel v. Fla. Dep't of Corr.*, 2017 WL 5774143, at *1 (N.D. Fla. Nov. 28, 2017) (explaining a plaintiff does not have to request an accommodation if "the defendant otherwise had knowledge of an individual's disability and needs but took no action").

Smith argues that the Defendants could have accommodated his intellectual disabilities through "use of simple language, a comprehension check, additional time, . . . assistive technology," (doc. 36, para. 36), or a "secure, lengthy legal phone call" with his attorney, (doc. 139 at 193).  However, since he never requested any accommodation, his need for his suggested accommodations must have been obvious.

---

[15]  Smith, in his brief, does say that the Defendants violated the ADA by "denying his request for an accommodation." (Doc. 74 at 5).  This appears to be a mistake, as later Smith argues not that he made such a request, but rather that the need for one was obvious and a request for one futile. (*Id.* at 21–26).  As the Defendants rightfully note, there "is nothing in the record to suggest that [Smith] ever made a request for" an accommodation during the relevant statutory period. (Doc. 88-16 at 31).

Smith does not adequately demonstrate that it was.  Contrary to any claim that his mental disability and his need for an accommodation were "obvious," the record abounds with evidence that Smith spent his time reading, writing, or in the prison library, and with examples of disclosures and forms Smith knowingly signed.

Smith builds his argument on two key assertions. The first is that the ADOC was aware that his IQ was somewhere in the range of 65–75, and so knew him to be in the "borderline range between mild [intellectual disability] and low average intelligence." (Doc. 74 at 22) (quoting Doc. 48-2 at 32).[16]  While this may be true, Smith does not explain how an inability to read or understand this form necessarily follows from having an IQ in that range.  Other testing instead demonstrated that he could "read[] at an 8.6 grade level, spell[] at an 11.5 grade point level, and do[] math computations at a 6.3 grade level." (Doc. 44-4 at 1).[17]  While Smith argues that the form required "nearly a four year college degree to fully understand," (doc. 74 at 26 n. 89), it does not appear *obvious* that he could not do so without evidence that the Defendants were aware of the form's difficulty.

Smith's second key assertion is that the ADOC was on notice that he was disabled from the day he arrived. (Doc. 74 at 21–22).  The ADOC noted on Smith's intake report that "[p]ersonally, I feel he didn't understand why the interview was being held. Although I did explain." (Doc. 44-1).  However, Smith fails to explain how this note on his twenty-

---

[16]  The Court here uses the term "intellectual disability" because "as the Supreme Court stated in *Hall v. Florida*, both law and medicine have moved away from the terms 'mentally retarded' and 'mental retardation.'" *Kilgore v. Sec'y, Fla. Dep't of Corr.*, 805 F.3d 1301, 1303 n.1 (11th Cir. 2015) (citing *Hall v. Florida*, 572 U.S. 701, 704–05 (2014)).

[17]  These results were presented by the State in Smith's prior litigation. *See Smith*, 112 So. 3d at 1117–18.

nine year old intake form is sufficient to put the ADOC on notice that he required any accommodation for this Election Form.

The record instead reveals that for years, the ADOC evaluated Smith's mental functioning, memory, speech, and concentration as "normal," and his demeanor and behavior as "rational." (*See*, for example, Docs. 47-3 at 17–20; 47-1 at 22). On forms to identify special needs, the ADOC never marked Smith as "Developmentally Disabled" or as having "Special Mental Health Needs." (*See* Docs. 47-25 at 2–3, 7, 11, 14, 17; 47-30 at 18, 23). Spaces to indicate required special accommodations on multiple forms were repeatedly left blank. (*See* Doc. 47-30 at 18, 23). Smith himself appears to have answered in the negative when asked if he had "ever been told [he had] a mental disorder, learning disability, physical or a developmental disability." (Doc. 47-4 at 40).

Additionally, at the Court's August 27, 2021 evidentiary hearing on this motion, testimony indicated that ADOC employees perceived no deficiency in Smith's ability to understand written material. Warden Stewart, Emberton, and Defendant Raybon all testified that they had no indication that Smith struggled to read things, and that he had never requested help in understanding a document. (*See* Doc. 139 at 26–27, 56–57, 144–45, 147). Emberton went further, explaining that Smith "always seemed very intelligent to [him]," and could "understand, [and] comprehend a lot." (*Id.* at 64). Emberton also noted that he had seen "[m]agazines, mail," and the like in Smith's cell, which indicated to him that Smith could read and understand written materials. (*Id.* at 57).

The record also makes clear Smith's history of understanding and completing forms and other paperwork. During his time at Holman, Smith has filled out dozens of forms,

many containing legal jargon[18] and complicated medical terminology.[19]   Many more indicated that he read and understood what it was he signed. (*See* Doc. 47-37 at 11 ("I have read and understand all the information above"), 15 ("My signature below signifies that I have read and understand all of the above"); Doc. 47-29 at 14 ("I have read this form and certify that I understand its contents"), 37 ("I have read the information sheet"), 39 ("I have read the above information")).   Nothing in the record indicates that he ever required help reading or understanding the forms, and so nothing indicates that it was obvious to the Defendants that Smith would require an accommodation to read the Election Form.

The record also clearly indicates that Smith can write, making it far from obvious that he needed an accommodation to elect nitrogen hypoxia in writing.   Smith has included his own annotations on forms. (Docs. 47-25 at 52 (writing on a release of responsibility form that "all [he] wanted was to see the dentist"); 47-1 at 68 (writing on an inmate property sheet that he wished someone would "get the TV [he] donated to Van Felt," as it was "the last day")).   He appears to have drafted at least three handwritten letters to the warden, complete with excellent spelling and penmanship. (Doc. 47-2 at 10–12).   Additionally, as noted above, he was found to spell at an "11.5 grade point level." (Doc. 44-4 at 1).   Without

---

[18]   *See, e.g.*, Doc. 47-2 at 99 ("I further understand my failure to provide these documents or falsification on any part of the documentation is grounds for denial of marriage and sanctions in accordance with state laws and AR 403, *Procedures for Violations and Infractions*"), 14 ("the undersigned does hereby release and does save harmless . . . for libel, slander, invasion of the right of privacy").

[19]   *See, e.g.*, Doc. 47-37 at 14 ("I am aware that dental procedures and oral surgery carry some risks including . . . rot tips placed into the sinuses, oropharynx, mandibular canal or other fascial spaces"). Smith also appears to correctly spell "benzoyl peroxide" on at least one occasion. (Doc. 47-30 at 47).   The scan of that document is relatively poor—Plaintiff *might* have written "perozide," but either word appears comparably difficult to "nitrogen" or "hypoxia."   On another form he wrote "benzoil peroxzide." (Doc. 47-25 at 35).

evidence that he was aided in drafting these forms or letters, Smith fails to show it was obvious to the Defendants that he could not elect nitrogen hypoxia in writing as required by ALA. CODE § 15-18-82.1.

Smith also argues that, in essence, none of this matters: the ADOC simply does not provide accommodations for mental disabilities. (Doc. 74 at 24–26). According to Smith, since the ADOC does not accommodate mental disabilities, it did not and would not know to look for them—as such, evidence that a need was "obvious" is impossible to find.[20] Smith asserts that there "would be no record of a prior accommodation made for [his] cognitive deficiencies because the ADOC provides none." (*Id.* at 24). Smith notes that the Defendants (or their agents) testified that "if they were made aware of [his] learning disability, he would have been instructed to find a fellow inmate to assist him with understanding or comprehending written information." (*Id.* at 25) (footnote omitted). That might very well be true. But in making this argument, however, Smith misconstrues what he needs to show. Regardless of whether the ADOC would, in fact, accommodate his disability does not mean Smith satisfies his burden of demonstrating that he obviously needed an accommodation for his disability. Put a different way, even if the ADOC *had* an extensive program of mental accommodations, this record does not make obvious that Smith needed an accommodation with respect to the Election Form.

---

[20] This contradicts the argument Smith makes in his reply brief that since the ADOC *did* accommodate him by reading him his death warrant, it knew he required similar accommodations to read the nitrogen hypoxia form. (Doc. 99 at 6–8). Smith does not explain how the ADOC could both offer accommodations and simultaneously not do so. That said, the record contains no evidence to show that Smith's death warrant was read to him as an accommodation of any intellectual inability to understand it.

Smith also gestures to, but does not explicitly make, the argument that he did not need to request an accommodation because it would have been futile to do so. (*See id.* at 24–26; Doc. 139 at 196).  It is not clear that the futile gesture doctrine applies to claims under Title II of the ADA in the same way it does to claims under other Titles.  Smith has not directed the Court to a case in which a court finds that a plaintiff satisfies his obligations under this third ADA factor in a Title II claim if it was futile to make a request to the public entity providing the program or service.  Additionally, the enforcement section of Title II does not contain the same language as the enforcement section of Title III.[21]

Even if a futility argument does apply to this claim, it is not clear that it applies to this *claimant*.  Other sections of the ADA make clear that when the futile gesture doctrine applies, a plaintiff must have "*actual notice*" that the provider of the public accommodation did not intend to comply with the ADA. 42 U.S.C. § 12188 (emphasis added).  This requirement is consistent across the caselaw. *See Resnick v. Magical Cruise Co.*, 148 F. Supp. 2d 1298, 1302 (M.D. Fla. 2001) (holding that plaintiffs could not rely on the futile gesture doctrine since they lacked "'actual notice' at the time suit was filed that [the defendant] did not intend to comply with the statute").  Such notice can be acquired by "having 'encountered discrimination or having learned of the alleged violations through expert findings or personal observation.'" *Schwarz v. Vill. Ctr. Cmty. Dev. Dist.*, 2013 WL 945402 (M.D. Fla. Mar. 12, 2013) (quoting *Resnick*, 148 F. Supp. 2d at 1302).

---

[21]  Section 12188 says that "[n]othing in this section shall require a person with a disability to *engage in a futile gesture* if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188 (emphasis added).  The comparable section for Title II regarding public services and benefits lacks such language. *Id.* § 12133.

Smith did neither. Since no inmate appears to have requested an accommodation for a mental disability, they have not encountered explicit discrimination on that basis. (*See* Doc. 74 at 25–26). The record also lacks indication that Mr. Smith saw any alleged violations or was informed about them by expert findings at the time the suit began. Indeed, his brief makes clear that he learned about the lack of mental disability accommodations at Holman only during discovery for this litigation, information he includes in his brief under the heading, "*b. New facts*." (*Id.* at 24). Facts newly learned in discovery are not known at the onset of litigation, and so Smith lacked actual knowledge of the ADOC's alleged intent to not comply with the ADA with respect to mental disabilities. Smith, then, likely cannot show that even if the futile gesture doctrine applies to claims under Title II of the ADA, he qualifies for its application here.

All told, Smith is unlikely to successfully demonstrate that his disability and need for an accommodation were open and obvious, or, in the alternative, that he did not need to request an accommodation because doing so was futile. He thus fails to demonstrate a substantial likelihood of success on the merits of his ADA claim.

"Controlling precedent is clear that injunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) (per curiam). However, the Court finds that Smith is not entitled to a preliminary injunction "for still another reason: the equities are not in his favor." *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1296 (11th Cir. 2016).

### b.   *Equitable Factors*

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).  In determining whether to grant this extraordinary remedy, the Court must "assess[] the harm to the opposing party and weigh[] the public interest." *Nken*, 556 U.S. at 435.  These separate factors "merge when the [State] is the opposing party." *Id.*  "[E]quity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

Smith argues that any delay in his execution will not harm the State.  The State has taken years to implement a nitrogen hypoxia protocol, so adding Smith to the pool of inmates already waiting to be executed by nitrogen hypoxia is not an additional harm. (Doc. 74 at 27–28).  By July 2022, either his ADA claim will be resolved at trial, or he will be executed by nitrogen hypoxia. (*Id.* at 28).  Smith additionally argues that the public interest would be harmed if the State were allowed to moot his lawsuit by executing him.  Smith contends that because the parties proposed, and the Court ordered, a trial schedule that runs through June 13, 2022, the Court should allow the litigation to continue through that date.  He suggests it would be unfair for the State to execute him before discovery is completed, before dispositive motions are filed, or before a trial on the merits, and he implores the Court to "not countenance Defendants' attempt to usurp [its] review and jurisdiction." (*Id.* at 6).  He additionally argues that the "public has an interest in persons aggrieved by ADA violations receiving judicial review." (*Id.* at 29).  By contrast, the Defendants argue that a preliminary injunction will harm the public interest because "[b]oth the State and the

victims of crime have an important interest in the timely enforcement of a sentence." (Doc. 88-16 at 38 (quoting *Hill*, 547 U.S. at 584)).  The Defendants point out that Smith has been on death row since 1992 and that his execution has already been delayed.

The Court begins by addressing Smith's argument that the State is attempting to unfairly moot his lawsuit by executing him while the case is pending.  On February 25, 2021, the Court ordered the parties to meet and confer and file a Rule 26(f) report of parties' planning meeting. (Doc. 59).  The Order explained that the undersigned's trial terms "as well as all other dates" used in the Court's Uniform Scheduling Order ("USO") are found on the Court's website. (*Id.* at 2).  On March 5, 2021, before the State moved to set Smith's execution date, the parties submitted their Rule 26(f) report, in which they agreed to a trial date on or after June 13, 2022. (Doc. 61 at 4).  However, the parties' proposed deadlines for completing discovery and filing dispositive motions did not match the Court's USO deadlines tied to their proposed trial date, and they did not explain why they needed different deadlines.  Based on their proposed trial date, the Court entered a USO setting forth deadlines for discovery, filing dispositive motions, and other matters. (Doc. 62).  The USO set a November 15, 2021 discovery deadline and a December 15, 2021 dispositive motions deadline. (*Id.* at 2).  It also provided a 14-day window in which a party could object to the deadlines. (*Id.* at 5).  Neither party filed any objections.  The USO also outlined procedures for requesting extensions of deadlines. (*Id.* at 4).  Additionally, Federal Rule of Civil Procedure 16(b) allows a scheduling order to be modified "for good cause and with the judge's consent."

On July 6, 2021, the State of Alabama moved to set Smith's execution date. (Doc. 70-1). His execution is scheduled for October 21, 2021, well before the June 13, 2022 trial date. True, the Defendants acquiesced to a discovery and litigation timeline that, by moving to execute Smith, they appear to be disregarding. But the parties' Rule 26(f) report contained no stipulation that the State would not move to set Smith's execution while this case is pending. Moreover, Smith points to nothing in the record indicating that the Defendants informally agreed or even represented to him that the State would not move to set his execution until his case is over. He presents no persuasive reason why the State would not be able to take concurrent action to set his execution while this case is pending. Additionally, after the State moved to set his execution, Smith could have moved this Court to modify the scheduling order, expedite discovery, and set an earlier trial date, pursuant to the USO and Rule 16(b). He did not. Instead, Smith requested, jointly with the Defendants, that the Court delay his deposition from September 2, 2021, to October 11, 2021. (Doc. 121).

On balance, the equities favor the Defendants. Smith was sentenced to death in 1992, nearly thirty years ago. An injunction that further delays Smith's execution "impose[s] a cost on the State and the family and friends of the murder victim." *Bowles v. DeSantis*, 934 F.3d 1230, 1248 (11th Cir. 2019). While Smith is right that the "public has an interest in persons aggrieved by ADA violations receiving judicial review," (doc. 74 at 29), he has not demonstrated that such an interest outweighs the public interest "in the timely enforcement of a sentence," *see Hill*, 547 U.S. at 584. And as noted above, Smith could have acted to expedite and complete this litigation before his execution, but he did

not.  His inaction with respect to the litigation timeline further undermines his entitlement to the "extraordinary remedy" of a preliminary injunction in order to fully litigate his case. *See Winter*, 555 U.S. at 24; *see also Jones*, 811 F.3d at 1291.

Because Smith has not shown a substantial likelihood of success on the merits of his ADA claim, and because the equities weigh against him, Smith has not met his burden of establishing his right to a preliminary injunction.

Accordingly, it is

ORDERED that the Plaintiff's motion for preliminary injunction is DENIED.

DONE this 17th day of October, 2021.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE